**CASE NO. 2021-1864**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

NIAZI LICENSING CORPORATION,

*Plaintiff-Appellant*,

v.

ST. JUDE MEDICAL S.C., INC.,

*Defendant- Appellee*

---

Appeal from the United States District Court for the District of Minnesota in Case

No. 17-CV-5096,

Judge Wilhelmina M. Wright

---

**CORRECTED BRIEF OF PLAINTIFF-APPELLANT**

---

Michael T. Griggs
Adam L. Brookman
Timothy E. Newholm
Marriam Lin
Boyle Fredrickson, S.C.
840 N. Plankinton Avenue
Milwaukee, WI 53203
(414) 225-9755

Attorneys for Plaintiff-Appellant
Niazi Licensing Corporation

June 21, 2021

# CLAIMS AT ISSUE

1.    A double catheter, comprising:

an outer, resilient catheter having shape memory and a hook shaped distal end configured for cannulation of the coronary sinus with at least one curved bend;

an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, the inner catheter having an internal lumen configured for the introduction of contrast media and a pacing lead into the coronary sinus; and

a mechanism operable from the proximal end of the outer catheter for changing the curvature of the distal end of the outer catheter.


11.    A method for placing an electrical lead in a lateral branch of a coronary sinus vein using a double catheter including an outer catheter and an inner catheter slidably disposed inside the outer catheter, comprising:

inserting the catheter into the coronary sinus;

advancing a guide wire through the catheter into a coronary sinus lateral branch vein;

advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;

inserting the lead through the outer and inner catheters to a target location in the branch vein; and

withdrawing the catheter leaving the lead in the branch vein.


13.     An outer catheter configured for use with an inner, pliable catheter which can be slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter, the outer catheter comprising a resilient tube having shape memory and sufficient stiffness to permit advancement of the outer catheter into a distal coronary sinus, and having a hook-shaped distal end wherein a first bend adjoining a straight, proximal portion of the outer catheter is in the range of 130° to 180°, a second, intermediate bend is in the range of 75° to 100° in a direction opposite the first bend, and a third bend nearest the distal end of the outer catheter in the same direction as the second bend is in the range of to 130° to 175°.

18.     A double catheter, comprising:

an outer catheter comprising a resilient tube having shape memory and sufficient stiffness to permit advancement of the outer catheter into a distal coronary sinus, and having a hook-shaped distal end wherein a first bend adjoining a straight, proximal portion of the outer catheter is in the range of 130° to 180°, a second, intermediate bend is in the range of 75° to 100° in a direction opposite the first bend, and a third bend nearest the distal end of the outer catheter in the same direction as the second bend is in the range of to 130° to 175°, and

an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, wherein the inner catheter has an internal lumen suitable for the introduction of a fluid therethrough and a hemostatic valve at a proximal end thereof that prevents leakage of blood when a pacing lead is introduced through the inner catheter into the coronary system.

24.     A method for placing a electrical lead in a lateral branch of a coronary sinus vein using a double catheter including an outer catheter comprising a resilient tube having shape memory and sufficient stiffness to permit advancement of the outer catheter into a distal coronary sinus, and having a hook-shaped distal end, and an

inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, the method comprising:

inserting the catheter into the coronary sinus;

advancing a guide wire through the catheter into a coronary sinus lateral branch vein;

advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;

inserting the lead through the outer and inner catheters to a target location in the branch vein; and

withdrawing the catheter leaving the lead in the branch vein.

# CERTIFICATE OF INTEREST FOR APPELLANT

The undersigned counsel for the Plaintiff-Appellant Niazi Licensing

Corporation certifies the following:

1. The full name of every party represented by me is:

   Niazi Licensing Corporation

2. The appellant named in the caption is the real party in interest.

3. No publicly held corporation owns 10% or more of Niazi Licensing Corporation.

4. The names of all law firms and the partners or associates that appeared for the plaintiff-appellant in the district court proceeding or are expected to appear for them in this court are:

   Michael T. Griggs, Adam L. Brookman, Timothy E. Newholm, and Marriam Lin of Boyle Fredrickson, S.C.

5. None.

6. None.


June 21, 2021                    /s/Michael T. Griggs
                                 Michael T. Griggs
                                 *Attorney for Plaintiff-Appellant*

# **Table of Contents**

Table of Contents ..................................................................................i

Table of Authorities .......................................................................... iii

Statement of Related Cases..............................................................vi

Jurisdictional Statement ....................................................................1

Statement of the Issues on Appeal ....................................................1

Statement of the Case.........................................................................2

I.    The catheter system and implantation method of the '268 patent ...............2

II.   St. Jude's Accused Products and Method ....................................6

III.  The procedural events leading to this appeal .............................7

    A.   The indefiniteness ruling ...........................................................8

    B.   The exclusion of expert evidence ............................................8

    C.   The summary judgment decision ..............................................8

    D.   The sanctions order....................................................................9

    E.   The *Daubert* ruling ...................................................................9

Summary of the Argument.................................................................9

Argument..........................................................................................15

I.    The district court erred when it found the terms "pliable" and "resilient" indefinite pursuant to 35 U.S.C. § 112 ......................................15

    A.   The district court erred by characterizing the term "pliable" as a term of degree......................................................................16

B.    The district court erred by characterizing the term "resilient" as a term of degree ......................................................................................................22

II.    The district court erred when it granted summary judgment of non-infringement with respect to claim 11 .......................................................27

A.    Step 1 (inserting the catheter into the coronary sinus) ............................29

B.    Step 2 (advancing a guide wire through the catheter into a coronary sinus lateral branch vein) and Step 3 (advancing the inner catheter out a front end opening of the outer catheter along the guide wire into the branch vein) ......................................................................................................33

C.    Step 5 (withdrawing the catheter leaving the lead in the branch vein) ....38

III.    The district court abused its discretion when it precluded NLC's experts from presenting and relying upon certain evidence ...................................39

IV.    The district court abused its discretion when it entered sanctions against NLC based upon Dr. Burke's summary judgment declaration ..................45

V.    The district court abused its discretion when it excluded Mr. Carlson from opining as to the appropriate royalty base .................................................51

Conclusion .........................................................................................................57

Addendum ……………………………………………………………...……59

Certificate of Compliance with Rule 32(a)

ii

# Table of Authorities

**Cases**

*Advanced Aerospace Techs., Inc. v. United States*,
124 Fed. Cl. 282 (2015)...................................................................... 17, 26

*Alexsam, Inc. v. IDT Corp.*,
715 F.3d 1336 (Fed. Cir. 2013) ...........................................................41

*Cablz, Inc. v. Chums, Inc.*,
708 F. App'x 1006 (Fed. Cir. 2017) .....................................................25

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015) ...........................................................55

*Citizens Bank of Batesville, Arkansas v. Ford Motor Co.*,
16 F.3d 965 (8th Cir. 1994) .................................................................42

*Eidos Display, LLC v. AU Optronics Corp.*,
779 F.3d 1360 (Fed. Cir. 2015) ...........................................................31

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp.*, LLC,
879 F.3d 1332 (Fed. Cir. 2018) ...........................................................55

*Fonar Corp. v. Deccaid Servs., Inc.*,
983 F.2d 427 (2d Cir. 1993) ........................................................ 49, 51

*Grunenthal GMBH v. Alkem Labs. Ltd.*,
919 F.3d 1333 (Fed. Cir. 2019)...........................................................37

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ...........................................................30

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995) .............................................................20

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ...........................................................32

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ...........................................................15

iii

*IQASR LLC v. Wendt Corp.*,
  825 F. App'x 900 (Fed. Cir. 2020) ........................................................15

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
  2017 WL 3671036 (S.D.N.Y. July 18, 2017) ......................................49

*Lauzon v. Senco Prod., Inc.*,
  270 F.3d 681 (8th Cir. 2001) ................................................................52

*Liberty Ammunition, Inc. v. United States*,
  835 F.3d 1388 (Fed. Cir. 2016) ...........................................................17

*Micro Chem., Inc. v. Lextron, Inc.*,
  317 F.3d 1387 (Fed. Cir. 2003) ...........................................................51

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ................................................................ 16, 18, 25

*Pascale v. G. D. Searle & Co.*,
  90 F.R.D. 55 (D.R.I. 1981) ..................................................................49

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...........................................................31

*Pyramid Real Estate Servs., LLC v. United States*,
  95 Fed. Cl. 613 (2010) .........................................................................49

*Rawlplug Co. v. Illinois Tool Works, Inc.*,
  11 F.3d 1036 (Fed. Cir. 1993) .............................................................25

*See United States v. Telectronics, Inc.*,
  857 F.2d 778 (Fed. Cir. 1988) .............................................................19

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) ................................................... 15, 20

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015) ............................................................................28

*Torgerson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) .............................................................27

*Transclean Corp. v. Bridgewood Servs., Inc.*,
    290 F.3d 1364 (Fed. Cir. 2002) ............................................................41

*Transtex Inc. v. Laydon Composites Ltd.*,
    2021 WL 1115435 (Fed. Cir. Mar. 24, 2021) .....................................25

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .............................................................31

## Statutes

35 U.S.C. § 112 ......................................................................................18

## Rules

Rule 26, Fed. R. Civ. P. ..................................................................... 39, 48

# **Statement of Related Cases**

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant Niazi Licensing Corporation states as follows:

(a)   There have been no previous appeals in this proceeding.

(b)   There are no cases currently pending that may be directly affected by the outcome of this appeal.

## Jurisdictional Statement

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338.  This

Court has jurisdiction under 28 U.S.C. § 1292(c).  The district court entered final

judgment on March 24, 2021.

## Statement of the Issues on Appeal

1.    Whether the district court erred in finding that the term "pliable" is

indefinite, rendering Claims 1-3 and 13-27 of U.S. Patent 6,638,268 ("the

'268 patent") invalid under 35 U.S.C. § 112.

2.    Whether the district court erred in finding that the term "resilient" is

indefinite, rendering claims 1-3 and 13-27 of the '268 patent invalid under

35 U.S.C. § 112.

3.    Whether the district court erred in granting summary judgment that claim 11

is not infringed.

4.    Whether the district court abused its discretion in precluding Plaintiff-

Appellant's damages expert from relying upon various third-party licenses in

support of his opinions on damages.

5.    Whether the district court abused its discretion in precluding Plaintiff-

Appellant's technical expert from presenting testimony on the issue of direct

infringement.

6.      Whether the district court abused its discretion when it sanctioned Plaintiff-Appellant for violating the district court's exclusion order and awarded fees in the amount of $35,985.75 to Defendant-Appellee.

7.      Whether the district court abused its discretion in precluding Plaintiff-Appellant's damages expert from opining as to which products should be included in the royalty base.

## <u>Statement of the Case</u>

## I.      **The catheter system and implantation method of the '268 patent**

In treating congestive heart failure, among other conditions, it has been shown that providing a pacemaker with various lead wires implanted in the heart can have tremendous therapeutic benefit.  The pacemaker delivers electric current to the heart via the various leads, which helps to regulate the heartbeat.  However, placing the leads within the heart poses significant challenges, as the electrophysiologist must guide the lead through tortuous arteries and veins.  The procedure is further complicated given the fact that each patient's anatomical structures are different, and that the patient's particular anatomy is not known until the procedure has begun.

Around the time Dr. Imran Niazi invented the subject matter disclosed and claimed in the '268 patent, a select group of electrophysiologists were conducting clinical trials relating to biventricular pacing, a new procedure that involved pacing

2

both sides of the heart as opposed to just one, which had been the convention at the time. Appx361. Biventricular pacing required access to the left ventricle, a procedure that was not known or performed at the time. *Id.*

The move toward biventricular pacing posed new challenges to electrophysiologists. Implanting a lead in the left ventricle requires access or "cannulation" of the coronary sinus, i.e., "accessing" the coronary sinus, a procedure that was not routinely performed. Appx289, 1:19-27. The coronary sinus is a vein at the back of the heart that is typically three to four centimeters in length and one centimeter in diameter, *id.*, 1:11-12, and the size and location of the coronary sinus presents challenges to an electrophysiologist who is attempting to guide a lead through the coronary sinus and into the left ventricle for implantation, particularly for patients with congestive heart failure, who are the majority of patients who receive biventricular pacing systems.

Once the coronary sinus has been cannulated, the electrophysiologist may face additional difficulties when attempting to place the lead in a vein that branches off the coronary sinus, commonly known as "a lateral branch vein." For example, the lateral branch vein may branch off at an acute angle, requiring the lead to advance through a sharp turn.

Dr. Niazi, the inventor of the technology and methods disclosed in the '268 patent, was and is a leader in the field of electrophysiology. At the time Dr. Niazi

3

developed his invention, electrophysiologists were using a single catheter system when attempting to cannulate the coronary sinus and implant a lead into a branch vein.  Appx362.  Through careful study and research, Dr. Niazi recognized the difficulties presented by the anatomical abnormalities in the coronary sinuses of patients with congestive heart failure, as well as the difficulties posed by attempting to access a lateral branch vein through the coronary sinus.  Appx2124. Such difficulties were not generally known because biventricular pacing – and the need to access the coronary sinus – was not widespread or conventional at the time. Dr. Niazi was the first to undertake such a study.

Dr. Niazi designed the catheter system and implantation methods disclosed and claimed in the '268 patent to address the challenges presented by accessing the coronary sinus of a patient with congestive heart failure.  One embodiment of the invention is shown below, which has been annotated to highlight the basic components of the system.  Generally speaking, the system includes a curved outer catheter (blue) and an inner catheter (green) that work together in a telescoping fashion.  Advancement of the inner catheter through the outer catheter causes the outer catheter to change shape to assist the electrophysiologist in cannulating the coronary sinus.  In other words, the electrophysiologist can use the inner catheter to adjust the shape of the outer catheter as needed to accommodate anatomical abnormalities and variances that are specific to each patient.



Once the coronary sinus has been cannulated, the inner catheter (green) is advanced into a lateral branch vein to support and guide a pacing lead (yellow) for implantation in the lateral branch vein.  The lead and catheters are typically advanced along a guide wire because the typical lead is an over-the-wire lead, meaning that the lead is tubular in shape to accommodate a guide wire that passes through the body of the lead. After the lead has been successfully implanted, the catheters are withdrawn one-at-a-time, leaving the lead in place.

Dr. Niazi's design improved over the existing system and method, which involved using a single catheter to cannulate the coronary sinus and implant the lead in a lateral branch vein.  Appx362.  For example, Dr. Niazi's telescoping system allows the electrophysiologist to change the shape of the outer catheter

during the procedure to facilitate cannulation of the coronary sinus. Further, the flexible inner catheter is able to access a lateral branch vein to help guide the lead to a desired location.

## II.    St. Jude's Accused Products and Method

St. Jude sells outer catheters (CPS Direct catheters), inner catheters (CPS Aim catheters), and over-the-wire leads (which come with a guide wire) that are implanted through the inner catheters (Quartet, QuickSite, and Quick Flex leads). Appx1246. An example of one family of outer catheters is shown below. *Id*. In addition to the CPS Direct SL, St. Jude sells the CPS Direct Universal line, and the CPS Direct MediGuide line. *Id*.



An example of one family of inner catheters is shown below.  Appx1427.  In addition to the CPS Aim SL, St. Jude sells the CPS Aim Universal line, and the CPS Aim MediGuide line.  *Id*.



St. Jude provides instructions for use for each family of Aim inner catheters that it sells.  Appx1083-1088.  Within the same families, the CPS Direct outer catheters and CPS Aim inner catheters are designed to be used with one another in a telescoping fashion to help electrophysiologists cannulate the coronary sinus and to implant pacing leads in branch veins of the coronary sinus.  Appx1337.  The catheters come in different shapes to offer electrophysiologists several options when presented with differing anatomical challenges from patient to patient.  *Id*.

## III.    **The procedural events leading to this appeal**

The scheduling order in the case provided for a claim construction hearing and claim construction order prior to summary judgment briefing.  The parties exchanged terms and proposed constructions in advance of the claim construction briefing, then filed parallel claim construction briefs and responses.

## A.    The indefiniteness ruling

As part of its claim construction briefing, St. Jude moved for summary judgment on its indefiniteness defense as to the terms "pliable" and "resilient." The district court granted this motion, rendering all but one of the asserted claims invalid.  Claim 11, a method claim, was the only claim remaining in the case after the district court's ruling on indefiniteness.

## B.    The exclusion of expert evidence

After the close of fact discovery, NLC submitted two expert reports: a technical report from Dr. Martin Burke and a damages report from Brad Carlson.[1] Mr. Carlson's report identified various third-party licenses that Mr. Carlson had identified by searching two private databases.  Dr. Burke's report included a short section addressing direct infringement, including statements that Dr. Burke himself is a direct infringer because he used St. Jude's products in an infringing manner. St. Jude filed a motion to exclude the third-party licenses from Mr. Carlson's report and to exclude testimony from Dr. Burke on the issue of direct infringement. The district court granted this motion.

## C.    The summary judgment decision

The case proceeded to summary judgment, focusing on the only remaining claim, claim 11.  NLC moved for summary judgment on the issues of infringement

---

[1] These reports issued prior to the district court's ruling on claim construction and, therefore, addressed all claims that had been asserted in the case.

and validity.  St. Jude moved for summary judgment on the issue of infringement.

The district court granted St. Jude's motion for summary judgment, finding that

claim 11 was not infringed.

### D.    The sanctions order

In support of its summary judgment motion, NLC submitted a declaration

from Dr. Burke.  St. Jude moved to strike the declaration and for sanctions, arguing

that the Burke declaration violated the district court's Exclusion Order.  The

district court granted St. Jude's motion, excluded certain statements from the

Burke declaration, and awarded $35,985.75 in fees to St. Jude.

### E.    The *Daubert* ruling

Finally, around the same time as the summary judgment briefing, both

parties submitted *Daubert* motions.  St. Jude's motion sought to exclude both Dr.

Burke and Mr. Carlson from presenting any testimony at trial.  The district court

granted St. Jude's motion in part, holding that Mr. Carlson could not present an

opinion as to which of St. Jude's products should be included in the royalty base.

## <u>Summary of the Argument</u>

The district court erroneously found the terms "pliable" and "resilient"

indefinite under 35 U.S.C. § 112, a determination that this Court reviews *de novo*.

The district court improperly imposed an overly strict standard for assessing

indefiniteness and also wrongly characterized these terms as terms of degree.  The

following statement regarding the term "pliable" illuminates the district court's misapprehension of the claims: "These descriptors do not establish objective boundaries as to *the range of pliability being claimed*." Appx39 [emphasis added]. But the claims to not claim a "range" of pliability or resilience. They simply claim a "pliable" inner catheter and a "resilient" outer catheter. The district court's indefiniteness determination should be reversed, and the terms "pliable" and "resilient" should be given their plain and ordinary meaning to one of ordinary skill in the art when read in light of the underlying disclosure as required by law.

The district court also erred in granting summary judgment that St. Jude did not induce infringement of the method of claim 11. The district court's decision turned primarily on issues of claim construction. Two of the steps of claim 11 are related, requiring "inserting" the double catheter into the coronary sinus and "withdrawing" the double catheter after the procedure is complete. The district court narrowly interpreted these two steps as requiring "simultaneous" insertion and withdrawal of the outer catheter and inner catheter. However, this interpretation runs counter to the teaching of the '268 patent itself, which discloses sequential insertion of the catheters, i.e., first the outer catheter than the inner catheter. The prior art also shows that sequential insertion and withdrawal was common practice.

10

Continuing with its overly narrow interpretation of the claims, the district court interpreted the interplay between step 2 of claim 11 (advancing a guide wire through the catheter into a lateral branch vein) and step 3 of claim 11 (advancing the inner catheter along the guide wire into the branch vein) to preclude a situation where the inner catheter is positioned within the opening of the branch vein, a guide wire then is passed into the branch vein, and the inner catheter then is advanced along the guide wire further into the branch vein. Contrary to the district court's interpretation, the specification teaches "advancing" a catheter in exactly that order.

Moreover, the district court erroneously granted summary judgment where the record presented questions of material fact that should have been put to the jury. For example, while St. Jude's instructions explicitly state that a guide wire can be used "if desired," the district court held that such a statement did not constitute recommendation, encouragement, or promotion of the use of a guide wire. Interpreting St. Jude's instructions is a question of fact that should be resolved by the jury.

The district court also abused its discretion when it precluded NLC's damages expert, Brad Carlson, from relying on third-party license agreements in support of his damages opinion, holding that these licenses should have been disclosed during fact discovery (which had closed about a month before the expert

11

reports were due).  Mr. Carlson found these third-party licenses in two private databases that he accessed when he prepared his report after the close of fact discovery.  NLC was not aware of these licenses, nor did it have possession of them during the fact discovery period.  Despite this, the district court precluded Mr. Carlson from relying on them.  Experts can rely upon a wide range of information when forming their opinions, and they are required to disclose that information in their reports.  The district court turned the notion of expert disclosure and discovery on its head by essentially ruling that anything an expert relies upon must be disclosed during fact discovery.  On the contrary, an expert may rely upon information from any appropriate source so long as that source is disclosed in a report in accordance with the Federal Rules of Civil Procedure.

This district court similarly abused its discretion when it precluded NLC's technical expert, Dr. Martin Burke, from presenting testimony on the issue of direct infringement.  Dr. Burke included a small section in his report stating that he had used St. Jude's products in an infringing manner consistent with St. Jude's instructions.  This was not only evidence of direct infringement, but also part of Dr. Burke's credentials and a qualifying basis for his expert testimony.  The district court abused its discretion when it precluded Dr. Burke from presenting this testimony, holding that such testimony should have been disclosed during fact discovery.  However, NLC was not aware of these facts until the expert discovery

12

phase of the case, NLC timely disclosed them in the expert report about a month

after the close of fact discovery, and there was no prejudice to St. Jude since there

was no trial date set and St. Jude had every opportunity to examine the statements

during the expert discovery phase of the case.

The district court further abused its discretion when it sanctioned NLC and

awarded $35,985.75 in attorneys' fees to St. Jude based upon Dr. Burke's

summary judgment declaration, which did not contain any testimony on the issue

of direct infringement.  Instead, St. Jude pointed to other statements in Dr. Burke's

declaration (largely background information relating to Dr. Burke's experience and

the technology at issue) that were included in Dr. Burke's expert report but were

not challenged by St. Jude when it moved to preclude testimony relating to direct

infringement.  The district court, however, characterized its prior ruling to

encompass some of the previously unchallenged statements and sanctioned NLC.

Wholly apart from the issues associated with St. Jude's challenge of

statements it had previously ignored, and the district court's overly expansive

reading of its prior order, there was no bad faith on the part of NLC to justify an

award of attorneys' fees as a sanction.  *Stevenson v. Union Pac. R. Co.*, 354 F.3d

739, 751 (8th Cir. 2004).  ("A bad faith finding is specifically required in order to

assess attorneys' fees.").  Indeed, the district court explicitly found there was no

bad faith underlying the submission of Dr. Burke's declaration.  Appx219-220.

("This does not mean that there was bad faith. I believe Mr. Griggs that he did not intent to practice a fraud upon the Court."). The district court abused its discretion in awarding $35,985.75 in attorneys' fees to St. Jude.

Finally, the district court abused its discretion when it granted St. Jude's *Daubert* motion in part and precluded Mr. Carlson from presenting an opinion as to which of St. Jude's products should be included in the royalty base for purposes of a calculation on damages. In doing so, the district court misapprehended the disclosure of the '268 patent and statements in Mr. Carlson's report. For example, the district court stated that the scope of the '268 patent "does not include leads," despite the fact that claim 11 is directed to a method for implanting "an electrical lead" and that the specification contains detailed disclosure regarding methods for implanting a lead.

In another example, the district court concluded that Mr. Carlson did not attempt to apportion the value of patented features from non-patented features. However, Mr. Carlson relied upon a statement from Dr. Burke that the method of the claim 11 was the "predominant" method for implanting leads. The district court usurped the role of the fact finder by rejecting this premise and holding that Mr. Carlson did not appropriately apply the principle of apportionment.

## **Argument**

**I.    The district court erred when it found the terms "pliable" and "resilient" indefinite pursuant to 35 U.S.C. § 112**

This Court reviews the district court's indefiniteness determination *de novo*. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).  Any factual findings made by the district court are reviewed for clear error.  *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 901 (Fed. Cir. 2020).  Here, the district court did not make any factual findings that underly its indefiniteness determination.

The purpose of the definiteness requirement is to ensure that the claim delineates the metes and bounds of the invention with reasonable certainty. Absolute precision is not required and is often impossible, given the ambiguity inherent in the English language.  *Sonix Tech. Co. v. Publications Int'l, Ltd.,* 844 F.3d 1370, 1377 (Fed. Cir. 2017).  The U.S. Supreme Court articulated the definiteness standard under § 112 as follows:

> To determine the proper office of the definiteness command,
> therefore, we must reconcile concerns that tug in opposite directions.
> Cognizant of the competing concerns, we read § 112, ¶ 2 to require
> that a patent's claims, viewed in light of the specification and
> prosecution history, inform those skilled in the art about the scope of
> the invention with reasonable certainty. The definiteness requirement,
> so understood, mandates clarity, while recognizing that absolute
> precision is unattainable.

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129, 189 L. Ed. 2d 37 (2014). Thus, the claims, viewed in light of the specification and prosecution history, must inform those skilled in the art as to the scope of the claims with only "reasonable certainty," not absolute precision.

This Court should reverse the district court's indefiniteness determination and construe the terms "pliable" and "resilient" as having their plain and ordinary meaning to one of ordinary skill in the art when read in light of the underlying disclosure of the '268 patent. While this Court applies a *de novo* standard of review, it is nevertheless important for NLC to address the district court's analysis so that this Court may understand where the district court went astray.

## A.    The district court erred by characterizing the term "pliable" as a term of degree

The term "pliable" appears in claims 1, 13, 18, and 24. Claim 1 is exemplary. It claims "an inner, pliable catheter." This term should be construed in accordance with its plain and ordinary meaning – ***easily bent, flexible*** – which is consistent with how it is used in the specification. For example, the specification explains that the inner catheter has flexibility so that it can "negotiate tortuous vessels and side branches." Appx291, 5:20-24. A person having ordinary skill in the art could readily determine what materials are and are not sufficiently bendable for this purpose.

16

The district court, however, did not attempt to construe this term. Rather, the district court erred by characterizing "pliable" as a term of degree. Appx39. Any modifier, be it an adjective or adverb, lacks absolute precision when read in isolation. That is its very purpose. Terms of degree have been recognized as a special class of modifier that inherently introduce some level of subjectivity into the patent claim. This Court has explained that a term of degree "necessarily calls for a comparison against some baseline." *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016). ("We begin our analysis by recognizing that the term 'reduced area of contact' is one of degree, as it necessarily calls for a comparison against some baseline."); *see also Advanced Aerospace Techs., Inc. v. United States*, 124 Fed. Cl. 282, 292 (2015) (considering whether terms of degree such as "near the point of engagement," "reasonably secure," and "substantially arrested" were indefinite.). Unlike the terms at issue in *Liberty Ammunition* and *Aerospace Techs.*, the term "pliable" does not require a comparison against some baseline. It simply is an adjective meaning "***easily bent, flexible***," and the district court should have construed it accordingly.

The district court's misapprehension is further illustrated by the following statement in the claim construction order: "These descriptors do not establish objective boundaries as to ***the range of pliability being claimed***." Appx39 [emphasis added]. However, the claims do not claim a "range of pliability" – they

merely recite a "pliable" inner catheter.  When a claim includes an adjective such as "pliable" – or other commonly used adjectives such as rigid, flexible, soft, hard, porous, solid – the definiteness requirements of *Nautilus* do not require the patent to disclose, let alone claim, a specific quantitative range so that the district court can answer the question of exactly "how pliable?" or "how rigid?" or "how soft?" etc.  One of ordinary skill in the art, armed with common sense, their knowledge of the technology, and the underlying disclosure, need not have reference to a specific quantitative range of values to understand what is and is not pliable, rigid, or soft with reasonable certainty – in full compliance with 35 U.S.C. § 112 as interpreted by *Nautilus*.

Following its erroneous characterization of "pliable" as a term of degree, the district court further erred when it failed to recognize that the specification discloses objective criteria as to the meaning of "pliable" that would enable a person having ordinary skill in the art to understand what is meant by a "pliable" inner catheter.

The '268 patent provides exemplary materials and dimensions for an inner catheter that is pliable.  Appx290, 3:13-23 ("An inner catheter 12, which slides in and out of outer catheter 11, is constructed of a more pliable, soft material such as silicone."); Appx291 5:20-24 ("[The inner catheter's] flexibility allows it to negotiate tortuous vessels and side branches that originate from the coronary sinus

at an acute angle, yet it still possesses the radial strength needed to prevent it from collapsing when obturator 53 is withdrawn."); Appx291, 5:14-28 (providing dimensions and describing other characteristics of one embodiment of the inner catheter).

Thus, the '268 patent provides an exemplary material – silicone – from which a pliable inner catheter may be made, as well as exemplary dimensions. A person having ordinary skill in the art could construct a pliable catheter in accordance with this disclosure to further understand its qualities and characteristics. Moreover, the '268 patent describes various functional characteristics, e.g., that the inner catheter slides within the outer catheter to change the shape of the outer catheter; that the inner catheter can navigate tortuous vessels and lateral branch veins; and that the inner catheter will not collapse down upon itself during the procedure. *See United States v. Telectronics, Inc.,* 857 F.2d 778, 786 (Fed. Cir. 1988) (rejecting an argument regarding the need to determine a current range, holding that "[a]djusting current so as to minimize fibrous tissue formation in other parts of the living being reasonably apprises those skilled in the art of the bounds of the claimed invention and is as precise as the subject matter permits.") A person having ordinary skill in the art would understand that if the inner catheter functions in this manner, it is "pliable" within the context of the '268 patent.

This Court has held that disclosure such as this overcomes an indefiniteness challenge to a term of degree:

> Accordingly, we have held that the clause "not interfering substantially" did not render a claim invalid as indefinite. In that case, we reasoned that the intrinsic evidence provided guidance as to the scope of the claims, including, *inter alia*, examples of noninterfering structures and criteria for their selection. This guidance allowed a skilled artisan to compare a potentially infringing product with the examples in the specification to determine whether interference is substantial.

*Sonix*, 844 F.3d at 1377 [citations and quotations omitted].

Finally, the district court erred by failing to address the level of ordinary skill in the art and their attendant knowledge base, which is significant because "[t]he person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). NLC submitted prior art patents relied upon by St. Jude in its invalidity contentions that describe various catheters as "pliable," which demonstrate that term would be well known and understood by a person having ordinary skill in the art.

Below is an excerpt from U.S. Patent 6,277,107 to Lurie, discussing pliability (Appx353, 7:23-33):

20

The guiding introducer may be made of any biocompatible material suitable for use in humans which has a memory or permits distortion from and substantial return to the desired three dimensional shape, such as polyethylene or polyurethane. In a preferred embodiment, the distal tip of the guiding introducer may be made of a more pliable, more compressible material, than the remaining length of the coronary sinus guiding introducer to prevent damage to the vasculature and the coronary sinus when in use. Also, preferably, the distal tip is made radiopaque.

Another example is U.S. Patent 5,488,960 to Toner (another prior art reference identified by and relied upon by St. Jude), which describes the introducer as having a "pliable tip" (Appx327, Abstract):

A coronary sinus catheter introducer system in which an introducer is installed in the right atrium of the cardiovascular system of a patient for delivery of a coronary sinus catheter into the coronary sinus. A bend near the distal end of the introducer enables placement of the end of the introducer into the coronary sinus opening and within the coronary sinus. A soft pliable tip end provided on the introducer minimizes abrasion of the coronary sinus and its opening by the introducer.

Thus, not only does the '268 patent provide exemplary characteristics of a "pliable" inner catheter, St. Jude's own cited prior art provides additional examples of "pliable" catheters and demonstrates that the term "pliable" is commonly used

21

to describe elements of catheters.[2]  The district court erred in failing to address the level of ordinary skill in the art and the pertinent prior art in rendering its indefiniteness determination.

In summary, the district court's erroneous indefiniteness determination should be overturned.  This Court should construe the term "pliable" in accordance with its plain and ordinary meaning – *flexible, easily bent*.

### B.    The district court erred by characterizing the term "resilient" as a term of degree

The term "resilient" appears in claims 1, 13, 18, and 24.  Claim 1 is exemplary, which claims "… an outer, resilient catheter having shape memory…" The specification provides ample support as to what is meant by a "resilient" outer catheter having shape memory.  In the same manner as it did with respect to "pliable," the district court erred by characterizing "resilient" as a term of degree. Appx40-42.  For example, in support of its indefiniteness determination, the district court stated that "[t]he specification fails to provide objective criteria for measuring resilience."  Appx41.  But the claims do not require a particular range of resilience, as the district court incorrectly suggests – they simply require a "resilient" outer catheter.

---

[2] The term "pliable" appears in the claims of more than 8,750 patents.  Appx370. This is a commonly used term that should be attributed its plain and ordinary meaning in the context of the '268 patent.

22

Just as with "pliable," "resilient" should be given its plain and ordinary

meaning: ***able to return to its original shape when undistorted***.  Thus, in the

context of the claim, a person having ordinary skill in the art would understand that

an "outer, resilient catheter having shape memory" is a catheter that is able to

return to its original shape when undistorted.  Indeed, the claims themselves

describe the resilient outer catheter as having "shape memory."

The district court erred when analyzing the specification, which provides

ample description and explanation to inform a person having ordinary skill in the

art what is meant by a "resilient" outer catheter.  First and foremost, the '268

patent explicitly recites the plain and ordinary meaning of the term "resilient" in

the specification: the outer catheter "has sufficient shape memory to return to its

original shape when undistorted."  Appx290, 4:21-23.  To a person having ordinary

skill in the art, a "resilient" outer catheter having shape memory is one that will

return to its original shape after being deformed.

Moreover, the specification explains that the outer catheter "has sufficient

shape memory to return to its original shape when undistorted," Appx290, 4:21-23,

and that the angle of the outer catheter "can be changed by inserting or

withdrawing the inner guide."  Appx291, 6:6-8.  A person having ordinary skill in

the art would understand that a "resilient" outer catheter in the context of the '268

23

patent is one that may be distorted by the insertion of an inner catheter and, upon withdrawal of the inner catheter, will return to its original shape.

The specification offers additional disclosure regarding the functionality and characteristics of a "resilient" outer catheter.  For example, one embodiment of the outer catheter "is made of braided silastic or similar material to allow torque control and stiffness."  Appx290, 3:10-12.  The specification further explains that this stiffness permits the outer catheter "to be manipulated in the right atrium to allow cannulation of the coronary sinus," *Id*., 3:39-41, and that the stiffness "lends support to the pacing lead as it is introduced into the distal coronary sinus."  *Id*., 3:41-43.

Still further, the specification describes another embodiment of an outer catheter, stating that the preferred dimensions are "2.9 mm in outer diameter" and "2.6 mm inner diameter."  Appx291, 5:3-5.  The outer catheter "is relatively stiff and has a braided design, which lends support for one-for-one torque control."  *Id*., 5:4-6.  "In this respect, it can resemble an angioplasty guiding catheter," *Id*., 5:6-7, an existing catheter that would have been known to a person having ordinary skill in the art.  In another embodiment, the outer catheter is "9 French in diameter" and is "60 cm" long.  *Id*., 6:32-33.  Thus, the specification provides exemplary materials and dimensions, including the thickness and length, of the outer catheter.  *See Sonix Tech.*, 844 F.3d at 1377 (finding that the term "visually negligible"

24

satisfied the definiteness requirements of *Nautilus* where the specification provided examples of noninterfering structures and the criteria for their selection).

Still further, this Court has on numerous occasions addressed claims where the term "resilient" is used consistently with how that term is used in the context of the '268 patent.  For example, the claim at issue in *Transtex Inc. v. Laydon Composites Ltd.*, No. 2020-1576, 2021 WL 1115435 (Fed. Cir. Mar. 24, 2021) involved a "resilient strut" that sustained elastic deformation when subjected to a load and then returned to its original shape after the load was removed.  This Court did not find "resilient" indefinite.  In another example, this Court did not find fault with a claim related to eyeglasses that required temple retainers connected by a "resilient member," which the United States Patent Trial and Appeal Board had interpreted as "having sufficient stiffness to maintain its shape and to return to its original form after being bent."  *Cablz, Inc. v. Chums, Inc.*, 708 F. App'x 1006, 1010 (Fed. Cir. 2017).  *See also Rawlplug Co. v. Illinois Tool Works, Inc.*, 11 F.3d 1036, 1037 (Fed. Cir. 1993) (describing a claimed shank made of "resilient material" as follows: "This metal shank has a memory such that, when forcibly deformed—e.g., pounded into a hole—it seeks to recover its original bent shape.")

This is just a small sampling of claims involving the term "resilient."  A simple search of the USPTO patent database shows that the term "resilient" appears in the claims of over 144,000 patents.  Appx370.  This term is ubiquitous

in the context of patent claim drafting, and, as the above cited cases and the '268 patent demonstrate, the plain and ordinary meaning of the term "resilient" is well known and definite, i.e., that the object will return to its original shape after deformation. Indeed, the '268 patent explicitly describes the outer catheter in such a manner: the outer catheter "has sufficient shape memory to return to its original shape when undistorted." Appx290, 4:21-23. *See Advanced Aerospace Techs., Inc. v. United States*, 124 Fed. Cl. 282, 294 (2015) ("A patent claim is definite, where a claim term has an objective meaning in the art and the patent uses the term consistently with that meaning.").

In summary, the district court's erroneous indefiniteness determination relating to the term "resilient" should be reversed. This Court should construe the term "resilient" consistent with its plain and ordinary meaning: ***able to return to its original shape when undistorted***. Allowing the district court's approach to stand would cast serious doubt on the validity of any patent that does not disclose a specific numerical range for every modifier used in the claims, potentially invalidating tens of thousands, if not hundreds of thousands, of patents, with respect to the use of "resilient" alone.

**II.      The district court erred when it granted summary judgment of non-infringement with respect to claim 11**

After the district court's determination of indefiniteness with respect to the terms "pliable" and "resilient," which invalidated most claims in the '268 patent,[3] claim 11 was the only claim remaining that NLC had asserted against St. Jude. NLC moved for summary judgment on the issues of infringement and validity. St. Jude moved for summary judgment on the issue of infringement. The district court granted St. Jude's motion, denied NLC's motion as to infringement, and denied NLC's motion as to validity moot in view of the determination of non-infringement.

This Court applies the law of the regional circuit when reviewing a summary judgment decision. The Eighth Circuit reviews *de novo* a grant of summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id.*

---

[3] NLC sought leave to file a motion for reconsideration with respect to the district court's indefiniteness determination, which the district court denied.

27

The district court's summary judgment decision is premised largely on claim construction issues involving the intrinsic record, which this Court reviews *de novo*. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331, 135 S. Ct. 831, 840–41, 190 L. Ed. 2d 719 (2015). Claim 11 has five steps and is reproduced in its entirety below:

> 11. A method for placing an electrical lead in a lateral branch of a coronary sinus vein using a double catheter including an outer catheter and an inner catheter slidably disposed inside the outer catheter, comprising:
>
> [1] inserting the catheter into the coronary sinus;
>
> [2] advancing a guide wire through the catheter into a coronary sinus lateral branch vein;
>
> [3] advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;
>
> [4] inserting the lead through the outer and inner catheters to a target location in the branch vein; and
>
> [5] withdrawing the catheter leaving the lead in the branch vein.

[numbers added here for convenience and reference].

In its summary judgment decision, the district court erroneously construed steps 1, 3, and 5. St. Jude neither identified these claim terms during the parties' exchange of claim construction disclosures, nor asked the district court to construe these terms during claim construction briefing. Instead, in a violation of the

district court's scheduling order regarding the identification of terms for construction by the court, St. Jude presented new claim constructions at the summary judgment stage, as well as new noninfringement arguments based upon those constructions.[4]  NLC moved to strike St. Jude's untimely request for these untimely claim constructions arguing that St. Jude had waived them, but the district court, by adopting these constructions, implicitly denied NLC's motion.

The district court abused its discretion by allowing St. Jude to present untimely claim construction arguments at the summary judgment stage and then additionally erred by granting summary judgment based upon those waived arguments.  In doing so, it read non-existent limitations into the claim without any basis for doing so.  These limitations exclude specific embodiments disclosed in the '268 patent and also ignore common practices in the field.

### A.    Step 1 (inserting the catheter into the coronary sinus)

Step 1 of claim 11 requires "inserting the catheter into the coronary sinus." The district court previously construed the term "catheter" as the "double catheter" that is recited in the preamble, i.e., the outer catheter and the inner catheter.  The

---

[4] In its non-infringement contentions, St. Jude did not contest that its instructions included Steps 1, 2, 3, and 5.  Appx1067.  Rather, St. Jude argued that NLC had not identified an instance of direct infringement.  Thus, St. Jude waived its new non-infringement positions and new claim construction positions that it first presented at summary judgment.  The district court abused its discretion by allowing St. Jude to present these untimely arguments.

"inserting" step should be given its plain and ordinary meaning: ***positioning the outer catheter and inner catheter in the coronary sinus***, whether by sequential insertion (e.g., first inserting the outer catheter and then the inner catheter) or by simultaneous insertion (e.g., inserting the outer catheter and inner catheter together).

The district court, however, adopted a far narrower construction, requiring ***simultaneous*** insertion of the outer catheter and inner catheter into the coronary sinus. Appx262. In other words, the district court's construction requires that the inner catheter must first be placed into the outer catheter, and then both catheters are positioned in the coronary sinus at the same time. This construction is too narrow because it ignores disclosure in the '268 patent whereby the outer catheter and inner catheter are inserted into the coronary sinus in a sequential fashion, i.e., the outer catheter is first inserted into the coronary sinus and then the inner catheter is inserted into the coronary sinus through the outer catheter. Appx291, 5:46-50 (describing how the physician first attempts to cannulate the coronary sinus using the outer catheter alone); 6:13-16 (describing how the outer catheter alone can be used to cannulate the coronary sinus before inserting the inner catheter). *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1379 (Fed. Cir. 2014) ("A construction that would exclude the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.") [citation and quotation

omitted].  NLC's expert, Dr. Burke, also explained that the '268 patent discloses

sequential insertion of the outer and inner catheters into the coronary sinus.

Appx2397-2398.

Still further, various purported prior art patents recognize the common

practice of inserting two sheaths sequentially.  For example, U.S. Patent 6,562,049

to Norlander ("Norlander") explains that "… the two introducer sheaths can be

introduced simultaneously or one sheath can [be] introduced prior to the other, e.g.,

the outer introducer being initially placed to facilitate subsequent placement of the

second introducer."  Appx319-320, 4:58-5:1.  In another example, U.S. Patent

5,935,160 to Auricchio ("Auricchio") discloses sequential insertion of catheters

into the coronary sinus.  Appx304, 3:22-38.  *See Eidos Display, LLC v. AU

Optronics Corp.*, 779 F.3d 1360, 1365 (Fed. Cir. 2015) (declining to interpret a

claim term in a manner inconsistent with industry practice where the specification

offered no indication of intent to deviate from the industry practice).

Claim terms should be given their ordinary and customary meaning as used

in the field of invention unless it is clear from the specification and prosecution

history that some other definition applies. *Phillips v. AWH Corp.*, 415 F.3d 1303,

1312–13 (Fed. Cir. 2005); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576,

1582 (Fed. Cir. 1996). The ordinary and customary meaning is the meaning a

claim term would have to a skilled artisan at the time of invention—the effective

filing date of the patent application. *Phillips*, 415 F.3d at 1313 (*citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116) (Fed. Cir. 2004). Here, the specification of the '268 patent, as well as the purported prior art references, confirm that a person having ordinary skill in the art would understand that "inserting" a double catheter into the coronary sinus may be accomplished by sequentially inserting the outer catheter and then the inner catheter, as this was common practice and expressly disclosed in the '268 patent. The district court failed to construe the "inserting" limitation as it would be understood by a person having ordinary skill in the art – indeed, the district court's summary judgment opinion does not even mention the phrase "ordinary skill in the art."

This Court should construe Step 1 as: ***positioning the outer catheter and inner catheter in the coronary sinus***, without limitation as to whether the catheters are inserted sequentially or simultaneously. It should also vacate the district court's entry of summary judgment based upon the district court's overly narrow construction requiring simultaneous insertion of the outer catheter and inner catheter into the coronary sinus.

Even if the district court's narrow construction stands – which it should not – the district court erred in granting summary judgment that no reasonable juror could find that St. Jude's instructions encourage simultaneous insertion of the outer catheter and inner catheter into the coronary sinus under the district court's narrow

interpretation of the limitation.  For example, Step 4 in the Cannulating Catheter

section of the instructions states: "Insert the inner catheter into the outer guide

catheter, using the inner catheter to facilitate positioning in the coronary sinus."

Appx1086.   Moreover, NLC's expert, Dr. Burke, testified that this instruction

satisfies Step 1 of claim 11.   Appx2403.  Dr. Burke further testified that a

statement in St. Jude's marketing materials also encourages simultaneous insertion.

Appx2404 ("When used in conjunction with CPS Direct™ Universal outer guide

catheters, CPS Aim™ Universal cannulators facilitate coronary sinus

cannulation.").  Viewed in the light most favorable to NLC, a reasonable juror

could find that St. Jude's instructions and marketing materials encourage

simultaneous insertion of the outer catheter and inner catheter into the coronary

sinus based upon the evidence of record.[5]  At a minimum, the evidence presents a

question of fact to be resolved by the jury.  The district court's determination with

respect Step 1 should be vacated.

> **B.    Step 2 (advancing a guide wire through the catheter into a
> coronary sinus lateral branch vein) and Step 3 (advancing
> the inner catheter out a front end opening of the outer
> catheter along the guide wire into the branch vein)**

The district court's ruling on Steps 2 and 3 also turned on a claim

construction issue, namely, what it means to "advance" the inner catheter along the

---

[5] St. Jude did not submit a countervailing expert declaration in support of its
positions on summary judgment.

33

wire into a lateral branch vein as recited in Step 3. The "advancing" limitation of

Step 3 should be accorded its appropriate scope and construed as follows: ***moving***

***the inner catheter further into the branch vein along the guide wire***. The initial

starting point of the inner catheter (i.e., whether the inner catheter is positioned

outside or inside the lateral branch vein) is irrelevant so long as the inner catheter

is moved further into the lateral branch vein along the guide wire.

This construction is supported by the '268 patent. For example, the

specification describes "advancing" the inner catheter into the coronary sinus as

follows: "In that case, inner catheter 12 is gradually advanced until the coronary

sinus is cannulated. Once the coronary sinus is cannulated, inner catheter 12 ***is***

***advanced*** as far as it will go ***into*** the coronary sinus and/or great cardiac vein."

Appx290, 4:51-55 [emphasis added].[6] Thus, the '268 patent uses the term

"advance" to describe moving the inner catheter further into a vein once the inner

catheter has been positioned within the vein, analogous to advancing down a

hallway by walking further down a hallway after entering it.

The '268 patent also describes situations where it may be difficult to insert

the guide wire into the lateral branch vein without assistance from the inner

---

[6] This language mirrors the language of Step 3, which clearly indicates that the
patentee intended "advancing" a catheter within a vein to encompass situations
where the catheter is already placed within the vein and then moved further into
the vein.

catheter and an obturator (which is not a claim 11 element but is another device similar to a catheter that is nested within the inner catheter). For example, the specification refers to Figure 7 as an example of how to position the inner catheter and the obturator within the lateral branch vein so that the guide wire can be inserted. Appx291, 53-58. Once the guide wire is in place, "inner guide 52, with obturator 53 inside, is then passed through the outer guide 52 [sic] over the 0.038" wire into the target side branch 56." *Id*. The district court's construction precludes this methodology, which is explicitly recited in the specification and shown in the figures.

The guide wire and the inner catheter work together as a system to advance the inner catheter into the lateral branch vein. NLC's expert, Dr. Burke, explained this telescoping action whereby the electrophysiologist moves the guide wire and the inner catheter in a push-pull fashion to advance the inner catheter along the guide wire into the lateral branch vein. Appx2405-2407. Moreover, Dr. Burke testified that a physician who follows St. Jude's instructions will perform the steps of claim 11 in the order recited. Appx2403. The district court did not view this unrebutted evidence[7] in the light most favorable to NLC.

---

[7] St. Jude did not submit a declaration from either of its experts to rebut Dr. Burke's testimony at summary judgment.

This interplay between Steps 2 (advancing a guide wire through the inner catheter into a coronary sinus lateral branch vein) and Step 3 (advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein) is consistent with and supported by the disclosure of the '268 patent.

When appropriately construed, Step 3 is satisfied by simply moving the inner catheter further into the branch vein along the guide wire. St. Jude's instructions direct advancing the inner catheter along a guide wire into a lateral branch vein. Appx2405-2407 (explaining that steps 4-6 of St. Jude's instructions "Subselection Catheter" section describe a telescoping action that will result in the inner catheter being advanced over the guide wire into the branch vein).

The district court, however, narrowly construed the "advancing" limitation of Step 3 to require the inner catheter to be positioned outside of the lateral branch vein prior to commencement of Step 3.[8]  Applying this construction, the district court found that St. Jude's instructions directed "advancing" the inner catheter into the lateral branch vein (as set forth in the sub-selecting step of St. Jude's

---

[8] The district court seems to have equated the term "advancing" with "inserting," which would mean that the inner catheter must begin in a position outside of the lateral branch vein before it is advanced over a guide wire into the lateral branch vein.  One analogous example is that a person can only enter a hallway from outside of the hallway.  However, a person who is already in a hallway can advance further down the hallway, which is consistent with NLC's construction and the plain meaning of that term.

instructions) before directing insertion of a guide wire into the lateral branch vein. The district court did not consider subsequent advancement of the inner catheter over the guide wire to fall within the scope of Step 3, despite the fact that the specification discloses this exact methodology.  Appx291, 5:50-58.

The district court also erred when it held that no reasonable juror could find that St. Jude's instructions encourage use of a guide wire.  Appx263.  On the contrary, the instructions explicitly recite the use of a guide wire.  Appx1087 ("If desired, insert a guidewire… through the inner catheter lumen into the branch vein.").  The district court held that St. Jude's statement that a guide wire could be used "if desired" did not constitute recommendation, encouragement, or promotion of the use of a guide wire.[9]  *Grunenthal GMBH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1339 (Fed. Cir. 2019) (The question for inducement is "whether the label encourages, recommends, or promotes infringement.").  Given the instructions' explicit recitation of a guide wire, whether such recitation constitutes recommendation, encouragement, or promotion of the use of a guide wire is a question of fact that should go to the jury.  For this additional reason, the district

---

[9] NLC presented testimony from St. Jude's 30(b)(6) witness that the instructions were St. Jude's recommendations for how to use the product.  Appx2090-2091; Appx2098-2099.  The district court did not view this evidence in the light most favorable to NLC.

court's determination of summary judgment as to Steps 2 and 3 of claim 11 should be vacated.

### C. Step 5 (withdrawing the catheter leaving the lead in the branch vein)

Similar to the "inserting" limitation of Step 1, the Court narrowly construed the "withdrawing" limitation of Step 5 to require simultaneous withdrawal of the outer catheter and the inner catheter. As with the "inserting" limitation, this limitation should be given its appropriate scope to encompass sequential withdrawal of first the inner catheter and then the outer catheter. In other words, this limitation should be interpreted as ***removing the outer catheter and the inner catheter***, whether simultaneously or sequentially.

The '268 patent does not specifically describe simultaneous or sequential removal of the inner and outer catheters and, as such, does not impart criticality to any particular sequence of removal. NLC provided expert testimony and third-party prior art to demonstrate that catheters are removed by splitting them, or cutting them, as they are withdrawn. Appx2399. This technique requires sequential removal of the catheters because an electrophysiologist can only split one catheter at time. Thus, the inner catheter is typically removed first, and then the outer catheter is removed. *Id*. Moreover, sequential removal of a double catheter is recognized in several of the asserted prior art patents. Appx321 8:15-43; Appx304, 3:22-38.

A person having ordinary skill in the art would understand that "withdrawing the catheter…" simply means ***removing the outer catheter and the inner catheter***. The sequence of this withdrawal is irrelevant insofar as the claim is concerned. However, in practice, withdrawal of such catheter sets is typically performed in a serial fashion rather than simultaneously. At a minimum, one of ordinary skill in the art, when viewing the claims in light of the underlying specification and armed with their own knowledge of the technology, would not have equated "withdrawal" with "simultaneous removal of the outer and inner catheters." The district court erred in artificially narrowing this claim limitation to preclude serial removal of the catheters, and then by granting summary judgment based upon that narrow construction, making no reference to a person having ordinary skill in the art. This Court should construe Step 5 consist with the plain and ordinary meaning of the term as it would have been understood by a person having ordinary skill in the art, and it should vacate the district court's summary judgment determination relating to Step 5.

### III.   The district court abused its discretion when it precluded NLC's experts from presenting and relying upon certain evidence

After the close of fact discovery, NLC submitted two expert reports in accordance with Rule 26(a)(2)(B), Fed. R. Civ. P., and in compliance with the deadline set forth in the scheduling order: a technical report from Dr. Martin Burke and a damages report from Brad Carlson.

39

Mr. Carlson identified various license agreements comparable to the technology at issue in this case upon which he relied in forming his opinion as to a reasonable royalty rate. For example, Mr. Carlson explained in his report that "As a means of testing my assertion [as to a reasonable royalty rate], I contacted two firms, Royalty Source and KTMine both of whom collect information regarding licensing transactions from available public sources including filings with the Securities and Exchange Commission." Appx466. "I combined the 53 licensing transactions obtained from the two royalty data sources as presented on Exhibit 1 to this report." *Id*.

As for Dr. Burke, his report included statements that he had used St. Jude's Accused Products in a manner that infringed claim 11. This established that he had knowledge and expertise relative to the accused products, and that he was a direct infringer for purposes of NLC's induced infringement claim with respect to claim 11. For example: "…on numerous occasions I have personally used St. Jude's catheters, leads, and guide wires in a telescoping manner – consistent with St. Jude's instructions and claim 11 of the '268 patent – to implant leads in a branch vein of a coronary sinus." Appx423. Dr. Burke's statements on knowledge of the accused devices and direct infringement appeared on pages 25-26 of his report under Section 6, entitled "Evidence of direct infringement." *Id*.

With respect Mr. Carlson's report, St. Jude moved to preclude him from relying upon the license agreements he identified in the third-party databases, arguing that those agreements should have been disclosed during the fact discovery period. St. Jude similarly moved to preclude Dr. Burke from offering testimony regarding his knowledge and use of the accused devices, arguing that Dr. Burke's this information should have been disclosed during fact discovery. NLC pointed out that it was not aware of these facts during the fact discovery period and could not disclose what it did not know. Appx541-542. Despite this, the district court granted St. Jude's motion and precluded Mr. Carlson from relying upon various license agreements he had identified and Dr. Burke from testifying regarding his knowledge of the accused devices direct infringement of claim 11.

A district court's decision to sanction a litigant under Rule 37 is reviewed for abuse of discretion. *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1342 (Fed. Cir. 2013). This Court applies the regional law of the circuit to the issue, which in this instance is the Eighth Circuit. *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).

In the Eighth Circuit, there are four factors to consider when deciding whether to exclude material that was not disclosed in a timely manner pursuant to Rule 37, Fed. R. Civ. P.: (1) the importance of the excluded material; (2) the explanation for failing to comply with the disclosure rules; (3) potential prejudice

41

from allowing the material to be used at trial; and (4) the availability of a continuance to cure such prejudice.  *See Citizens Bank of Batesville, Arkansas v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir. 1994).  The district court abused its discretion when it applied these factors and precluded Mr. Carlson from relying upon various license agreements in forming his opinion and Dr. Burke from testifying regarding his direct infringement.

With respect to the first factor, the district court considered the importance of the information as neutral.  However, evidence of direct infringement is required to prove inducement, so this factor should weigh against preclusion.  The licenses identified by Mr. Carlson supported his royalty analysis, which should also weigh against preclusion.

With respect to the second factor, as the record indicates, NLC did not become aware of these facts until it started working with its experts during the expert phase.  Appx541-542.  The district court, however, in essence punished NLC for failing to disclose information it did not know and could not have reasonably known at the time.  Experts typically rely on a broad range of material when forming their opinions.  Damages experts often locate and identify comparable license agreements when determining a reasonable royalty.  Here, Mr. Carlson accessed a private license database – to which NLC did not have access – and he identified and disclosed comparable licenses that he relied on in his report.

42

Applying the district court's approach, an expert would have to write a report before the close of fact discovery so that all facts in the report (including all materials relied upon or consulted) could be disclosed during the fact discovery period.  This defies logic and common litigation practice, which typically includes an expert discovery period where parties can request materials relied upon by the expert, which was available to St. Jude in this case.  In some district courts, this issue is completely obviated by the practice of closing fact discovery after the deadline for expert reports.  Regardless of the actual procedure, NLC was not aware of these facts until after the close of fact discovery, and upon becoming aware of them, disclosed them to St. Jude via expert reports shortly after learning of them.  Thus, the second exclusion factor – the reason for the late disclosure – weighs against preclusion as NLC acted reasonably under the circumstances.

With respect to the third factor – potential prejudice to St. Jude – fact discovery closed on September 13, 2019.  Appx145.  NLC produced its expert reports containing the facts at issue on October 15, 2019, a little more than a month after the close of fact discovery.  There was no trial date set at the time.  St. Jude had every opportunity to probe these facts during depositions of Dr. Burke (two depositions taken November 12, 2019 and November 19, 2019) and Mr. Carlson (February 5, 2020), precisely the point of the expert discovery phase of the case –

43

to examine the expert's opinions and the facts relied upon. This factor weighs against preclusion.

Finally, with respect to the fourth factor – the availability of a continuance – there was no trial date scheduled at the time this issue arose. To the extent St. Jude needed to conduct additional third-party discovery to probe the facts disclosed in the reports, there was ample time to do so – and indeed, St. Jude deposed NLC's experts after the disclosure of these facts. The district court noted the expense associated with potential third-party discovery as a basis for precluding the facts, Appx152-153, but St. Jude would have incurred those very same expenses during the fact discovery period had the facts been disclosed before the close of fact discovery. This is not an issue of additional expense. It is an issue of possible delay. But given that the disclosure occurred roughly a month after the close of fact discovery, and given that there was no trial date set, there is no reason that a continuance could not have been available for St. Jude to pursue whatever third-party discovery it believed appropriate.

The district court abused its discretion in precluding Mr. Carlson from relying upon various license agreements that he identified in a private database and Dr. Burke from testifying about his direct infringement of the method claims of the '268 patent. This Court should vacate the district court's order precluding these

44

facts and allow Mr. Carlson and Dr. Burke to rely upon these facts and present testimony consistent with the full scope of their reports.

## IV.  The district court abused its discretion when it entered sanctions against NLC based upon Dr. Burke's summary judgment declaration

After the district court entered its December 2, 2019 Exclusion Order, NLC submitted a declaration from Dr. Burke in support of its motion for summary judgment.  While Dr. Burke and NLC were mindful of the district court's exclusion order and deliberately avoided making any statements relating to direct infringement, St. Jude nevertheless moved to strike the declaration and requested monetary sanctions.  The district court abused its discretion by, after the fact, broadening the scope of the exclusion order to encompass statements from Dr. Burke that were not previously challenged by St. Jude and then sanctioning NLC based upon this broadened scope.

St. Jude's motion to exclude sought *exclusively* to preclude statements related to direct infringement by Dr. Burke.  Those statements, as identified by St. Jude in its motion, were found in pages 25-26 of Dr. Burke's Report in a section entitled "Evidence of direct infringement."  Appx423-424.  St. Jude asked the Court to strike "(1) the portions of Dr. Martin Burke's Expert Report *in which he claims that he is a direct infringer* of the '268 Patent (Ex. A at 25), and any testimony, opinion, or argument related thereto; (2) the portions of Dr. Martin

Burke's Expert Report referencing undisclosed "interactions," "conversations and experiences with other electrophysiologists" *as evidence of direct infringement* of the '268 Patent (Ex. A at 25– 26), and any testimony, opinion, or argument related thereto." Appx394 [emphasis added]. Thus, St. Jude focused only on statements on pages 25 and 26 of Dr. Burke's report.

The district court granted St. Jude's motion in its December 2, 2019 Order and excluded Dr. Burke from presenting such evidence. Despite granting the motion, the district court's oral ruling does not identify any particular statements or sections in Dr. Burke's expert report for exclusion. Nor does the district court's ruling identify any other category of information other than "direct infringement." Thus, the only reasonable interpretation of the district court's order is that the district court granted the relief requested by St. Jude, namely, the preclusion of the identified statements on pages 25-26 of Dr. Burke's report relating to direct infringement.

The district court's ruling explicitly states that it is limited to the issues presented by St. Jude, i.e., precluding Dr. Burke testifying as a fact witness on the issue of direct infringement. For example, the district court stated that "[t]he Court finds that all of the factual disclosures *at issue* were untimely produced." Appx150 [emphasis added]. The district court further noted that "had Dr. Burke's *direct infringement* been disclosed properly in discovery, St. Jude could and

would have sought documents, communications and testimony related thereto." Appx153 [emphasis added].

In response to the specific scope of St. Jude's motion ("evidence of direct infringement") and the district court's reference only to that issue, NLC and Dr. Burke crafted and submitted a summary judgment declaration that removed the statements relating to direct infringement. Indeed, NLC's summary judgment filing does not present or otherwise rely on Dr. Burke as a fact witness on the issue of direct infringement.

Despite NLC's and Dr. Burke's efforts to comply with the Exclusion Order by removing all references to evidence of direct infringement, St. Jude attacked Dr. Burke's summary judgment declaration with a motion to strike and for sanctions, focusing on statements disclosed in Dr. Burke's expert report that St. Jude *did not* challenge in its original motion to strike, i.e., specifically, statements in paragraphs 12, 13, 25, 26, and 28 of Dr. Burke's summary judgment declaration *that do not relate to direct infringement*.

The district court granted St. Jude's motion for sanctions in its April 30, 2020 Order ("the Sanctions Order"), characterizing its Exclusion Order in terms inconsistent with St. Jude's original motion to strike: "Simply stated, Dr. Burke was precluded from offering testimony of fact in this case because he was not timely disclosed as a fact witness." Appx219. Thus, the district court expanded its

Exclusion Order after-the-fact to go far beyond the issue of direct infringement. In doing so, the district court abused its discretion when it found a "willful" violation – not for submitting the evidence of direct infringement that had been the subject of St. Jude's motion, but for submitting previously unchallenged facts that are little more than background supporting Dr. Burke's qualifications and experience to support his standing as an expert – as required by Rule 26, Fed. R. Civ. P.

In the Eighth Circuit, "[a] bad faith finding is specifically required in order to assess attorneys' fees." *Stevenson*, 354 F.3d at 751. "This bad faith conduct must have practiced a fraud upon the court or defiled 'the temple of justice.'" *Id*. [citation omitted]. The district court made no finding of bad faith on the part of NLC. On the contrary, the district court explicitly found that there was ***no*** bad faith: "This does not mean that there was bad faith. I believe Mr. Griggs that he did not intent to practice a fraud upon the Court." Appx219-220. Despite this, the district court sanctioned NLC in the amount of $35,985.75. This was an abuse of discretion. The district court's order on sanctions and subsequent fee award should be vacated.

Alternatively, the district court abused its discretion by sanctioning NLC for violating an order that was unclear and ambiguous. The district court did not specifically identify which portions of the report were excluded, and St. Jude only asked for statements on pages 25-26 relating to direct infringement to be stricken.

48

To the extent the district court subsequently interpreted its oral ruling to extend

beyond the relief requested by St. Jude – which is precisely how the district court

interpreted the ruling when sanctioning NLC – the Exclusion Order is unclear and

ambiguous and cannot be the basis for sanctions.

"[A] party commits a willful violation when he or she takes an action that he

knew or ... should have known, to be contrary to a court order." *Pyramid Real

Estate Servs., LLC v. United States*, 95 Fed. Cl. 613, 623 (2010) [citations and

quotations omitted].  However, "[a] district court may punish for disobedience of

an order only if the order is clear and unambiguous.  *Fonar Corp. v. Deccaid

Servs., Inc.*, 983 F.2d 427, 429 (2d Cir. 1993); *see also Pascale v. G. D. Searle &

Co.*, 90 F.R.D. 55, 59 (D.R.I. 1981) ("Considering the ambiguous nature of the

June 12 order, that part of the November 3 order imposing sanctions is not 'just'; it

is therefore contrary to law, and is hereby vacated."); *Joint Stock Co. Channel One

Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *21 (S.D.N.Y. July 18,

2017), report and recommendation adopted, 2017 WL 4712639 (S.D.N.Y. Sept.

28, 2017) ("Noncompliance with discovery orders is considered willful ***when the

court's orders have been clear***, when the party has understood them, and when the

party's noncompliance is not due to factors beyond the party's control.") [emphasis

added].

49

St. Jude's original motion to exclude was directed to Dr. Burke's testimony as a fact witness on the issue of direct infringement.  In granting St. Jude's motion, the district court's Exclusion Order did not explicitly identify any statements to be stricken from Dr. Burke's report.  Rather, it simply granted St. Jude's motion, which sought to strike portions of statements on pages 25-26 of Dr. Burke's report (though St. Jude did not explicitly identify which portions it sought to strike).

Despite this obvious ambiguity, and the district court's subsequent expansion (or expansive interpretation) of its Exclusion Order, NLC was found to have willfully disobeyed the Exclusion Order.  Demonstrating the district court's fluid interpretation of its ruling, and NLC and counsel's difficulties in understanding and complying with the district court's order, the district court struck paragraph 20 of Dr. Burke's declaration in its entirety, even though this statement in Dr. Burke's report (Appx418-419) *was not challenged by St. Jude in either its original motion to strike or in its motion for sanctions*.  Nor were the statements in this paragraph identified or seemingly encompassed in either the district court's Exclusion Order or in its Sanctions Order.  Why would NLC – or any objective reviewer of the record – believe that Dr. Burke would be precluded from making these previously unchallenged statements?  And, more importantly, how can the submission of these statements be considered "willful disobedience"

of the district court's Exclusion Order given that the motion by St. Jude and the

district court's prior statements all focused on "evidence of direct infringement?"

The scope of the district court's Exclusion Order became a moving target,

having been greatly expanded (or interpreted in a greatly expanded manner) after

the fact.   Given that, it cannot objectively be characterized as "clear and

unambiguous."  *See Fonar*, 983 F.2d at 429.  The Exclusion Order did not

explicitly identify any statements in Dr. Burke's report that were excluded.

Moreover, the district court's subsequent interpretation of its Exclusion Order as

precluding Dr. Burke from testifying as to ***any*** facts is inconsistent with the issues

raised and relief requested by St. Jude.  Appx219 ("The Court finds that the

insertion of facts into the Burke declaration violates this Court's [Exclusion]

order.").

Accordingly, the district court's characterization of the Exclusion Order as

"clear" (Appx219), and the resultant sanctions from the ambiguous Exclusion

Order, are an abuse of discretion.  *See Fonar* (sanctions cannot be predicated on an

order that is unclear or ambiguous).

## V.     The district court abused its discretion when it excluded Mr. Carlson from opining as to the appropriate royalty base

This Court applies the law of the regional circuit when reviewing a district

court's decision to exclude expert testimony from trial.  *Micro Chem., Inc. v.*

*Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).  The Eighth Circuit reviews a

district court's determination to exclude expert testimony at trial for an abuse of discretion. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 685 (8th Cir. 2001).

Mr. Carlson offered an opinion on damages for infringement of claim 11 of the '268 patent – a method claim directed to a procedure for implanting a pacing lead into a lateral branch vein through the coronary sinus. He ultimately concluded that a reasonable range for a royalty was 6.0% to 16.63%, with a recommended royalty of 9.9% based upon the analysis contained in his report. Appx728. As for the royalty base, claim 11 recites four components necessary to perform the method – an outer catheter, an inner catheter, a lead, and a guide wire. Mr. Carlson offered an opinion that the royalty base for infringement of claim 11 should include these four components.

St. Jude moved to exclude NLC's damages expert, Mr. Carlson, from presenting any damages opinions at trial. The district court granted the motion in part, ruling that "[Mr.] Carlson's opinions and testimony as to the royalty base [for claim 11] are inadmissible." Appx251. In other words, the district court ruled that Mr. Carlson could not opine that the royalty base for infringement of claim 11 should include the four components recited in the claim: an outer catheter, an inner catheter, a lead, and a guide wire.[10] The district court's exclusion of Mr. Carlson's

---

[10] The district court denied St. Jude's motion with respect to Mr. Carlson's opinion as to a royalty rate.

opinion is an abuse of discretion because the district court misapplied applicable

patent law principles and because its determination is contrary to the plain

language of the claim.

The district court's error flowed from its focus on the principle of

apportionment, which attempts to separate the value of the patented features from

the value of the unpatented features.  For example, the district court held that

"Carlson did not even attempt to identify, let alone subtract, the value of any

unpatented aspects of the four components that comprise his definition of the

royalty base."  Appx248.  But this is not a product claim.  It is a method claim

directed to a method for implanting a pacing lead.  There are no "patented

features" or "unpatented features" of the four recited components – they are simply

workpieces used to perform a process.

The district court also made the puzzling statement that "although leads are

recited in claim 11, the '268 patent does not teach or disclose leads."  *Id*.  On the

contrary, the '268 patent discusses pacing leads throughout the specification, and

leads are clearly shown in various figures.  Appx290, 3:29-31 ("Valve 14 prevents

leakage of blood when a 5 French pacing lead is introduced through the inner

catheter 12 into the coronary system."); Appx288 (Fig. 8 showing electrical lead

83), and Appx291, 5:46-64 (referring to Fig. 8 and discussing implantation of a

lead).

The district court then concluded that "[t]he entirety of the '268 Patent's scope is limited to a 'double catheter' for use in the 'coronary sinus.'"  Appx248. "This scope does not include leads." *Id*.  "As such, Carlson's royalty base accounts for more than the *method* claimed." *Id*. [emphasis in original].  The district court's erroneous statements cannot be reconciled with the disclosure in the '268 patent – which includes a detailed description of a method for implanting a pacing lead and a figure directed to the same – and with the plain language of claim 11 itself – which is directed to "[a] method for placing an electrical lead in a lateral branch of a coronary sinus vein…" and recites a lead as a component that is necessary to perform the method.

This Court has held that it is appropriate to include conventional features in a royalty base:

> On appeal, Briggs argues that Exmark's expert should have apportioned or separated the value of the baffle from the other features of the mower through the royalty base rather than the royalty rate. We disagree. We have held that apportionment can be addressed in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] ... by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." Ericsson, 773 F.3d at 1226. So long as Exmark adequately and reliably apportions between the improved and conventional features of the accused mower, using the accused mower as a royalty base and apportioning

> through the royalty rate is an acceptable methodology. Id. (citing
> Garretson, 111 U.S. at 121, 4 S.Ct. 291). "The essential requirement is
> that the ultimate reasonable royalty award must be based on the
> incremental value that the patented invention adds to the end
> product." Id.

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp.*, LLC, 879 F.3d
1332, 1348 (Fed. Cir. 2018).

Thus, even if the district court was correct in its statement that the scope of
the '268 patent "does not include leads," it is not *per se* improper to include leads
in the royalty base. However, just as the claim in *Exmark* recited a mower, which
was appropriately included in the royalty base, claim 11 at issue here recites a lead,
which likewise can permissibly be included in the royalty base.

Moreover, this Court has recognized the common practice of using per-unit
royalties as an appropriate measure for the use of a technology:

> This court has noted the common (not universal) economic
> justifications for using per-unit royalties for measuring the value of
> use of a technology: doing so ties compensation paid to revealed
> marketplace success, minimizing under- and over-payment risks from
> lump-sum payments agreed to in advance.

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir.
2015).

The district court also took issue with Mr. Carlson's analysis, stating that "Carlson's calculation of the royalty rate expressly does not discount the value of the non-patented features of an inner catheter, outer catheter, guide wire, or lead…" Appx251. However, in his report Mr. Carlson noted his assumption that "NLC's expert will provide testimony explaining that the method claims are infringed when a lead is implanted in accordance with St. Jude's instructions, and that the claimed method is the predominant implantation method that is utilized when implanting leads with a telescoping system." Appx716.

Thus, Mr. Carlson did consider non-patented aspects or alternatives to the method of claim 11 when he relied upon testimony that the claimed method was the "predominant" method employed by electrophysiologists. Mr. Carlson's reliance on NLC's technical expert is not a flaw in his analysis. The district court abused its discretion by playing the role of the fact finder and rejecting the premise that the claimed method is the predominant implantation method. This is a question of fact for the jury to resolve. Moreover, this is precisely why Mr. Carlson offered a range for a reasonable royalty rate – to accommodate the resolution of factual disputes that may move the rate higher or lower.

The district court abused its discretion by ruling that Mr. Carlson could not offer an opinion as to the royalty base for infringement of the method claims. This

Court should reverse the district court and allow Mr. Carlson to offer the opinions disclosed in his report.

## Conclusion

WHEREFORE, Plaintiff-Appellant NLC respectfully requests that this Court:

1. REVERSE the district court's indefiniteness determination with respect to the terms "pliable" and "resilient" and CONSTRUE those terms consistent with their plain and ordinary meaning;

2. VACATE the district's court summary judgment determination and CONSTRUE the "inserting," "advancing," and "withdrawing" steps consistent with their plain and ordinary meaning as would be understood by a person having ordinary skill in the art;

3. REVERSE the district court's order precluding from Mr. Carlson from relying upon the third-party licenses identified in his original report and precluding Dr. Burke from presenting testimony about his use of the accused devices and direct infringement;

4. REVERSE the district court's sanctions order;

5. REVERSE the district court's order precluding Mr. Carlson from presenting an opinion as to which devices should be included in the royalty base; and

6.    REMAND the case to the district court to proceed in a manner consistent

with this Court's rulings.


Dated:  June 21, 2021                    /s/Michael T. Griggs
                                         Michael T. Griggs
                                         Adam L. Brookman
                                         Timothy E. Newholm
                                         Marriam Lin
                                         Boyle Fredrickson, S.C.
                                         840 N. Plankinton Avenue
                                         Milwaukee, WI 53203
                                         (414) 225-9755

                                         ***Attorneys for Plaintiff-Appellant***
                                         ***Niazi Licensing Corporation***

**Addendum**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Niazi Licensing Corporation, | Case No. 17-cv-5094 (WMW/BRT) |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| Boston Scientific Corp., | |
| Defendant. | |

---

| | |
|---|---|
| Niazi Licensing Corporation, | Case No. 17-cv-5096 (WMW/BRT) |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| St. Jude Medical S.C., Inc., | |
| Defendant. | |

---

Plaintiff Niazi Licensing Corporation (Niazi) commenced these patent-infringement actions against Defendants Boston Scientific Corp. (Boston Scientific) and St. Jude Medical S.C., Inc. (St. Jude), alleging that Defendants have infringed claims in United States Patent No. 6,638,268 (the '268 Patent), titled "Catheter to Cannulate the Coronary Sinus."  Pending before the Court are St. Jude's motion to strike Niazi's infringement contentions, Boston Scientific's motion to exclude evidence, and the parties' requests for the construction of disputed claim terms in the '268 Patent.  (Case No. 17-cv-5094, Dkts. 56, 83; Case No. 17-cv-5096, Dkts. 67, 78.)  For the reasons addressed below, the Court

denies the motion to strike and the motion to exclude evidence and resolves the claim construction disputes as described herein.

## BACKGROUND

Niazi, a Washington corporation with its principal place of business in Wisconsin, owns the '268 Patent at issue here. Both Boston Scientific and St. Jude manufacture and sell medical devices. Boston Scientific is a Delaware corporation with its principal place of business in Massachusetts. St. Jude is a Minnesota corporation with its principal place of business in Texas.

The '268 Patent, issued on October 28, 2003, pertains to a catheter system that can be inserted into the coronary sinus of the heart. This catheter system allows medical professionals to administer fluids and introduce pacing leads to the coronary sinus. Although the use of catheters in general was well established by 2003, the '268 Patent describes an invention that, based on its structure and shape, purportedly is better suited for "use in the coronary sinus, especially in patients suffering from congestive heart failure." As relevant here, the '268 Patent claims a double catheter system with an "outer, resilient catheter having shape memory and a hook shaped distal end" and an "inner, pliable catheter slidably disposed in the outer catheter." The '268 Patent also claims methods of using the catheter system.

Niazi initiated these patent-infringement lawsuits against Boston Scientific and St. Jude on November 13, 2017. Niazi alleges that both Boston Scientific and St. Jude have infringed—either literally or through the doctrine of equivalents—the '268 Patent. Niazi alleges that Boston Scientific and St. Jude have directly infringed the '268 Patent by

using, manufacturing, selling, or offering to sell infringing catheter systems.  Niazi also alleges that both Defendants have indirectly infringed the '268 Patent by inducing its customers—namely, medical professionals—to infringe the '268 Patent.

The '268 Patent includes 27 claims, some of which are directed to configurations of the catheters and others that are directed to the method of using the catheter system.  Niazi alleges that Boston Scientific infringes 11 claims in the '268 Patent: independent Claims 1, 11, 13, 18, and 24 and dependent Claims 10, 14, 19, 23, 25, and 26.  Niazi also alleges that St. Jude infringes those same claims, as well as dependent Claims 15 and 27.

## ANALYSIS

Before the Court are St. Jude's motion to strike Niazi's infringement contentions, Boston Scientific's motion to exclude evidence, and the parties' requests for claim construction.  The Court addresses each, in turn.

### I.      St. Jude's Motion to Strike

Pursuant to Local Rule 26.1 and the February 22, 2019 Scheduling Order, (Case No. 17-cv-5096, Dkt. 65), Niazi submitted infringement contentions in advance of the claim-construction hearing.  St. Jude moves to strike these infringement contentions, arguing that Niazi fails to identify an act of direct or indirect infringement.[1]

---

[1]      St. Jude also alleges that Niazi is arbitrarily applying claim language to force infringement.  Specifically, St. Jude argues that the word "bend" in the '268 Patent is indefinite.  An argument of this nature—that a term is indefinite—is an argument for claim construction.  *See Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012).  The Court's claim-construction analysis is in Part II of this Order.

A motion to strike generally is brought under Rule 12(f), Fed. R. Civ. P., which provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Here, St. Jude is not moving to strike *pleadings*, but rather infringement contentions. In support of its motion, St. Jude relies on Federal Rules of Civil Procedure 16(f) and 41. When a party "fails to obey a scheduling or other pretrial order," a district court may issue sanctions. Fed. R. Civ. P. 16(f); *accord O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1363 (Fed. Cir. 2006) (holding that a federal district court "may impose any just sanction for the failure to obey a scheduling order" (internal quotation marks omitted)). Similarly, when a plaintiff fails to comply with the Federal Rules of Civil Procedure or a court order, "a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b).

St. Jude contends that Niazi's infringement contentions violate the February 22, 2019 Scheduling Order. St. Jude does not argue that Niazi's infringement contentions are untimely, but instead argues that the infringement contentions are *substantively* deficient. Nothing in Rule 16(f), Rule 41(b), or any case to which St. Jude cites contemplates that such a deficiency is a violation of a *scheduling* order. Moreover, the authority on which St. Jude relies provides, at most, that a district court has the *discretion* to impose sanctions if it determines that the infringement contentions violate a court order. Under the circumstances presented here, the Court declines to strike Niazi's allegedly deficient infringement contentions.

Accordingly, St. Jude's motion to strike is denied.

## II.  Claim Construction

Niazi alleges that St. Jude and Boston Scientific have infringed the '268 Patent.  The parties request construction of 21 terms or phrases that are found within the claims at issue.

A patent is infringed by "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a).  Courts employ a two-step analysis when making an infringement determination.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  First, the court must construe the asserted claims of the patent to ascertain their meaning and scope.  *See id.*  Second, the fact finder must compare the construed claims with the accused product.  *See id.* at 976.  Only the first step of this analysis—claim construction—presently is at issue.

A district court's duty when performing claim construction is "to resolve a dispute about claim scope that has been raised by the parties."  *Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016).  This duty resides with the court because "the ultimate question of construction [is] a legal question."  *Id.* at 1318 (alternation in original) (quoting *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 842 (2015)).

It also is appropriate at this stage for a district court to determine whether a disputed claim complies with the definiteness requirement of Title 35, United States Code, Section 112(b).  *See Noah Sys.*, 675 F.3d at 1311 (holding that a determination of indefiniteness is "a matter of claim construction").  Section 112(b) provides that patent claims must "particularly point[ ] out and distinctly claim[ ] the subject matter which the inventor . . .

regards as the invention." 35 U.S.C. § 112(b). A party asserting that a claim is indefinite must show by clear and convincing evidence that the claim is indefinite. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). An indefiniteness ruling renders a claim invalid as a matter of law. *See, e.g.*, *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 906 (2014); *Maurice Mitchell Innovations, L.P. v. Intel Corp.*, 249 F. App'x 184, 186 (Fed. Cir. 2007).

When engaging in claim construction, a district court must construe the claims "independent of the accused product, in light of the specification, the prosecution history, and the prior art." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (per curiam) (internal quotation marks omitted). Although it is appropriate for a court to consider the accused device when determining *which* aspects of the patent claim should be construed, the claim itself "is construed in the light of the claim language . . . *not* in light of the accused device." *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006) (internal quotation marks omitted). Claim construction merely elaborates the normally terse claim language "in order to understand and explain, but not to change, the scope of the claims." *Embrex*, 216 F.3d at 1347 (internal quotation marks omitted).

A district court's claim-construction analysis begins by focusing on the words of the claims. "It is a bedrock principle of patent law that the claims of the patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). A construction that gives meaning to all claim terms is preferred. *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). Because claim terms often are used "consistently

throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314.  And the doctrine of claim differentiation creates a presumption that the use of different terms in a patent claim connotes that those terms should be ascribed different meanings.  *See Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012).

Courts generally give the words in a patent claim their ordinary and customary meaning at the time of the invention.  *Phillips*, 415 F.3d at 1313.  The ordinary and customary meaning of a claim term is the meaning that would have been understood by a person of ordinary skill in the field of technology in question.  *Id.*  As the Federal Circuit has explained:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.  Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.  The inventor's words that are used to describe the invention—the inventor's lexicography—must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology.  Thus the court starts the decisionmaking process by reviewing the same resources as would that person, *viz.*, the patent specification and the prosecution history.

*Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).  "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  Courts are mindful that "a sound claim construction need not always purge every shred of ambiguity.  The resolution of some line-drawing problems—especially easy ones . . . —is

properly left to the trier of fact." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007).

The patent specification, the written description of the invention, must be "clear and complete enough to enable those of ordinary skill in the art to make and use" the invention. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). When the specification indicates "a special definition given to a claim term by the patentee that differs from the meaning [the claim term] would otherwise possess," the inventor's lexicography governs. *Id.* at 1316. But a court may not import limitations from the written description into the claims. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998). For this reason, the disclosure of a particular embodiment of the claimed invention in the specification does not narrow the patent claims. *Id.* at 1347-48.

As with the specification, the patent's prosecution history may be used to understand the claim terms, but this history cannot enlarge, diminish, or vary the claim limitations. *Markman*, 52 F.3d at 980. Similarly, extrinsic evidence may be consulted when necessary to resolve an ambiguity that cannot be resolved by consulting the intrinsic evidence. *See Vitronics*, 90 F.3d at 1583. But extrinsic evidence cannot be used to vary or contradict the terms of the claims. *Markman*, 52 F.3d at 981.

With these legal standards in mind, the Court addresses the disputed claim terms.[2]

## A.    Inner, Pliable Catheter

Independent Claims 1, 13, 18, and 24 of the '268 Patent contain the phrase "inner, pliable catheter."  For example, Claim 1 recites:

> 1.  A double catheter, comprising:
>
> . . .
>
> an **inner, pliable catheter** slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter . . .

(Emphasis added.)  St. Jude and Boston Scientific argue that the phrase "inner, pliable catheter" renders Claims 1, 13, 18, and 24, and the claims that depend on them, invalid as

---

[2]     Boston Scientific moves to exclude two pieces of evidence with respect to the claim-construction proceedings: the Patent Trial and Appeal Board's Decision on Institution of *Inter Partes* Review in a related case involving Medtronic, Inc., and a declaration of Dr. Imran Niazi.  Boston Scientific first argues that Dr. Niazi disclosed the evidence in an untimely manner.  A party may not rely on evidence that was disclosed in an untimely manner unless the failure to disclose "was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Assuming without deciding that the evidence was untimely, the disclosure nonetheless is harmless.  The record establishes that Boston Scientific was aware or should have been aware of the underlying substance of both pieces of evidence at the outset of claim-construction briefing.  Boston Scientific also argues in favor of excluding Dr. Niazi's declaration, alleging that Dr. Niazi is a biased witness.  Mindful that an inventor's testimony "as to the inventor's subjective intent is irrelevant to the issue of claim construction," *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008), the Court considers Dr. Niazi's declaration only to the extent that the declaration addresses the state of the art and other objective matters.  Finally, Boston Scientific argues that Dr. Niazi's declaration is unsigned.  But the record does not support this allegation.  For these reasons, Boston Scientific's motion to exclude evidence is denied.

indefinite as a matter of law.[3]  Niazi counters that this phrase is definite and proposes that this phrase be construed to mean "a catheter that is easily bent, flexible."

 "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  This legal standard arises from the requirement of public notice.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open" to the public.  *Id.* at 909 (alteration in original) (internal quotation marks omitted).  Failure to do so would create a "zone of uncertainty" that would discourage further innovation.  *Id.* at 911 (internal quotation marks omitted).

Although a claim need not rise to the level of "absolute or mathematical precision," the claim must delineate "objective boundaries for those of skill in the art" when read in light of the specification and the prosecution history.  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014).  "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).

The Court of Appeals for the Federal Circuit recently clarified the distinction between definite and indefinite terms.  In *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, the Federal Circuit held that the term "visually negligible" was definite because the patent specification

---

[3]      Alternatively, Boston Scientific contends that, if this phrase is amenable to construction, it should be construed as an "inner catheter that lacks braiding."

included a general design of a visually negligible indicator, two specific examples of such indicators, and objective requirements for one of skill in the art to measure negligibility. *See* 844 F.3d 1370, 1378 (Fed. Cir. 2017). In contrast, the Federal Circuit held the terms "aesthetically pleasing" and "in an unobtrusive manner that does not distract a user" to be indefinite because those terms turned on an individual's subjective opinion. *See id.* at 1378-79 (distinguishing the facts of *Sonix* from *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) and *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014)). Moreover, the respective patent specifications for those indefinite terms lacked detailed examples and did not provide objective factors on which a person of skill in the art could rely. *See id.*

Here, the disputed claim term, "inner, pliable catheter," does not provide a "meaningfully precise claim scope" on its face. *See Halliburton Energy*, 514 F.3d at 1251. As such, the Court looks to the specification to determine whether the '268 Patent establishes objective boundaries for this disputed term. The specification describes the inner catheter as being "made of a soft, pliable material such as silicone" and as "extremely flexible." Elsewhere, the specification states that the inner catheter "preferably ha[s] a predetermined shape and a *certain degree of stiff[n]ess to maintain such shape during manipulation in the heart, but still flexible enough to bend when required*." (Emphasis added.)

These descriptors do not establish objective boundaries as to the range of pliability being claimed. Instead, the specification creates a "zone of uncertainty." *See Nautilus*, 572 U.S. at 911. The inner catheter is both "extremely flexible" and preferably has a "a

certain degree of stiff[n]ess." Although the specification includes an example—a silicone catheter that is 2.6 mm in outer diameter and 2.3 mm in inner diameter—this one example does not clarify the *scope* of what the '268 Patent claims as the "inner, pliable catheter."

Niazi maintains that "inner, pliable catheter" is a definite term, relying on *McCreary v. United States*, 35 Fed. Cl. 533, 556-57 (1996). Setting aside *McCreary*'s lack of precedential value, the reasoning applied in *McCreary* undermines Niazi's argument. In *McCreary*, the court construed the disputed term "flexible." After observing that the plain meaning of "flexible" is "pliable," the *McCreary* court concluded that the definition was "not particularly helpful because the dispute between the parties is over *how* flexible or pliable the [claimed invention] must be." *Id.* at 556. The court then considered the specification for further guidance and ultimately determined a construction of the term. Here, as in *McCreary*, the amount of pliability is at issue. But, for the reasons addressed above, the specification of the '268 Patent fails to provide objective boundaries or other sufficient guidance for the scope of the term.

The record contains clear and convincing evidence that the term "inner, pliable catheter" renders the claims in which it is found invalid as indefinite.

### B. Outer, Resilient Catheter and Resilient Tube

Independent Claims 1, 13, 18, and 24 include the term "resilient" in the context of an "outer, resilient catheter" or a "resilient tube." For example, Claim 1 recites:

1. A double catheter, comprising:

an **outer, resilient catheter** having shape memory and a hood shaped distal end configured for cannulation of the coronary sinus with at least one curved bend . . .

(Emphasis added.)  St. Jude and Boston Scientific argue that the term "resilient" also renders independent Claims 1, 13, 18, and 24, and their dependent claims, invalid as indefinite.[4]  Niazi contends that the Court should give "resilient" its plain and ordinary meaning, namely, "able to return to its original shape when undistorted."

As with "pliable," the term "resilient" does not, on its face, provide clear notice of the scope of the claim.  Because indefiniteness is determined by looking to the claims in light of the specification, the Court once again turns to the specification of the '268 Patent. *See Nautilus*, 572 U.S. at 901.

The specification explains that the outer catheter (or tube) is "relatively stiff," has a "braided design," and is "made of a braided silastic or similar material to allow torque control and stiffness."  The specification then provides that the outer catheter "preferably ha[s] a predetermined shape and a certain degree of stiff[n]ess to maintain such shape during manipulation in the heart, but still flexible enough to bend when required."  The specification fails to provide objective criteria for measuring resilience.  And the example of a "braided silastic or similar material" does not provide meaningful notice to the public as to what the '268 Patent claims as the scope of its invention.

_____

[4]     Alternatively, Boston Scientific argues that, if the term "resilient" can be construed, it should be defined as "braided."

Accordingly, the record establishes by clear and convincing evidence that "resilient"—as used in the terms "outer, resilient catheter" and "resilient tube"—renders the claims in which it is found indefinite.[5]

In light of the Court's conclusions, "pliable" and "resilient" render Claims 1, 13, 18, and 24 invalid as indefinite. Because Claims 14, 15, 19, 23, 25, 26, and 27 depend on Claims 1, 13, 18, and 24, these dependent claims also are indefinite. *See Soverain Software LLC v. Newegg Inc.*, 728 F.3d 1332, 1335-36 (Fed. Cir. 2013) (per curiam) (explaining presumption that, unless parties specifically present a basis for distinguishing a dependent claim from its corresponding independent claim, the claims "rise or fall together"). Having determined that the claims are indefinite on the foregoing grounds, the Court need not address the merits of Defendants' remaining claim-construction arguments with respect to these claims. *See Noah Sys.*, 675 F.3d at 1307 n.3 (declining to reach the merits of party's alternative grounds for indefiniteness of claims).

## C.     The Catheter

In light of the above analysis, only Claim 11 remains as asserted against St. Jude and Boston Scientific. The parties dispute the construction of the term "the catheter," as found in Claim 11, which provides:

---

[5]     In support of its argument that "resilient" is a definite term, Niazi contends that this term has been used in other patents. *See, e.g.*, *Cablz, Inc. v. Chums, Inc.*, 708 F. App'x 1006, 1010 (Fed. Cir. 2017). That the term may be found in other patents, however, is not determinative here. The Court does not hold that the term "resilient" is indefinite *per se*. Rather, the '268 Patent does not contain clear, objective parameters that put the public on notice of what is being claimed as "resilient."

A method for placing an electrical lead in a lateral branch of a coronary sinus vein using a double catheter including an outer catheter and an inner catheter slidably disposed inside the outer catheter, comprising:
inserting **the catheter** into the coronary sinus;
  advancing a guide wire through **the catheter** into a coronary sinus lateral branch vein;
  advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;
  inserting the lead through the outer and inner catheters to a target location in the branch vein; and
  withdrawing **the catheter** leaving the lead in the branch vein.

(Emphasis added.)  St. Jude contends that the term "the catheter" renders Claim 11 invalid as indefinite because "the catheter" lacks an antecedent basis.[6]  Niazi contends that "the catheter" means "the double catheter."

As addressed above, a patent claim must "inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  A claim may be indefinite when one of its terms lacks an antecedent basis.  *See* Manual of Patent Examining Procedure § 2173.05(e) (providing an example of indefiniteness if a claim refers to "the lever" without any earlier reference to a lever but acknowledging that the mere lack of an antecedent basis is not a *per se* basis for indefiniteness).  And although an indefinite claim cannot stand, a court's adopted construction "need not always purge every shred of ambiguity."  *Acumed LLC*, 483 F.3d at 806.

The term "the catheter" creates a degree of ambiguity within Claim 11.  For example, because the preamble of Claim 11 discusses a double catheter with an outer catheter and an inner catheter, the reference to "*the* catheter" in Step 1 of Claim 11 arguably

---

[6]     Boston Scientific does not argue that "the catheter" is indefinite.

may refer to the double, outer, or inner catheter. (Emphasis added.) But the Court does not consider disputed claim terms in isolation, *see Nautilus*, 572 U.S. at 901, and the remainder of Claim 11 is instructive. When Claim 11 refers to the double catheter's *component* parts in Steps 3 and 4, the claim specifies an *inner* catheter or an *outer* catheter. In this context, a person with ordinary skill in the art would understand that Claim 11's reference to "the catheter" describes the double catheter system.

Accordingly, the Court construes "the catheter" in Claim 11 to mean "the double catheter."

### D.      Order of Method Steps

The parties also dispute whether the steps recited in Claim 11 must be performed in the order listed to constitute infringement. The parties agree that, logically, the first step *must* be "inserting the catheter into the coronary sinus" and the last step *must* be "withdrawing the catheter." But the parties dispute whether the guide wire must be advanced (Step 2) before the inner catheter is advanced (Step 3).

Generally, a method claim does not require a particular order to the recited steps. *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014). But when "the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps," the claim requires the recited order. *Id.* at 1398-99 (internal quotation marks omitted).

Step 3 of Claim 11 describes the act of "advancing the inner catheter out of a front end opening of the outer catheter *along the guide wire into the branch vein*." (Emphasis

added.)  Logic dictates that the inner catheter can be advanced "along the guide wire into the branch vein" only if the guide wire has itself already been advanced through the outer catheter.  Clearly, Step 3 of Claim 11 must be performed after Step 2.[7]

Because logic requires the steps of Claim 11 to be performed in the order listed, the Court concludes that Claim 11 is infringed only when the steps are performed in the order listed.

## ORDER

Based on the foregoing analysis and all of the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.      Defendant St. Jude Medical S.C., Inc.'s motion to strike, (Case No. 17-cv-5096, Dkt. 67), is **DENIED**.

2.      Defendant Boston Scientific Corp.'s motion to exclude evidence, (Case No. 17-cv-5094, Dkt. 83), is **DENIED**.

3.      The disputed claim terms of United States Patent No. 6,638,268 are construed as addressed herein.

Dated:  October 21, 2019                          s/Wilhelmina M. Wright
                                                          Wilhelmina M. Wright
                                                          United States District Judge

---

[7]      Niazi advances no argument that Step 4, "inserting the lead through the outer and inner catheters to a target location in the branch vein," can be performed out of order.

<pre>
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                  )
      Niazi Licensing Corporation,  )  File No. 17-CV-5094
 4                                  )               17-CV-5096
              Plaintiff,            )               (WMW/BRT)
 5                                  )
      vs.                           )
 6                                  )  St. Paul, Minnesota
      Boston Scientific Corporation,)  December 2, 2019
 7                                  )  8:59 a.m. - 10:46 a.m.
                                    )  1:34 p.m. - 2:04 p.m.
 8            Defendant.            )  DIGITAL RECORDING
      _____
 9
      Niazi Licensing Corporation,
10
              Plaintiff,
11
      vs.
12
      St. Jude Medical S.C., Inc.,
13
              Defendant.
14
15    ------------------------------------------------------------
16
17
              BEFORE THE HONORABLE BECKY R. THORSON
18        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                      (MOTION HEARING)
19
20
21
22       Proceedings recorded by digital recording; transcript
      produced by computer.
23
24
25
</pre>

1    <u>APPEARANCES</u>

2    For the Plaintiff:          Michael T. Griggs, Esq.
                                 Boyle Fredrickson, S.C.
3                                840 N. Plankinton Ave
                                 Milwaukee, WI 53203
4
     For Defendant Boston       Timothy E. Grimsrud, Esq.
5    Scientific:                 Doowon R. Chung, Esq.
                                 Faegre Baker Daniels, LLP
6                                90 S. 7th Street, Suite 2200
                                 Mpls, MN 55402-3901
7
     For Defendant St. Jude     Kalpesh Shal, Esq.
8    Medical:                    Benesch, Friedlander, Coplan &
                                 Aronoff, LLP
9                                333 W. Wacker Drive
                                 Suite 1900
10                               Chicago, IL 60606

11   Transcriber:               Lynne M. Krenz, RMR, CRR, CRC
                                 Suite 146
12                               316 North Robert Street
                                 St. Paul, Minnesota 55101
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                     IN OPEN COURT

 3           THE COURT:  This is United States District Court

 4    for the District of Minnesota and we are here on two motions

 5    in two related cases.

 6           The first is Niazi Licensing Corporation versus

 7    St. Jude Medical.  And that case is numbered 17-CV-5096

 8    WMW/BRT.

 9           And then the related case is Niazi Licensing

10    Corporation versus Boston Scientific.  And that is case

11    17-CV-5094 WMW and BRT.

12           Let's get appearances of Counsel, starting with

13    the Plaintiff's side.

14           MR. GRIGGS:  Good morning, Your Honor.  Michael

15    Griggs on behalf of Plaintiff.

16           THE COURT:  Good morning.  And for St. Jude?

17           MR. SHAH:  Good morning, Judge.  Kal Shah on

18    behalf of St. Jude.

19           THE COURT:  Good morning.

20           MR. GRIMSRUD:  Good morning, Your Honor.  Timothy

21    Grimsrud from Faegre Baker Daniels on behalf of Boston

22    Scientific.

23           THE COURT:  Good morning.

24           MR. CHUNG:  Good morning, Your Honor, Doowon Chung

25    also on behalf of Boston Scientific.
```

```
 1                THE COURT:  Good morning.

 2           Thank you everyone for being here.  And I know the

 3      weather has finally cleared, but I know that it may have

 4      taken some effort to get here last night if you were coming

 5      in from out of town.  So I appreciate that you are here and

 6      here on time.

 7           Well, I have reviewed all the materials, and you

 8      know that I'm fairly familiar with the case.

 9           We have a related motions and St. Jude filed first

10      and then Boston Scientific joined and has a little bit of a

11      different argument, the response is a little bit different.

12           My suggestion would be that we start off with St.

13      Jude and that St. Jude argues first.

14           It might make sense to have the Plaintiff hear

15      both St. Jude and Boston Scientific and then respond to both

16      to avoid repetition, but I'll leave it to Plaintiff.

17           Would you like the opportunity to respond directly

18      to St. Jude and then we'd move on to Boston Scientific, Mr.

19      Griggs?

20           MR. GRIGGS:  I'm fine either way, frankly.  So

21      whatever would be easiest with the Court, I'd be happy to

22      oblige.

23           THE COURT:  I think either one would be fine.

24           I'm just thinking about, you know, whether there

25      are arguments that are going to be duplicative, but why
```

1    don't we just check and see after St. Jude argues --

2              MR. GRIGGS:  Sure.

3              THE COURT:  -- if there would be anything that

4    you'd want to respond to or if we should just move to Boston

5    Scientific.

6              So then let's start off with St. Jude's argument.

7              MR. SHAH:  Good morning, Judge.

8              THE COURT:  Good morning.

9              MR. SHAH:  So let me start with, I mean, given

10   your familiarity with the case and the issues, I'll start

11   with why I believe the briefing kind of leaves us, which is

12   there's no dispute between the parties that there was a

13   production, whether through the expert report, and

14   disclosures of factual issues and documents themselves, all

15   of which were produced well after the close of fact

16   discovery, those facts are not in dispute.

17             Similarly, there's no dispute between the parties

18   on what rule governs.  Both briefs indicate that it's

19   Rule 37 of the federal rules that govern.  And that those

20   rules provide that a party that fails to disclose

21   information in a timely manner under Rule 26 here by the

22   discovery cutoff should not be, or shall is the word that's

23   used in the rules, shall not be permitted to use those

24   materials at a trial hearing or on a motion.

25             And that's precisely what we're seeking, Judge.

 1    Is that with respect to Dr. Burke, his last-minute,

 2    after-the-fact claim that he is the factual evidence of

 3    direct use of the product, that that should be excluded.

 4    And then with respect to Mr. Carlson, his reliance on what

 5    appears to be 5,000 pages of documents that were not

 6    produced before.

 7             THE COURT:  Does the 5,000 documents include

 8    copies of the actual licenses?

 9             MR. SHAH:  I don't believe they do, Judge.  I

10    haven't gone through all of them, but I -- and I don't know

11    if Boston Scientific knows, but I believe that they're not

12    in there.  Is that correct?

13             MR. GRIMSRUD:  That's correct.

14             MR. SHAH:  Yeah.  That's -- so from our

15    understanding, Judge.

16             And I think it's also useful to tell you, Judge,

17    that I believe that the entirety of their production prior

18    to that was about 10-to-12,000 pages.  So we're talking

19    about almost 50,000 -- you know, 50 percent of the entirety.

20             But I think whether it's 5 or 5,000, the important

21    component is the rule, which says they shall not be

22    permitted for use at trial, which is what we're heading

23    towards.

24             And there are two exceptions, Judge.  One is

25    unless the failure is harmless.  And the other is unless

1    there's substantial justification.  And neither of which has

2    been provided, Judge.

3              The only response that I gathered from their

4    opposition was that they simply weren't aware of this

5    information prior to the expert discovery deadline.

6              And frankly, Judge, I don't think that falls into

7    either category as harmless or substantial justification,

8    but it's not.

9              It's certainly not harmless with respect to Mr. --

10   Dr. Burke and his claim that he's a direct infringer.  That

11   has been an essential component to this case.

12             And let me, if I may, I made a quick timeline

13   demonstrative I have given to opposing Counsel, I'd like to

14   --

15             THE COURT:  All right.  As long as you've given it

16   to opposing Counsel I'll receive it.  Thank you.

17             MR. SHAH:  Yeah.  So before I go to the timeline,

18   I think one other important component, Judge, and maybe it's

19   just a nuance, but I think details are important, is the

20   entirety of NLC's opposition here rests on an affidavit by

21   Mr. Griggs.

22             So while they claim in their brief that NLC didn't

23   have certain information, no one on behalf of the company

24   has said that, it's only their counsel who, frankly, unless

25   he's going to be a (inaudible) witness at trial, which he's

1    not, in my view, that the declaration in and of itself is

2    inadmissible and improper to be before Your Honor on a

3    motion.

4         But putting that aside, if Your Honor is going to

5    consider the argument that somehow they didn't know about

6    it, I think that timeline is very telling as to Dr. Burke,

7    because you may recall, Judge, that we have filed on behalf

8    of St. Jude numerous motions in this case with respect to

9    dismissal.  I have it, so.

10         In any event, Judge, you may recall we filed

11    several motions in this case with respect to the contentions

12    issue.

13         So the first, as you'll see they're back in --

14    when this case started we filed a motion on the complaint

15    because the complaint did not have any issues with respect

16    -- did not have any disclosures with respect to direct

17    infringement.

18         We then a year later received their infringement

19    contentions.  We went back and forth with some letters in

20    2018 and we filed another motion.  And in that motion we

21    made clear that there's no evidence of direct infringement

22    and we moved to strike the infringement contentions.

23         And I think it's important to note, Judge, that

24    that's not our burden.  Plaintiff has the burden of

25    establishing infringement.  They're asserting indirect

1    infringement.  Indirect infringement by law has a

2    requirement of direct infringement, which is direct news.

3         Yet, it wasn't there.  Our motion was denied, fair

4    enough.  But they knew and should have known at all times

5    that that was evidence that needed to be presented.

6         We subsequently took the deposition of Dr. Burke.

7    And Dr. Burke had indicated he's been working with them for

8    over a year.  And so for some reason either Dr. Burke did

9    not disclose, or Plaintiff did not ask, both of which is not

10   a substantial justification, Judge, with respect to what is

11   -- what is the basis of this direct infringement claim until

12   October 15th, when all of a sudden we hear somehow it is Dr.

13   Burke and he's done it.

14        THE COURT:  When did you first know that Dr. Burke

15   would be Plaintiff's expert?

16        I know there was a disclosure date of the identity

17   of everyone's experts, but I just want to confirm --

18        MR. SHAH:  Correct, Judge.

19        I think that was earlier this year.  I can look it

20   up if you want.  I can look it up on my iPad real quick.  I

21   don't have a calendar before me.

22        THE COURT:  Well, maybe it's a simpler question,

23   did the -- all the parties disclose the experts, the

24   identity of the experts?

25        MR. SHAH:  Correct, Judge.

1          THE COURT:  By the deadline in the scheduling

2     order?

3          MR. SHAH:  We did.

4          THE COURT:  All right.

5          MR. SHAH:  We did.

6          THE COURT:  But importantly there, Judge, if Dr.

7     Burke was going to be a fact witness as well -- so there's a

8     difference, right?  We're not -- there are other *Daubert*

9     issues that we'll have for Your Honor at the *Daubert* phase.

10          But with respect to his claim that I am the one

11     who's been implanting these devices in an infringing manner,

12     that is a direct piece of factual evidence that's required

13     and that should have been disclosed.

14          And so we asked discovery, as was on our brief on

15     that question.  We also have the federal rules that require

16     additional disclosures of fact witnesses.

17          He was not disclosed in that regard and so --

18          THE COURT:  I understand the distinction.  And so

19     I'm not -- I'm not merging a fact witness --

20          MR. SHAH:  Okay.

21          THE COURT:  -- with an expert witness, but I was

22     just curious whether the parties had, you know, consistent

23     with the order, identified their expert witnesses.

24          Now, with respect to the -- your point on

25     discovery, what I take Plaintiff's argument to be there is

1    that you didn't ask for -- you didn't ask an interrogatory

2    about the use, instead you asked for documents about the

3    use.

4             What is your response to that argument in

5    Plaintiff's position?

6             MR. SHAH:  Well, my response is two-fold, Judge.

7             First, I shouldn't need an interrogatory on that

8    particular issue because that's a requirement as part of the

9    infringement contentions.

10            The basis for your infringement if you're going to

11   assert indirect infringement requires a finding or an

12   assertion of direct infringement.

13            And so I think it's a little bit of burden

14   shifting improperly that suggests that my client now has to

15   determine their infringement analysis.

16            They need to present the basis of their

17   infringement in their contentions, and that's precisely why

18   we moved to strike it.

19            And equally important, they've been on notice of

20   this for a significant time to now just say, well, somehow

21   we would have just asked to Rog that would have been clear.

22   And, of course, Judge, that doesn't mesh with their latest

23   complaint but, I mean, the position which is we didn't even

24   know about this.

25            So whether one would have asked to Rog or not, I'm

1    assuming the Rog would have said nothing until, you know,

2    well after the discovery deadline, but I don't think a Rog

3    answers it.

4         And, frankly, I do think -- and I have to go back

5    and check, Judge -- and I will even, perhaps, I don't want

6    to take the time now, I do think we asked a Rog that may

7    have at least a line with this issue, if not directly asks

8    this issue.  But, again, I would rest on the contention

9    issue therein the burden on the Plaintiff with respect to

10   that position.

11        There may have been one on the damages side now

12   that I think about it but I have to go back and check,

13   Judge.

14        THE COURT:  And it seems like the primary argument

15   is that this is a fact witness and a fact witness needed to

16   be disclosed as part of Rule 26(b) initial disclosures.

17        And here we have a fact witness who is, in your

18   view, well, working under the cloak of an expert witness.

19        MR. SHAH:  Correct, Judge.

20        And I think, also, it's that -- the nature of that

21   fact evidence.  So it's not just a technicality that somehow

22   they made a mistake and merged these two or didn't know

23   about it.  They certainly should have known.

24        Your Honor may recall, we had that mediation and

25   one of the factors that was part of it.  I don't want to --

1          THE COURT:  I don't want to insert anything that

2     was covered in the mediation --

3          MR. SHAH:  Sure.

4          THE COURT:  -- because of the mediation ground

5     rules.  And it may not even apply because confidential

6     information is what is covered under the mediation ground

7     rule.

8          MR. SHAH:  That's fair, Judge.

9          THE COURT:  But I don't think we even need to get

10    into that.

11         MR. SHAH:  It was more of a timing issue.  At the

12    time of that, the evidence had been closed and we went

13    through that effort, but let me skip that.

14         More importantly, it is the factual nature of this

15    evidence.

16         So we did depose Dr. Burke before and he was

17    candid that he has not taken the time or has not preserved

18    these records, there might not even be records, on this

19    alleged use over time.

20         And in order for us at St. Jude to verify this, we

21    would have to take depositions of hospitals, potentially get

22    HIPAA records of surgical patients to see precisely what

23    steps were used.

24         You may recall that the method claim at issue

25    here, Judge, has five distinct steps, which has been ruled

1    in the claim construction order must be done in sequence.

2              In order to determine that, we now are in the

3    position where either Dr. Burke is just going to say, hey, I

4    did it.  And I haven't had the opportunity to take discovery

5    of the hospitals, to take discovery of vendors, to take

6    discovery of patients to either determine whether or not

7    that's factually provable or not provable, whether there's

8    any credibility to it whatsoever.  That would be a

9    significant amount of discovery that I have to do.

10             And the position we're in now is an expert's going

11   to get up on the stand and he's going to say, I did this in

12   an infringing way, and the jury's going to have to either

13   believe him or not because I haven't had the time or the

14   opportunity to take that deposition.

15             So it's a lot more than just, you know, it came --

16   he happens to have this statement.  It's a pretty

17   significant statement that we have been indicated to the

18   Plaintiff from day one, since the time the complaint was

19   filed, that they lack in as far as evidence.

20             And to come in October 15th and surprise us with

21   that is completely improper.

22             THE COURT:  Let me ask you about your chart here.

23             MR. SHAH:  Yep.

24             THE COURT:  And I'm looking at in the middle of

25   the page.  You have a pink reference to "2018 NLC's expert

```
 1    concludes he is a direct infringer, but this is not

 2    disclosed."

 3              Tell me a little bit about what you understood at

 4    this point.

 5              You're talking the deposition in -- just a few

 6    days ago, right?

 7              MR. SHAH:  Correct.  Yes.

 8              THE COURT:  And during that deposition then you

 9    learned what?

10              MR. SHAH:  I asked him, When did you realize that

11    you were an infringer because you claim to be an infringer

12    of St. Jude's products?  And he said, When I read the

13    patent.  And I said, When was that?  And he said about

14    August 20 -- I think it was August, but 2018.

15              And then I said, Well, when did you disclose that

16    to your lawyers?  And he says, On October 4th or 5th,

17    whatever that date was.

18              And so, you know, again, I don't think that's --

19    whether it's a communication gap, which I -- frankly I find

20    hard to believe that you're working with an expert and this

21    is the central issue on infringement and you haven't

22    discussed it.

23              But, in fact, if that's what it is, it's not St.

24    Jude's problem that you didn't ask that pertinent question,

25    particularly when we filed two motions and you have
```

1    contentions that require that disclosure to not have asked

2    that of your expert, who apparently was aware of it as far

3    back as 2018, is really hard to swallow for my client,

4    Judge.

5         I mean, this is a central issue.  We've spent a

6    lot of money briefing it, albeit we've lost, but then to

7    have that notice and to take that time through two motions,

8    through the contentions, through all the back and forth, to

9    be in a position where this is the evidence.  You know, we

10   were told at the close of fact discovery Mr. Griggs has

11   adamantly said we don't need direct evidence, we can just

12   use the documents.  They say that again in their briefing.

13   Yet, here we all are, you know, months after the close of

14   fact discovery, talking about a medical expert who's going

15   to try to get on the stand and say, I am the factual witness

16   who can tell you that I put these products in an infringing

17   manner.  That's problematic.

18        And just as problematic is 5,000 damages documents

19   that we now have to digest and review in a matter of three

20   weeks, spend an expert's time and money to look at.

21        I mean, those are things that just should have

22   been thought of and done before.

23        And that's what it comes down to, fairness and

24   what the purpose of the federal rules and the fact discovery

25   is.

1            THE COURT:  Well, it seems like we have two

2     different issues here relating to the motions that seek to

3     exclude portions of the expert opinions, so this is -- this

4     is not a *Daubert* motion.  It's related to discovery.

5            But with respect to Dr. Burke, it's more about we

6     have a new fact witness.

7            MR. SHAH:  Correct, Judge.

8            THE COURT:  With respect to Mr. Carlson, it's

9     whether there is -- there are facts that the expert relies

10    on that should have been disclosed during fact discovery or

11    whether the rules relating to expert disclosures allow that

12    expert to identify new facts.

13           So tell me about St. Jude's view on the

14    Plaintiff's view of how the rules operate?

15           MR. SHAH:  Well, Judge, I think there's certainly

16    -- I think the rules operate -- here's St. Jude's position

17    on that.

18           An expert certainly is able to and should be

19    permitted to rely on those things you would rely in the

20    ordinary course of his expertise.

21           If you're a physician that may be, you know,

22    you're background and training as a physician.

23           If you're a damages expert, your background and

24    training as an accountant and maybe standard things you

25    would go to, whether it's a textbook, or an examining manual

 1    or, you know, those types of things.

 2          And if in the course of that whether it is because

 3    you're turning to your standard arsenal, if you will, of

 4    resources that a physician, or an accountant, or an engineer

 5    would typically go to then it's probably fair game because

 6    both experts would know, okay, we're going to hit this and

 7    this is where we should go to.

 8          That's different than factual evidence that's not

 9    unique -- I'm sorry, that's unique to a particular

10    individual in a particular analysis.

11          And so with respect to Dr. Carlson -- I mean, Mr.

12    Carlson, for example, he has apparently used 5,000-plus

13    documents that are not available publicly, that are not

14    available at St. Jude, that don't necessarily relate, in our

15    view, to the facts.  I'm sure they don't, which is why they

16    weren't produced during fact discovery, because if they were

17    related directly then I'm sure Plaintiff would have found

18    them and produced them, but they are not.

19          And somehow whether it's through his prior roles

20    as an expert or some other relationship he obtained these

21    5,000 documents.

22          That's not the type of documentation that the

23    federal rules permit an expert to be able to rely upon

24    without prior disclosure because that is factual evidence

25    that you're relying upon for him to digest and then use his

1    expertise upon, as opposed to a foundation for his

2    expertise.

3          And the 5,000 documents is a perfect example,

4    because our expert would not have access to them absent us

5    apparently asking, which I don't think is the rule.  I think

6    the rule is if we're going to rely on anything like that you

7    must produce it at the time of the expert report.  And if

8    it's limited then, of course, our expert is smart and could

9    handle it.

10          If it was five documents, Judge, three licenses,

11    something manageable, I don't think we would be here.

12          We're not here -- again, this is not a

13    technicality.  This is the reality of the substantial

14    hardship and burden that's been placed on St. Jude in that

15    5,000 documents relating to damages issues is a lot for

16    someone to absorb.

17          And whether admissible or not I think is a red

18    herring because they are going to have to be addressed.

19          Their expert's going to get on the stand on the

20    damage side and say, this is my royalty number based on

21    documents, you may not try to admit them, but in order to

22    cross-examine him, we're going to have to go through those

23    and explain why they're not applicable, otherwise how else

24    to we attack his credibility?

25          And so now we're faced with, you know, a three or

1    four week period, albeit it's a little bit longer but it's

2    still a significant production that then has to be analyzed,

3    addressed, and factored into this calculation.  Again, all

4    things that should have been produced prior so that we can

5    understand what and how this analysis is coming from, just

6    like we should be able to understood what the claim for

7    direct infringement is when we're addressing and formulating

8    our defenses.

9              THE COURT:  All right.  Anything further?

10             MR. SHAH:  One last thing, Judge.

11             THE COURT:  All right.

12             MR. SHAH:  I think it's important to mention,

13    just, I think it's kind of telling of the mess that's

14    created, for example, by Dr. Burke.

15             I had to go back -- I did go back with my client

16    and I said, Do we have -- you know, how can we check this?

17    Because Dr. Burke did testify, Judge, and I have his

18    deposition transcript, he also testified that about

19    20 percent of the time he doesn't use the product with -- in

20    a way that would be capable of qualifying as direct

21    infringement.

22             So there are other issues with his infringement

23    analysis, but at least 20 percent of the time he mixes and

24    matches products.

25             So he may use a Boston Scientific product for part

1    of it, a St. Jude product for part of it, an Aero product,

2    but that -- that's in his testimony.

3          So now, we have an issue of credibility and

4    qualification on percentage.

5          But I had to go back and find the customer service

6    rep that worked with Dr. Burke and talked to him about Dr.

7    Burke's testimony on the factual side.

8          And I just updated our initial disclosures two

9    weeks ago to include him because unfortunately if Dr. Burke

10   is allowed to put this testimony on about him being the

11   direct infringer, I'm going to need to put on a witness

12   who's going to have to say why I don't think that's true.

13         And, again, I don't have any real way to verify

14   that from either side because I don't have the hospital

15   records, I don't have the patient records in order to be

16   able to precisely pinpoint that.

17         But we're in this position where if he's allowed

18   to do that testimony, I'm going to have to put on a

19   representative or two from St. Jude who's going to say, I

20   don't think that's accurate.  In fact, I've seen him in the

21   surgical OR and he's done it in a different way.

22         And that's the type of mess that entirely could

23   have been prevented had we had this disclosure in time

24   instead of having an expert who's going to also, you know,

25   focus on factual issues and that I have to have two factual

1    witnesses say, well, for part of his testimony here's what

2    I'm talking about, but for the expert part of the testimony,

3    there's going to be an expert that's rebutting.

4         So it's just horribly confusing.  It all could

5    have been avoided if Plaintiff had just followed the

6    schedule you had provided and the disclosure requirements

7    under the federal rules.

8         THE COURT:  Thank you.

9         Why don't we go ahead and get Mr. Griggs' response

10   on this, especially since we now got the chart and I asked a

11   few questions.

12        MR. GRIGGS:  Thank you, Your Honor.  And I guess

13   I'd like to start with the Carlson issue.

14        You just heard Counsel for St. Jude basically

15   saying that the burden is on the volume of the -- of the

16   documents, they're 5,000 pages and, you know, that's very

17   difficult for them to address, and so on, and so forth.  And

18   that's the basis for the prejudice or the burden that

19   they're feeling.

20        Counsel said if it was just a few documents we

21   wouldn't even be here today.

22        And so what it really gets down to is should these

23   documents should have been produced three weeks earlier with

24   the report and what not?

25        THE COURT:  No.  I think the question -- that

1    comment doesn't change the argument, and I think this is an

2    argument on both sides, that damages-related documents

3    needed to be disclosed earlier as part of fact discovery.

4         And sometimes there will be additional documents

5    that might be referenced and, you know, disclosed a little

6    bit later, but not this type of thing.

7         But let's go back, you know, let's start with the

8    damages and go back.  Because there are, as I look at it,

9    you have an obligation to disclose your computation of

10   damages and all the documents that you rely on as part of

11   26(a).

12        And you also have an obligation to respond to

13   discovery requests.

14        Now I understand your argument about was there a

15   request that with precision asked the fact discovery that

16   Dr. Burke is orally providing.

17        However, no question that damages-related

18   documents were requested as part of discovery.

19        And so I think you need to deal with initial

20   disclosures and the requirement to produce documents with

21   initial disclosures.  And then why you didn't respond to

22   document requests.  And then why you didn't produce.

23   Because the report requirement isn't that you just get to

24   mention a document, it needs to be -- you know, the rule, I

25   think, is pretty clear that the report must contain.  And

1   contained means include facts, and it didn't, and it still

2   doesn't because the license agreements aren't in there.

3           So that's -- if you want to start out with Mr.

4   Carlson, I think you need to address all of the multiple

5   failures to produce the license agreements that are relied

6   upon here.

7           MR. GRIGGS:  Sure, Your Honor.  Thank you.

8           Well, first, as we set forth in the brief, we

9   didn't have these documents during the fact discovery

10  period.

11          THE COURT:  What about the three agreements

12  related to the patents?

13          MR. GRIGGS:  Those -- the settlement agreements?

14          THE COURT:  Yeah.

15          MR. GRIGGS:  Yeah.  Those were produced during

16  discovery.

17          I think there are three separate agreements that

18  aren't related to the patents.

19          THE COURT:  Okay.

20          MR. GRIGGS:  That Mr. Carlson also identified.

21          THE COURT:  All right.

22          MR. GRIGGS:  And so the timing of this is we did

23  fact discovery.  Fact discovery closed.

24          THE COURT:  Uh-huh.

25          MR. GRIGGS:  We started working with our expert.

```
 1          Our expert decided to use these license databases
 2    to search for similar licenses.  Ran the searches in the two
 3    databases.  Retrieved the data.  And then I don't want to
 4    get too much into attorney/client or work product, provided
 5    a draft report to Counsel.
 6          THE COURT:  When?
 7          MR. GRIGGS:  It was probably about five or six
 8    days before the expert report deadline.
 9          THE COURT:  When did you know your expert was
10    trying to obtain additional licenses for purposes of the
11    expert report?
12          MR. GRIGGS:  Your Honor, I'd have to go back and
13    look at my records, but I'm fairly certain all of these
14    conversations took place after the close of fact discovery
15    because that's when we pivoted over to the expert phase of
16    the case.
17          So, again, it's not as if NLC had these documents
18    and were sitting on them during fact discovery.  We engaged,
19    you know, an outside expert to do the work and do the
20    damages analysis and this was one component of that.
21          And so --
22          THE COURT:  It seems pretty clear that what the
23    experts do is work with the facts.  And they don't generate
24    the facts.  And they don't -- we don't end up with a new
25    fact discovery period on an expert's new investigation of
```

1    the -- of facts that should be part of, at least, you know,

2    your efforts to come up with your own -- own facts to

3    support the case.

4            And I -- it just seems like we are in -- on

5    different planes here with respect to what facts -- what

6    experts do, they opine on the facts.

7            And there's got -- are you saying that your expert

8    just started fresh and worked on all of these after the

9    close of discovery?

10           MR. GRIGGS:  Your Honor, and I'd have to dis -- I

11   mean, it's not based on just the facts in the case.

12           For example, you know, if you have trademark

13   cases, you can have survey experts.  And they will go out

14   and they will conduct a survey, and they will poll people,

15   and generate survey questions, and so on, and so forth.

16           Now the expert may generate an opinion based on

17   that survey, but that underlying survey evidence isn't

18   entered into evidence.

19           And that's generated after the fact, that's what

20   the expert is saying.

21           THE COURT:  But that's generating survey evidence.

22   It's not finding existing facts and relying on them.

23           MR. GRIGGS:  I guess I somewhat disagree with that

24   here because what the expert has done is he's, you know,

25   gathered a number of other licenses that he believes are

1    similar technology, similar devices, looked at the royalty

2    rates.  And then out of those, you know, based -- sort of

3    taken almost a survey of that, and then evaluated that, and

4    then consolidated that, and then used that as part of his

5    analysis.  And it is included in his summary chart attached

6    to his report, so.  And I think --

7          THE COURT:  But a summary has -- and this is

8    what's -- I guess, the bottom line is we don't have the

9    licenses.

10          MR. GRIGGS:  And, Your Honor, I think we're going

11    to the weight of the evidence at this point, which may be

12    challenged on a *Daubert* motion or a motion in limine later.

13    But just to simply say you're excluded at this stage of the

14    case is quite an extreme remedy.

15          And, you know, again, if they want to challenge

16    that the documents aren't there, or that they're not going

17    to be submitted into evidence, or whatever other substantive

18    attacks they want to make, you know, that's for later in the

19    case.

20          THE COURT:  But the -- this is not excluding the

21    expert, it's excluding evidence that hasn't been produced.

22          And so even if I -- if I agree with you all along,

23    there still are no licenses.  The licenses aren't produced.

24          And so if -- if it still hasn't been produced, the

25    license agreements, how can the other side actually look at

1    the evidence and offer some different analysis if it is a

2    summary analysis?  I don't think the case law supports that.

3             MR. GRIGGS:  Okay.  Maybe there's a bit of a

4    disconnect here.

5             I believe what is generated out of these databases

6    is basically abstracts and so it abstracts certain

7    information.  It does not contain the actual underlying

8    license documents.

9             THE COURT:  That's my point.

10            MR. GRIGGS:  And the abstracts have been produced.

11            THE COURT:  I'm talking about the license

12    agreements.

13            If the license agreements are being relied upon by

14    your expert, I think there are cases that say the licenses

15    themselves need to be supported because how would they ever

16    get to cross-examine maybe an incorrect abstract, or

17    summary, or look at whether or not it's comparable really if

18    you don't have the actual document?

19            So what's your reason for not hunting down the

20    actual licenses?

21            MR. GRIGGS:  Again, Your Honor, our expert does

22    not have the licenses.  And those are not provided by those

23    services.

24            THE COURT:  Okay.

25            MR. GRIGGS:  So -- so that's -- I mean, that's

1    just the fact of why they were not produced.

2         And like I said, I think we're starting to wander

3    into the weight of the evidence.  And, you know, if they

4    want to attack that he's only relying on abstracts and not

5    the documents -- you know, not the underlying documents

6    themselves, like I said, that's an argument for a different

7    day.

8         What we're -- we're talking about here is we

9    provided what was relied on and we provided it three weeks

10   after the initial deadline.

11        THE COURT:  Why isn't that too late?

12        MR. GRIGGS:  Because, I believe -- and this gets

13   back into Rule 26, and we did cite a number of cases and

14   there are many more that there isn't a production

15   requirement, these are expert disclosures with the report.

16        THE COURT:  What does the word contain mean to

17   you?

18        MR. GRIGGS:  It talks about containing the facts

19   in the data, which we've got other cases that clarify that

20   that just -- it means listing what you are relying on.

21        And I cited just two exemplary cases, there are

22   many more.  I cited the *Bazarian* case, which also simply

23   says you just need to list the expert's experience and the

24   documents and whatever else is being relied on.

25        I cited the *Fidelity* case, which is out of the

1    Seventh Circuit which talks about requiring an expert to

2    retain the materials that were considered so that -- you

3    know they could be produced later on in the discovery

4    process, if necessary.

5          You know, a lot of the cases cited by the

6    Defendants here are about Rule 45 subpoenas being issued to

7    experts for documents that were not included with the

8    initial expert report.

9          So I think, based on my research, and my reading

10   of it -- and I haven't seen a single case cited by any of

11   the Defendants here saying that there was a production

12   requirement under Rule 26.  I mean, Rule 26 talks about

13   expert disclosures, a disclosure requirement.

14         THE COURT:  Yes.  And the disclosure must contain

15   the facts.

16         MR. GRIGGS:  Which -- which it does.  It

17   identifies these documents.

18         THE COURT:  Okay.

19         MR. GRIGGS:  And then, you know, if they want to

20   see them, they can ask for --

21         THE COURT:  But that's not the facts.  That's not

22   the facts.  That's saying there's a place for the facts

23   somewhere else.

24         MR. GRIGGS:  But, Your Honor, I understand, but I

25   have not seen a case saying -- supporting what you are

1    saying.  I've seen cases supporting what I am saying.  They

2    have not cited any cases supporting that interpretation.

3              THE COURT:  All right.  All right.

4              MR. GRIGGS:  So, you know, I --

5              THE COURT:  Don't a lot of your expert disclosures

6    include lists that reference Bates numbers?

7              MR. GRIGGS:  Yes.  And that's for the documents

8    that are -- that are in the case.

9              You know, as I mentioned, they could have a

10   conversation with another expert, or somebody else, or

11   someone not involved in the case at all, and they could list

12   that conversation, and then you can probe that conversation

13   during expert discovery.

14             But simply identifying that conversation satisfies

15   the rules, Rule 26(a)2(B).

16             THE COURT:  Okay.

17             MR. GRIGGS:  And, you know, again, this dovetails

18   a little bit with Rule 703 which talks about, you know,

19   experts can form their opinions based on anything that other

20   experts would reasonably rely upon here.

21             And so that says that they can rely on facts and

22   other information that are not part of the record in the

23   case, and they don't need to be admitted into the record in

24   order for the opinion to be admissible.

25             THE COURT:  Right.  But the experts have to have

1    an opportunity -- the parties and the experts have to have

2    an opportunity to digest the facts so that they can prepare

3    their, you know, corresponding evidence and then prepare

4    their experts.

5         How would it be possible for a rebuttal report to

6    meet the deadline based upon your three-week production of

7    5,000 documents?

8         MR. GRIGGS:  Well the -- again, we produced them

9    when we had them.

10        And the three weeks -- we've already extended the

11   deadline.

12        THE COURT:  I'm not talking -- I'm talking about

13   the current deadlines that this Court had in place.  I'm not

14   talking about what the Court had to do, only what happened.

15        I'm talking about we had a deadline for opening

16   reports and then rebuttal reports.  And by producing 5,000

17   documents, how do you think that's fair for the other side?

18        MR. GRIGGS:  Well, Your Honor, again, we're

19   talking about the volume -- I mean, if those had been

20   produced on the day of -- I mean, we're talking about the

21   three-week delay.  And, again, there's a fundamental

22   disagreement here as to what is required under Rule 26.

23        And, you know, this is not a hiding the ball -- I

24   mean, we identified it in pretty substantive and substantial

25   summary charts and an exhibit attached.

1            But this is not --

2            THE COURT:  But summary charts, you have to make

3    the underlying information available --

4            MR. GRIGGS:  And we --

5            THE COURT:  -- under the rule.  Under Rule 1006

6    you have to -- if you prepare a summary chart, the

7    underlying information has to be immediately available.

8            MR. GRIGGS:  Yeah.  And it is.  But what happened

9    was --

10           THE COURT:  The licenses aren't.

11           MR. GRIGGS:  We, you know, we just jumped straight

12    to a motion to exclude.  If they would have asked it the day

13    they got the reports, we would have turned it over.

14           THE COURT:  Okay.  All right.

15           MR. GRIGGS:  So.

16           THE COURT:  I think I understand Carlson.

17           What did Dr. Burke?  Because that is a little bit

18    different in that here you have the burden to produce

19    evidence to support infringement.

20           The gap, alleged gap, you may not agree that there

21    was a gap, was identified.

22           In the motion to strike that was rendered moot,

23    the response that you had to that motion was that, We don't

24    have to do anything with the evidence at the time of our

25    infringement contentions.  That's just for theories.  We

1    produced the evidence later in discovery.

2            And you didn't produce that evidence later in

3    discovery.  And I have a few questions about that.

4            MR. GRIGGS:  Sure.

5            THE COURT:  What you did was you presented an

6    expert report and you inserted as if this was expert

7    material facts about the experts.

8            So explain what your thought process -- and if

9    this was a new fact witness, why you didn't identify this

10   person as a fact witness and supplement -- and immediately

11   supplement your initial disclosures and identify this as a

12   fact witness, this person as a fact witness.

13           And, you know, deal with what, by your

14   declaration, is a big problem, in that, whoops, we found

15   some new facts that we didn't discover earlier.  And we're

16   -- we need to be able to present those.

17           Why did you, and I'll use the word cloak them, in

18   an expert report?

19           MR. GRIGGS:  Well, Your Honor, again, I'd just

20   like to start out that Rule 23(e) provides for

21   supplementation of prior disclosures which --

22           THE COURT:  But not in an expert -- buried in an

23   expert report.

24           MR. GRIGGS:  Well, no, that's not true.

25           I mean, it says that it just needs to be in

1     writing.  It can be in a letter, it can be in an e-mail, it

2     needs to be in writing.  And so this is disclosure in

3     writing.

4              THE COURT:  Okay.

5              MR. GRIGGS:  You don't necessarily need to go back

6     and revise the initial disclosures or interrogatory answers,

7     it just needs to be communicated in writing.  And that's

8     what Rule 26(e) requires.

9              As far as the timing goes, maybe it is unfortunate

10    that it was not learned of Dr.  -- that NLC did not learn of

11    Dr. Burke's infringement until after the close of fact

12    discovery.

13             THE COURT:  Why not?  You had -- when did you

14    start working with this expert?

15             MR. GRIGGS:  We started in -- we started working

16    with him via the IPR, which was focused on invalidity.

17             So there were no conversations of infringement

18    back then and that was focused on Medtronic because St. Jude

19    and Boston Scientific, you know, were not involved in that.

20             And so I believe when you go back and look at the

21    transcript, it was just sort of a general question that was

22    posed to him.

23             And, you know, it wasn't further developed under

24    the context of what he was thinking, but I believe that's

25    what Dr. Burke meant when he said, That's when I first sort

1    of started, you know, realizing that I might be a direct

2    infringer, was in the context of that IPR.

3          And then, frankly, we really didn't engage Dr.

4    Burke until after the close of fact discovery again when we

5    started talking specifically about the question of

6    infringement with respect to St. Jude and Boston Scientific.

7          THE COURT:  But this gap in this evidence that St.

8    Jude alleged was flagged for you.

9          Don't you think you have some obligation to be

10   diligent in pursuing the fact discovery you want to pursue

11   to prove your case and here you've got an expert right in

12   front of your nose?

13         MR. GRIGGS:  Yep, Your Honor.  And, again, perhaps

14   we could have done things differently.  But again that, I

15   guess, would go to the substantial justification as to --

16   you know, I haven't seen any case law about, well, you have

17   to diligent -- you know, diligently go out and try and

18   gather all the evidence within the fact discovery period,

19   which, you know, I believe we were trying to do here.

20         THE COURT:  You don't think you have an obligation

21   to be diligent to look to -- as a Plaintiff when you have

22   claims to discover the evidence needed to prove your case?

23         MR. GRIGGS:  Sure.  Your Honor, and we were -- I'm

24   not saying that we were not diligent, maybe we were looking

25   in different areas, but, you know, I can't go back and

1    change how it unfolded.

2          And, you know, frankly, I believe we timely

3    disclosed this shortly after we learned about it.  We did it

4    in compliance with Rule 26(e).

5          And, you know, if the Court is going to consider

6    that there is some sort of disclosure violation here, we've

7    cited the cases with respect to harmlessness of this,

8    particularly where expert discovery's still ongoing.

9          You know, St. Jude has already disclosed --

10          THE COURT:  What about fact discovery?

11          You're forgetting that fact discovery was closed a

12    long time ago.  And this late-breaking disclosure of a fact

13    witness on a gap that you had in facts would require fact

14    discovery to be reopened.

15          MR. GRIGGS:  Well, Your Honor, and we could get

16    into that a little bit because Dr. Burke -- you heard St.

17    Jude's Counsel talking about, well, we need to go and

18    subpoena hospitals, and so on, and so forth.

19          Well, Dr. Burke explained during his deposition --

20    Dr. Niazi also explained this during his deposition, but the

21    records that are made with respect to these patients during

22    these procedures, they do not lay out step-by-step what is

23    going on.

24          So it's neither going to disprove nor corroborate

25    what Dr. Burke is saying.

 1          What Dr. Burke said is, you know, the records that

 2    would exist would be records of the equipment that was used

 3    and only the equipment.

 4          So it's not going to be a detailed step-by-step of

 5    the procedure.

 6          And he said -- and Dr. Burke does not have these

 7    records, they are in the possession of the hospitals because

 8    they would be associated with patient files.

 9          Dr. Burke also said he thought that St. Jude,

10    since they sold these devices, would also have similar

11    records as to which devices were sold --

12          THE COURT:  You know under the law that's not an

13    excuse for you producing the records.

14          And that just underscores the need that St. Jude

15    or Boston Scientific, if it's relevant to Boston Scientific,

16    would have to be able to go to those third parties to, you

17    know, have you identify the third parties that Dr. Burke

18    talked to.

19          I don't see any way around, in light of this late,

20    very late disclosure of information, you absolutely knew

21    that it was the doctors who would know about the use.  You

22    wanted St. Jude to disclose the doctors who used the

23    product.

24          Here you have an expert, your expert, who you know

25    uses the product and you didn't ask the question.

1          St. Jude, if -- if this was allowed, if this late

2     disclosure of discovery was allowed, and I haven't made that

3     decision yet, St. Jude would absolutely have the right to

4     reopen discovery and find other evidence that contradicts

5     the evidence that you want to present and use to support

6     your case.

7          They don't just get to look at the facts that that

8     you've produced late.

9          MR. GRIGGS:  Your Honor, and -- I am not saying

10    that they -- we would certainly not object to allow them to

11    take whatever discovery they felt necessary.

12         My only point was that we believe that they would

13    be in possession of records, as well.  And I'm not saying

14    that's an excuse or that they should not be able to pursue

15    whatever additional discovery they would want and we

16    wouldn't object to that.

17         THE COURT:  But this was your burden.  This

18    discovery was your burden to go get.  Why didn't you do this

19    earlier?

20         MR. GRIGGS:  Well, Your Honor, frankly, the -- you

21    know, like I said -- and I don't want to get too far into

22    what we were doing, but we were going down other avenues.

23    And, yeah, I guess Dr. Burke was sitting right in front of

24    us, but, you know, we were busy with -- and I don't -- you

25    know, we were busy with the claim construction, you know,

1    there were a lot of fact depositions that were happening at

2    a single time and so we put off talking to Dr. Burke until

3    we wrapped up, you know, what we were working on at the

4    time.

5            And, you know, when he disclosed that to us, we

6    promptly put it in the expert report and we disclosed it to

7    the other side.

8            And just further note, Boston Scientific is not

9    challenging this.  This is -- St. Jude is the only one

10   that's making a challenge to Dr. Burke's testimony in these

11   motions here.

12           You know, and, again, I've got a number of cases

13   that talk about, you know, look, if you get an opportunity

14   to depose this person, then the harm is alleviated.

15           THE COURT:  It's not just this person.  It's that

16   the whole topic of direct infringement has been opened up

17   on.  Because prior to this witness appearing at the two last

18   pages in an expert report, there was no disclosure of a fact

19   witness who would testify about his direct infringement

20   using the method of patent.

21           MR. GRIGGS:  And, Your Honor, again, you know, if

22   we could have disclosed him earlier, if we had known about

23   it, we certainly would.  This is not as if we're trying to

24   hide the ball or anything.

25           You know, my reading of these cases is that

1    exclusion is an extreme remedy and Court's are loathed to

2    exclude evidence.

3              And I've cited a number of cases where disclosures

4    have been far later in the case and the courts say, We will

5    provide an opportunity to depose or take whatever followup

6    discovery you need and that alleviates any prejudice.

7              And so here, you know, again, we've got a lot of

8    -- a fair amount of time left in this case.

9              And, you know, unfortunately we didn't disclose

10   it.

11             THE COURT:  We don't have a lot of time left in

12   the case.  Dispositive motions are due February.  How can

13   you say that?

14             I mean, I'm a pretty even keel here, but to tell

15   me on December 2nd that we've got a lot of time left in this

16   case is simply not true.  How can you say that?

17             MR. GRIGGS:  I guess two months to me seems like

18   we -- probably two-and-a-half months before dispositive

19   motions, in my mind, that is enough time to conduct

20   third-party discovery of hospitals, take whatever

21   depositions we need.

22             If they want to depose Dr. Burke again, you know,

23   Dr. Burke can be made available for another deposition

24   before dispositive motions.  And I think that's what -- you

25   know, that's what would need to be done.  And I think

1    there's certainly enough time to do that in advance of the

2    dispositive motion deadline.

3              THE COURT:  All right.  One last question before

4    we move on to Boston Scientific.

5              I think the rule for supplementation is not that

6    you can just wait and look later for things you could have

7    found before, but that it has to be something that was

8    incorrect or had you been diligent you wouldn't have found

9    before.

10             And so how do you think that 26(e) is -- is going

11   to salvage the late disclosure when had you been diligent

12   during the discovery period you would have found it?

13             MR. GRIGGS:  Well, again, and I don't want to get

14   too far into what we were doing, but it's not as if we were

15   not being diligent.  I believe we were pursuing other

16   avenues and ultimately decided we did not want to go down

17   that path and -- so it's not like we were just ignoring the

18   issue, we were trying, but ultimately we decided we did not

19   want to pursue that path.

20             I wish I could offer a little bit more detail and

21   the reason behind it, but, you know, so the issue of

22   diligence is broader than just, well, why didn't you find

23   Burke sooner?  It's because, you know, we were looking in a

24   different place and, you know, that -- we decided not to go

25   down that path.

```
 1              And then, you know, when we came back around
 2    during expert discovery, we -- Dr. Burke informed us that,
 3    you know, what's -- what's set forth in his reports.  And so
 4    we included it in his report and disclosed it in a timely
 5    manner with respect to when we learned of it.  You know, I
 6    understand the question of diligence but, you know,
 7    sometimes you're asking the wrong questions and --
 8              THE COURT:  Why didn't you put him on a witness
 9    list for 26(a)?  Why didn't you supplement your initial
10    disclosures?
11              MR. GRIGGS:  When we did his report?
12              THE COURT:  Yeah.
13              MR. GRIGGS:  Well, because I did do some research
14    on this and there are cases that say you don't -- as long as
15    you disclose it in writing you satisfy 26(e), you do not
16    need to go back and amend -- amend those other documents.  I
17    can do that.
18              But the spirit of Rule 26(e) is you communicate
19    the information.  And, you know, the Courts say it's a
20    little bit of an elevation of form over substance if, you
21    know, for example, we disclosed it and then someone came
22    back around later and said, well, you didn't update your
23    initial witness and so you need to exclude this where, you
24    know, the information had been communicated in writing.
25              And so I'd gladly do that and I can do that if the
```

1    Court believes that would be helpful.

2            But, you know, based on my research, communicating

3    this information in writing, whatever form, satisfies the

4    supplementation requirements of 26(e).

5            THE COURT:  What about 26(g) when you have an

6    initial disclosure that identified your fact witnesses?

7    Under 26(g) don't have you have to fix your 26(a)

8    disclosure?

9            MR. GRIGGS:  So it's -- you're referencing signing

10   disclosures and discovery requests?

11           THE COURT:  Right.  So you sign a disclosure, it's

12   not complete or accurate anymore.  So don't you have to do

13   something?

14           MR. GRIGGS:  Yeah, perhaps, Your Honor.  And

15   frankly I've not researched 26(g), and nobody's raised a

16   26(g) issue, or frankly argued that our, you know, that the

17   initial disclosures are inaccurate or incomplete at this

18   point.

19           You know, I agree, Dr. Burke, you know, he has

20   some factual testimony and he should be listed as a fact

21   witness.

22           So, again, if that renders our original initial

23   disclosures incorrect under 26(g), like I said, I believe

24   that's an easy fix and --

25           THE COURT:  I'm talking about what has happened up

1    to this point of the hearing, not what we do after.

2            Because if we do anything after other than exclude

3    the portions of the report that were not disclosed or deal

4    with the fact discovery issues, then fact discovery will be

5    reopened.

6            MR. GRIGGS:  Sure.

7            And I'm looking at 26(g) and what it says is --

8    under a, it says that it's, you know, accurate with respect

9    to a disclosure it is complete and correct as of the time

10   it's made.

11           And so I think the signature on the initial

12   disclosures is -- it complies with 26(g)  because the

13   disclosure was correct and accurate at the time it was made.

14           THE COURT:  Uh-huh.

15           MR. GRIGGS:  So, again, I think that dumps you

16   back into 26(e) supplementation which does not necessarily

17   require issuing an amended initial disclosure, so.

18           THE COURT:  Okay.  I -- I don't know what your

19   research was to kind of think that you, wow, I have a new

20   fact witness and I'm going to, you know, disclose a new fact

21   witness in my expert report and not amend your other --

22   other discovery.  I'm not sure what your research was on

23   that.

24           I -- I don't know.  You know, I may look at that

25   during the break but, anyway, I think I've covered what --

1    what my concerns were with you and to give you a chance to

2    respond.

3              MR. GRIGGS:  Okay.  Thank you, Your Honor.

4              THE COURT:  Thank you.  Let's hear from Boston

5    Scientific.

6              UNIDENTIFIED SPEAKER:  Did you want me to reply to

7    all of them.  I mean, I'm happy to.  I have a couple points

8    but I --

9              THE COURT:  Why don't we go ahead and hear from

10   Boston Scientific.  And I don't have any time pressure here

11   today, so I will let everybody make whatever points they'll

12   make.  And my -- my plan here is that I will take a break.

13   I'm not sure how long of a break I'll need, and I will be

14   issuing my decision from the bench here today.

15             MR. GRIMSRUD:  Thank you, Your Honor.

16             From Boston Scientific's perspective, just to be

17   clear, there's all sorts of problems that we think exist

18   with both expert reports, Carlson and Burke.  And we -- as

19   far as there's a comment about Boston Scientific not

20   challenging Dr. Burke, I mean, that's not accurate, we are

21   very much challenging Dr. Burke and think his opinion is

22   just rife with problems, and lack and foundation and all

23   sorts of issues.

24             One issue is -- we've been dealing with, too, is

25   when to raise all these issues.  There's, you know, if

1    appropriate, there would be *Daubert* motions, potentially

2    other motions to exclude.  There's all sorts of things going

3    on.

4         What we are most concerned about, though, with --

5    with both of these reports is as flawed as they are in our

6    view is we don't want supplementation of them.  We don't

7    want document productions coming on the fly.

8         Our damages expert, Mr. Grosky, had been analyzing

9    Mr. Carlson's report.  And then, basically, you know, was --

10   we were trying to get it done because the initial deadline,

11   I believe, was before Thanksgiving even, and then I think

12   got moved to the 26th of November, or something.

13        But we were on the verge of having Mr. Grosky

14   finish it up when all of a sudden we get this 5,000-page

15   document dump.  And that's a big deal.  I mean, talking

16   about analyzing complex data and 5,000 documents, that's

17   certainly not harmless, it's highly prejudicial to us.

18        We're coming to, you know, think about, you know --

19   Mr. Grosky hasn't actually analyzed this stuff yet either

20   because it's not properly in the case, but if he were to do

21   that, it would be very, very prejudicial, more time, more

22   money, and it's just not the way litigation's supposed to

23   work.

24        We're having to scramble to deal with this

25   untimely kind of chaotic production from the Plaintiff's

1     side.

2          It's also not substantially justified.  There is

3     no way on earth this production is substantially justified.

4          And this is on Page 7 of NLC's brief in our case,

5     Your Honor.

6          And there's footnote here, forgive me -- there's a

7     footnote here that says -- this is their explanation for why

8     they did this 5,000-page document dump.

9          They say that "St. Jude moved to strike various

10     portions of Mr. Carlson's expert report without ever asking

11     Mr. Carlson to produce the documents.  As a result of NLC's

12     meet and confer with St. Jude, NLC reached out to Mr.

13     Carlson without formal request from either St. Jude or BSC"

14     that's not correct, "and Mr. Carlson agreed to provide the

15     documents at issue in this motion to NLC.  NLC subsequently

16     produced the documents to St. Jude and BSC."

17          So what I want to be clear about is this is not a

18     situation where NLC was scrambling to get the documents

19     produced from the get-go and, you know, got this report from

20     Mr. Carlson and thought to themselves, oh, jeez, we've got

21     to get these documents produced.  And they're, you know,

22     working hard to get it done and then produced it, you know,

23     a couple days late or something.  That's not the situation

24     we're in at all.

25          We're in a situation where they served this expert

1    report.  They knew it had this Royalty Source, KT Mine

2    analyses in it, which were not available to Boston

3    Scientific or St. Jude.

4         They're based on compilations of data that these

5    two entities did that we have no way of knowing what -- what

6    in the world they did.

7         And then they sat on it.  And then in response to

8    St. Jude's motion, apparently, they decided to, oh, maybe we

9    should go collect the documents and produce them.

10        That's not a substantial justification at all.  If

11   St. Jude hadn't brought this motion, I don't think they

12   would have produced the documents.  I mean, from the

13   characterizations they have here, it's that St. Jude brought

14   the motion and then they decided to produce the documents.

15   And that's not a substantial justification and it's very

16   harmful to both Boston Scientific and St. Jude for them to

17   have done that.

18        And so under Rule 37, this is clearly a case where

19   the remedy is automatic exclusion, the sanction, it's

20   automatic exclusion.  That it's untimely production.  The

21   case -- the *Johnson* case we cite says likewise -- I mean

22   this is what -- this is this is a Minnesota case saying,

23   "Likewise," this is the *Johnson* case, "Likewise, pursuant to

24   Federal Civil Procedure 26(a)2(B) experts must produce facts

25   and data considered by the expert in formulating her

```
1    opinion."

2              Must produce it.  And of course they have to.  If

3    they're relying on it, they have to produce this

4    information.

5              We have no way -- our expert has no possible way

6    of analyzing the KT Mine and Royalty Source information

7    without the reports that we received from them, so.

8              THE COURT:  In your request what you were planning

9    to do is to move to strike the references to the opinions

10   based on the unproduced material?  What was Boston

11   Scientific planning to do?

12             MR. GRIMSRUD:  Before we brought this motion?

13             THE COURT:  Before you -- before the documents

14   were produced?

15             MR. GRIMSRUD:  Yeah.  Sure.

16             Before the documents were produced, I mean,

17   there's -- there's many problems with these reports, this

18   isn't one of them and so we were, you know, going to depose

19   Mr. Carlson.  And ultimately whether it would have been as a

20   Daubert or a motion to strike, maybe -- potentially a motion

21   to exclude, too, there's no rule that you have to bring a

22   motion to exclude now.

23             I mean, sometimes we bring those at summary

24   judgment, even, which is another option for some of the

25   problems, as well.
```

1         So there were a lot of ways that we were going to
2    deal with it.  And whether it would be a *Daubert* motion,
3    motion to strike, or it's just another motion to exclude,
4    I'm not -- I'm not positive, but it would probably have been
5    in one of those flavors.
6         THE COURT:  Uh-huh.
7         MR. GRIMSRUD:  But, you know, it would have been
8    after the depositions when we were initially planning to do
9    it.
10        And part of the discovery process -- you know, we
11   have to do our rebuttal reports, which is what we were most
12   focused on.
13        And so then having them serve basically what are
14   supplemental expert reports.
15        I mean, it's a 5,000-plus documents that are
16   apparently central to this -- Mr. Carlson's preparation of
17   Exhibits 1 through 5, I think it is, you know, it's
18   essentially supplemental to expert reports.
19        So it's at that time that we say, well, if they're
20   producing all this information in the middle of our expert
21   discovery period while we're preparing rebuttal reports, we
22   -- I mean, now they've forced us to bring a motion to
23   exclude.
24        THE COURT:  What -- if you could clarify your
25   arguments on the, you know, reasons that this should have

1    been produced earlier, if you do think it should have been

2    produced earlier.

3              I note, you know, obviously there's the

4    computation of damages as part of Rule 26(a) disclosures.

5              I do see, based upon the Defendant's submissions,

6    that there were discovery requests for documents relating to

7    any related licenses.  And I -- I take it you didn't get the

8    licenses that were later disclosed by the expert.  And then

9    you didn't get these immediately with the expert reports.

10             So please talk about your views about when these

11   types of materials should be produced in a case, starting

12   with 26(a), and then moving to fact discovery, and then

13   moving to expert disclosures.

14             MR. GRIMSRUD:  Yes.

15             Your Honor, with 26(a) with the initial

16   disclosures, obviously if they have the information they

17   need to identify it and produce it, so that's clear.

18             As part of discovery, both sides clearly during a

19   case are gathering information and learning facts.  That is

20   typical in a discovery case.

21             But during fact discovery it should have been

22   produced, Request Number 27 is our document request that

23   asks for documents that NLC may rely on to support its claim

24   for damages in this litigation.  Their response, No

25   objection.  NLC will produce documents in support of its

 1    claim and damages.  And these are clearly in that category

 2    and it should have been produced during fact discovery.

 3         Then, at a minimum, by the time you do your

 4    opening expert report, you know, if your expert has some

 5    information that they somehow discovered, absolutely would

 6    have to be produced at that time with the opening expert

 7    report.

 8         THE COURT:  And what is your position on -- and

 9    none of the parties really focused on this, but when I

10    looked at the cases, it was certainly the focus that if a

11    party is going to rely on license agreements, then the

12    license agreements need to be produced.

13         Here it appears the 5,000 documents are some

14    compilation or summary of license agreements, but you don't

15    have the license agreements.  Is that an issue?

16         MR. GRIMSRUD:  Yeah.  That's absolutely an issue.

17         Yes.  The license agreements -- if NLC's going to

18    actually try to pursue this theory that Mr. Carlson is

19    pursuing they would have had to have produced the license

20    agreements.  And that -- I would put that in the category of

21    there's all sorts of problems in these reports and there's

22    just going to be more motion practice on that, I'm sure and

23    one -- and, you know, depending on how things shake out.

24         But one of them would be that there's -- there's a

25    lack of the actual license agreements as well.  And so those

1    absolutely would have had to have been produced.

2              And, you know, whether that falls in -- since they

3    don't have them apparently, whether that falls in the

4    category of a motion to strike or exclude or a *Daubert*

5    motion is probably another question.

6              But in order to successfully rely on this

7    information, they would have had to get the license

8    agreements, produce the license agreements, you know,

9    presumably these reports, these 5,000-plus pages of

10   documents, they would have had to produce those as well, but

11   the license agreements absolutely would have had to have

12   been produced.

13             And since they weren't produced, that is a glaring

14   *Daubert* motion to strike issue with Mr. Carlson's report for

15   sure.

16             THE COURT:  All right.

17             MR. GRIMSRUD:  That -- the issue -- the issue that

18   we've brought up today, just as far as, you know, what's

19   kind of the most timely issue right now while we're in the

20   middle of expert discovery is that these 5,000 pages of

21   reports, or whatever it is, from Royalty Source and KT Mine

22   need to be excluded from the case.

23             That what we're worried about is kind of periodic

24   supplementations to try to cure problems in the reports,

25   because the problems are full of -- or the reports are full

1    of problems.  And, you know, the first attempt now has been

2    to produce the 5,000-plus pages, which you can't do, that

3    should be excluded.

4         If you read Mr. Griggs' declaration closely, he

5    lets the Court know that he's now produced, I believe it was

6    right before Thanksgiving, didn't produce the license

7    agreements, the three license agreements that we have a

8    problem with, too.  He didn't produce those, but he produced

9    documents about them.

10        So there's, you know, there's -- I haven't even

11   have a chance to look at them but I think there's some court

12   orders or opinions from some other case or something that's

13   been produced, so they're trying to produce more and more

14   information to take care of these problems.  And that's what

15   we absolutely don't want to happen, is we don't want to be

16   in a situation where we're having to, you know, respond to

17   untimely productions and bring more motions to exclude

18   things.

19        And so with the 5,000-plus documents, we're

20   bringing this motion now because we don't -- it's not

21   appropriate for them to be basically supplementing the extra

22   report --

23        THE COURT:  All right.

24        MR. GRIMSRUD:  -- in discovery.

25        THE COURT:  So your motion is a little bit

1    different.

2              You're seeking to exclude the 5,000 documents and

3    you're saving for later the challenge to the expert report

4    based upon a lack of support?

5              MR. GRIMSRUD:  Well, we have brought up now -- in

6    our motion we brought up the issue with Mr. Carlson's report

7    that -- basically joining St. Jude's motion on that, that

8    the Court should strike the portions of the report that

9    we're relying on these documents just because it seems like

10   now we've -- we've, you know, this issue's been brought up

11   and it's before the Court.

12             And so there is -- and our position on that is

13   once the 5,000 pages are out, there's just -- there's

14   nothing in his report.  The exhibits -- the exhibits to this

15   report -- to Mr. Carlson's report are basically apparently

16   summaries of these 5,000-plus documents.

17             And so, if those documents are out, which NLC's

18   saying they're not going to use at trial anyway but, again,

19   that's sort of a misnomer, because we don't want Mr. Carlson

20   talking about the documents even if they're not in evidence.

21             So that's why now we have brought this issue to

22   the Court of joining St. Jude's motion to just strike -- to

23   strike Mr. Carlson's opinion on these because there's just

24   nothing there anymore.

25             THE COURT:  And I -- I want to get both parties'

1    views on this so I know what the scope -- bless you -- what

2    the scope of my ruling should be.  But both parties are

3    moving to strike only a portion of the Carlson report that

4    points to -- bless you -- the 5,000 documents, or the 5,000

5    documents, and they have disclosed three documents.  I'm not

6    sure if I completely understand if there's an overlap there.

7         Why can't the Court rule -- and this is probably

8    one I need both of you to speak on, since this is about

9    discovery and what hasn't been produced in discovery, and

10   what hasn't been produced as facts in support of the

11   reports, why can't I make that ruling based on the fact that

12   the license agreements themselves weren't produced?

13        Why does that need to wait for a dispositive

14   motion?

15        MR. GRIMSRUD:  It does not need to wait.  Your

16   Honor could -- from Boston Scientific's perspective, Your

17   Honor, absolutely could strike the portion --

18        THE COURT:  Isn't that the same issue --

19        MR. GRIMSRUD:  Yes.

20        THE COURT:  -- that they haven't been produced?

21        MR. GRIMSRUD:  Yes.

22        THE COURT:  And so since they haven't been

23   produced, then that portion -- I'm just not sure I

24   understand why there would be a distinction.

25        MR. GRIMSRUD:  Between the 5,000-plus documents

 1    and the failure to produce the licenses?

 2                THE COURT:  Right.

 3                MR. GRIMSRUD:  Yeah.  Absolutely, Your Honor.

 4                I mean, that would be the efficient way to handle

 5    it, is that's basically what I would say cutting to the

 6    chase of the effect of there not being anything in there to

 7    support these licenses means the report should be stricken

 8    on those issues.

 9                THE COURT:  Not the whole report?

10                MR. GRIMSRUD:  Those portions.

11                THE COURT:  But in the -- you know, the summary --

12                MR. GRIMSRUD:  Yeah.

13                THE COURT:  -- of the documents weren't produced

14    that support the summary, but also there's no license

15    agreements that support the -- that statement.

16                MR. GRIMSRUD:  Right.

17                THE COURT:  I just need to get a handle.  And, of

18    course, Mr. Griggs can address that point because I'm

19    grappling with that a little bit.

20                MR. GRIMSRUD:  You're right, Your Honor.

21                That is the effect of it, is that since there's no

22    licenses that have been produced the portions of the report

23    that are based on the unproduced licenses should be

24    stricken.

25                THE COURT:  And what are your views in responding

1    to what Mr. Griggs says is that, you know, you had fact

2    discovery and the parties, you know, exchanged fact

3    discovery, and asked for written interrogatories, and sought

4    documents, and took depositions of fact witnesses and then

5    they completed the fact discovery, didn't -- didn't get

6    license agreements then and -- in response to your requests

7    and so then that point ended.

8            And then they turned to their expert and their

9    expert collected what would be responses to your requests.

10           What is your position on whether that is

11   permissible to start, essentially, a new fact discovery

12   period?

13           MR. GRIMSRUD:  That's not permissible.

14           THE COURT:  Why?  And they say you haven't cited

15   any cases.

16           MR. GRIMSRUD:  Well, I don't know of a case

17   offhand, but in the fact discovery period, that's when they

18   produce facts.

19           And so the licenses would be factual information.

20   To the extent they want to rely on licenses, we had requests

21   for documents supporting damages, licenses, those types of

22   things.  They needed to go out and get them.

23           So if that involved going to going to a

24   third-party, KT Mine, Royalty Source, any other party, they

25   needed to do that during fact discovery, get the documents

1    and produce them so we could analyze them.  So we could take

2    fact discovery.

3          You know, the fact that NLC hasn't obtained any of

4    the licenses, if we had known of one that they were

5    interested in, maybe we would have gone to the third-party

6    to try to get it, who knows.

7          But that's just to give an example of absolutely

8    they should have done that during fact discovery.  And if

9    they're using an expert witness, Mr. Carlson to help them,

10    that's fine, but he needs to help them during fact discovery

11    to get the licenses produced.

12          He can then subsequently give an opinion on the

13    licenses during expert discovery, but we -- we would have

14    needed to get the licenses during expert discovery, that

15    would have been the proper time to do it.

16          THE COURT:  Right.  Why don't I give Mr. Griggs an

17    opportunity to respond to Boston Scientific's argument.

18          And I think I've teed up a couple of things for

19    you to respond to, as well, Mr. Griggs.

20          MR. GRIGGS:  Sure.

21          First, that *Johnson* case that Counsel put up,

22    there is a distinction there that does not say that you need

23    to produce documents along with a report.

24          If you look through that case, what that case is

25    about is a Rule 45 subpoena that's issued to an expert

1    seeking to -- for production of documents that were

2    considered but maybe not relied upon in the report or just

3    considered.

4          So what the Court is saying is, yes, if it's

5    considered it has to be produced.  In this instance it's

6    produced in response to a Rule 45 subpoena.  It's not

7    produced along with your initial expert report in rule --

8    according to Rule 26.  So that case does not say that an

9    expert has to produce every single document that's

10   considered along with the report.

11         And, again, Your Honor, we've cited a number of

12   cases, and there are many more out there that talk about

13   listing information in reports that is what meant and

14   required by Rule 26.  That's what Mr. Carlson did here.

15         And then you can continue the expert discovery

16   phase to seek to discover those documents.

17         Your Honor, of all --

18         THE COURT:  I don't think the expert discovery

19   phase is -- there's -- the expert discovery phase has

20   discovery being depositions.

21         Were you ever intending to produce the documents

22   that were relied on voluntarily or was Counsel correct in

23   that they were only produced because you produced them when

24   St. Jude demanded?

25         MR. GRIGGS:  Well, Your Honor, again, we disclosed

1    them and if they want to see them, certainly we'll produce

2    them --

3              THE COURT:  All right.

4              MR. GRIGGS:  -- so they can go back.

5              THE COURT:  So your view is that you can put the

6    list together but you don't have to produce them unless

7    there's requests.

8              MR. GRIGGS:  Sure.

9              I mean, for example, there's a -- and this is a

10   different part of the rule, but we list all of Dr. Burke's

11   publications.  We didn't produce all of those.  You know, if

12   they wanted to see one or two of those and question him --

13             THE COURT:  But doesn't that say a list?

14             MR. GRIGGS:  It does, Your Honor.

15             THE COURT:  So that doesn't help you.

16             MR. GRIGGS:  But I'm just saying that, you know,

17   this is about disclosing information.  It is not about

18   producing every -- every document that is relied upon, for

19   example, like treatises, or other texts, or, you know,

20   whatever else may fall into that category, those don't need

21   to be produced.

22             If the expert happens to have possession and it is

23   asked for, you know, then we can produce that as part of the

24   expert discovery phase.

25             THE COURT:  Okay.

```
 1                MR. GRIGGS:  And so --

 2                THE COURT:  And your view -- just to make sure I

 3     know, your view was that you could deliver the report,

 4     provide a list of things that were relied on that weren't

 5     available to the other side because you haven't produced

 6     them in discovery, or they weren't publicly available, and

 7     then you only needed to produce them if they were requested?

 8                MR. GRIGGS:  Sure.

 9                THE COURT:  Okay.

10                MR. GRIGGS:  And that's --

11                THE COURT:  That's what I want.

12                MR. GRIGGS:  And there are cases that support that

13     position.

14                THE COURT:  Okay.

15                MR. GRIGGS:  And that's the course of expert

16     discovery.  That's, you know, that's the way it's intended

17     to be implemented.

18                I did want, while we were sitting there, I was

19     able to pull up one case, and I can give you the case cite

20     about supplementing initial disclosures if you wanted, and I

21     can read the quote here, I think I highlighted it.

22                It says -- and this case is *Poitra v. School

23     District*, 311 F.R.D. 65 --

24                THE COURT:  Okay.  What district is it out of or

25     circuit?
```

1              MR. GRIGGS:  District of Colorado.

2              It's 2015, 311 F.R.D. 659.  And this quote is at

3    664.  And the quote is, "There is, however, no affirmative

4    duty to supplement initial disclosures when 'if the

5    additional or corrective information' has 'otherwise been

6    made known to the party -- to the other parties during the

7    discovery process or in writing.'"  So, and, again, there's

8    a number of other cases that support that.

9              So the spirit of the rule is as long as you

10   communicated in writing, there's no obligation to formally

11   go and, you know, amend the prior disclosures as long as

12   that information has been communicated.

13             You know, again, I'm sort of wrestling with this,

14   we should have produced the license agreements, but first of

15   all I'd like to draw a distinction between NLC and Mr.

16   Carlson, because, you know, Mr. Carlson's documents and his

17   work are not NLC's work, just in terms of, you know,

18   document requests issued to NLC.  I mean these -- these are

19   things that are in Mr. Carlson's custody and control.

20             THE COURT:  You don't have any control over your

21   expert?

22             MR. GRIGGS:  I can ask.  If he said no, I can't --

23   if I said, please, you know, give me the -- you know, this

24   -- the KT or the data from the Royalty Source and he said,

25   no, we paid money for that, that's ours, you know, I'm not

1    -- you know, I'm not going to turn that over to you.  I have

2    no means to produce -- to get those documents or produce it.

3    So, you know, we have a working relationship and, you know,

4    he -- he responded when asked.

5            But, you know, I think there is an important

6    distinction here.  And there are a lot of cases that involve

7    Rule 45 subpoenas to expert for that very reason.  Because a

8    lot of this information is not in the parties' custody and

9    control, the requests should really properly be directed to

10   Mr. Carlson.

11           THE COURT:  Didn't -- aren't those Rule 45 cases,

12   aren't those really no longer that applicable given the

13   whole change in the, you know, the discovery of the, you

14   know, the expert report drafts, and all that?

15           Aren't the parties objected to produce the

16   information that is contained in the expert report?

17           MR. GRIGGS:  No.  I think it -- actually the

18   change in the rule, when it changed from just the facts and

19   data relied upon they changed it to considered and so that

20   has actually opened up this Rule 45 discovery.

21           Because, you know, there could be information that

22   the expert considered, but perhaps undercut the expert's

23   position.

24           THE COURT:  Right.  But here -- my point is here

25   you're relying on licenses.  Licenses were asked for.

1    Licenses are always relevant in patent cases involving

2    reasonable royalty.

3           It seems like the practice is that parties work

4    with experts all along the way.  And all along the way, you

5    know, you might say will we be relying on any other licenses

6    because I'm going to need to produce them in discovery, I've

7    got a discovery request and we don't want to have those

8    excluded.

9           That didn't enter your mind?

10          MR. GRIGGS:  Well, Your Honor, here, you know,

11   first of all, I don't even know if these licenses -- the

12   license documents themselves are available from KT Mine and

13   Royalty Source.

14          THE COURT:  Well, I'm just talking about

15   generally.  When you -- when you know licenses are going to

16   be part of your case.

17          MR. GRIGGS:  Your Honor, and that sort of gets

18   into what type of information acts -- like Rule 703.

19          For example, if Mr. Carlson were to say, yes, you

20   know, this is how I value -- and IP, and determine royalty

21   rates is I rely on these abstracts from these royalty

22   sources, and they are reliable, and other experts in the

23   field rely upon these.

24          Then that is a proper basis for his opinion,

25   whether or not the underlying licenses have been produced.

1          Now, I understand if --

2          THE COURT:  I'm -- I'm going to pause here because

3     discovery of these documents helps the another side to be

4     able to discover information about those documents.  They

5     can fully look at the document.  They can prepare for

6     cross-examination, they can see if the license is -- is one

7     that they need to do some further discovery.

8          There's a reason that discovery is produced so

9     that more discovery can be taken.  And it's not all produced

10    with the expert.  And that's why we have fact discovery

11    followed by expert discovery.

12         MR. GRIGGS:  And, Your Honor, again, NLC does not

13    have licenses other than the ones that were produced during

14    fact discovery.  You know, NLC doesn't have subscriptions to

15    these royalty databases or anything else.

16         And, you know, that's why we rely on the expert

17    who has access to that and an understanding of that to go

18    and, you know, conduct his own analysis of that.

19         And, you know, if -- again, this seems to be going

20    to the weight of the evidence and the reliability --

21         THE COURT:  I don't think -- it's discovery.  It's

22    discovery.

23         MR. GRIGGS:  But, Your Honor, we don't have the

24    licenses.  I mean, we can't produce what we don't have.  And

25    Mr. Carlson can't produce what he doesn't have.

1          And, you know, he did produce what he does have,

2    which are the abstracts and other information that were

3    provided from KT Mine and Royalty Source.

4          And, like I said, under Rule 703, if that is the

5    type of information that experts routinely rely upon, then

6    it is perfectly appropriate for him to base his opinion on

7    that, whether or not those abstracts are admissible into

8    evidence.

9          And so that is -- is sort of the basis.  We may be

10   having a fundamental disagreement among the parties here as

11   to, you know, what is required.  But, you know, I have not

12   seen any case law that says that an expert has to produce

13   every document relied upon or considered along with the

14   report.

15         On the contrary, we've submitted the cases that

16   say you just have to include -- identify the information in

17   the disclosure, which is the report, which is the --

18         THE COURT:  It doesn't say that.

19         The rule says it has to contain the facts.  That

20   means it has to include the facts and data.

21         MR. GRIGGS:  Yes.  And I've got cases interpreting

22   that as --

23         THE COURT:  Okay.

24         MR. GRIGGS:  -- disclosing in a list form.

25         THE COURT:  And do you have a case out of the

1    Eighth Circuit that interprets that?  Because nothing else

2    is binding on me.  I get to look at the rule.

3              MR. GRIGGS:  Sure, Your Honor.

4              And, but, again, there's no -- and I can look for

5    an Eighth Circuit case.  But, you know, there's nothing on

6    the other side.  And that's part of the problem here is --

7              THE COURT:  Right.

8              MR. GRIGGS:  -- you know, they haven't cited any

9    case saying that, well, you need to produce all of this.

10   And, again, that is not generally how the rules are applied

11   throughout the country.

12             I've got a number of sampling district courts as

13   to how this rule is interpreted.  And none of them interpret

14   it as requiring production of documents.

15             And, again, if there is some violation here, you

16   know, let's -- let's assume there is some violation here,

17   you know, it certainly was unintentional.  And I think we're

18   having a disagreement over the interpretation of the rule.

19   You know, the documents were produced three weeks later.

20             THE COURT:  Only because you were caught.

21             MR. GRIGGS:  It's not about -- we weren't

22   withholding anything.

23             THE COURT:  No.  But you only produced them --

24             MR. GRIGGS:  When we were asked to.

25             THE COURT:  -- after St. Jude said, We're bringing

1    a motion.

2            MR. GRIGGS:  Yeah.

3            THE COURT:  That's what triggered your production.

4            MR. GRIGGS:  Yes.

5            Because typically instead of bringing a motion

6    they would say, Can we see these documents?  But they

7    skipped that step.  And they just went straight to exclude

8    the evidence, which, you know, again, and we've got the

9    cases, that is an extreme remedy, exclusion of evidence.

10           And in terms of prejudice and alleviating

11   prejudice, courts across the country say that, you know, if

12   you get an opportunity to depose that witness and conduct

13   whatever further in discovery, then that's alleviated.

14           You know, I cited that Second Circuit case where a

15   new opinion was disclosed during trial while the expert was

16   on the stand.  And the Court said, No, there's no prejudice

17   here because you haven't -- you can cross-examine that

18   expert and you haven't -- I'll give you the opportunity to

19   recall your expert, so.

20           THE COURT:  But here we have new facts.  Here we

21   have new facts.

22           MR. GRIGGS:  With respect to the --

23           THE COURT:  Everything.

24           MR. GRIGGS:  The documents?

25           THE COURT:  Yeah.  There are new facts disclosed.

1    You have sought to reopen fact discovery.

2              MR. GRIGGS:  Again, with respect to Carlson, I

3    disagree.  I mean those are -- those are the basis of his

4    opinion and, you know, they're facts outside the case.

5              THE COURT:  Are they responsive to Boston

6    Scientific's document requests?

7              MR. GRIGGS:  It may be.

8              But, again, that goes back to, you know, they were

9    -- when we got the draft report, I mean, that's when we

10    would have supplemented.

11              THE COURT:  And you didn't have any idea that your

12    expert would be relying on other licenses until a few days

13    before the expert report was finalized?

14              MR. GRIGGS:  Well, again, I don't want to get too

15    much into work product, but he explained what he would be

16    doing.

17              THE COURT:  Yeah.

18              MR. GRIGGS:  And then he gave us the results of

19    the work a few days before the report was --

20              THE COURT:  Did you know that he would be locating

21    license agreements?

22              MR. GRIGGS:  I did not know.  He just said he was

23    going to survey license -- license information.

24              THE COURT:  All right.

25              MR. GRIGGS:  And so then when we received the

1    draft report.

2              THE COURT:  When did he say that?

3              MR. GRIGGS:  That was when we -- at the beginning

4    of expert discovery.  I, you know, I said, All right.  You

5    know, now's the time.

6              I gave the information that we had and he went off

7    and did what he did.  And then he gave us the draft report.

8    And then that's when we disclosed what we disclosed in the

9    initial report, which, like I said, we believe complies with

10   Rule 26.

11             THE COURT:  Uh-huh.

12             MR. GRIGGS:  There's no sandbagging, there's no

13   withholding, there's nothing about being devious or anything

14   here.

15             You know, we produced it promptly once the issue

16   was raised, because there -- you know, there may be even

17   other information that --

18             THE COURT:  Uh-huh.

19             MR. GRIGGS:  -- you know, that he relied on that

20   there has been no issue with, you know, so.

21             THE COURT:  When you say that you first learned

22   that -- and I'm just asking you for similar things to what's

23   on your declaration.

24             MR. GRIGGS:  Uh-huh.

25             THE COURT:  So I'm just asking.  The -- when did

1    you first have knowledge that your expert would be looking

2    for information about licenses?

3                MR. GRIGGS:  I --

4                THE COURT:  Time/date.

5                MR. GRIGGS:  I tried.  It was probably during our

6    initial conversations right at -- toward the beginning of

7    the expert phase.  I don't know that I know --

8                THE COURT:  He was identified in August, right?

9                MR. GRIGGS:  Yes.

10               THE COURT:  And so by August you had at least

11   information before the close of fact discovery where you

12   knew that he would be locating -- he would be looking for

13   license agreements, right?

14               MR. GRIGGS:  It's possible.

15               And, again, looking for license agreements, you

16   know, I don't think it was that specific, you know, I think

17   it just -- he -- they -- I believe it's explained in his

18   report, I mean they value IP.  And this is the way they

19   value IP.

20               THE COURT:  Right.

21               MR. GRIGGS:  And so, I don't --

22               THE COURT:  But my question is very specific.

23               MR. GRIGGS:  Yeah.  And I don't know that he said

24   I am going to be identifying specific licenses.  I think he

25   said I will --

```
1              THE COURT:  But did you know he'd be looking for
2    licenses?
3              MR. GRIGGS:  Again, I'd have to go back and look
4    at my records and see what, you know --
5              THE COURT:  What do you think?
6              MR. GRIGGS:  -- what was communicated when.
7              THE COURT:  At some point --
8              MR. GRIGGS:  At some point certainly --
9              THE COURT:  -- he has permission.
10             MR. GRIGGS:  At some point he said --
11             THE COURT:  To spend money on third-party reports.
12             MR. GRIGGS:  Sure.
13             THE COURT:  When did he get that permission to
14   start looking at third-party reports?
15             MR. GRIGGS:  Well, again, that -- I mean, that was
16   in sort of the scope of the work --
17             THE COURT:  Yeah.
18             MR. GRIGGS:  -- I believe.  But the question is,
19   you know, whether during that initial conversation, August,
20   whether we discussed specifically what he would be doing,
21   or, you know, whether that conversation occurred later when
22   we actually said, Green light.  Go.  Do it.
23             THE COURT:  At some point he knew that he had
24   permission to spend money on third-party reports, right?
25             MR. GRIGGS:  At some point, certainly.
```

1           THE COURT:  And was that some point in October?

2           MR. GRIGGS:  It may have been.  Again, I -- I

3      know that --

4           THE COURT:  Does that make sense that they have a

5      draft including all that -- I -- it seems to me that he

6      would have to push the button on trying to obtain that

7      information long before his draft was produced to you.

8           MR. GRIGGS:  And, again, I don't know -- and I --

9      I haven't spoken to Mr. Carlson about his timing.

10          All I know is, you know, generally when I had

11     conversations with him -- and what I do know is we do not

12     get the draft report until, you know, less than a week

13     before the final deadline.  And that's, again, that's when

14     NLC first learned of this information.

15          THE COURT:  But were you -- were you surprised

16     that you -- that it was in there?  It was like, Whoa.

17     There's 5,000 documents here.

18          MR. GRIGGS:  Well, I didn't have the documents.

19          THE COURT:  I didn't give him permission to do

20     that.

21          MR. GRIGGS:  I had a summary.  So I didn't

22     understand what the underlying documents were.

23          THE COURT:  Okay.

24          MR. GRIGGS:  He had, like, distilled the

25     information into a summary table.  And so that's what was

1    disclosed to NLC.

2              THE COURT:  Uh-huh.

3              MR. GRIGGS:  You know, the first time we saw the

4    documents was in the result of what we're doing here today.

5              And, you know, again, it seems like there's a

6    fundamental misunderstanding as to what Rule 26 requires.

7    And I believe we've got the case law that supports --

8              THE COURT:  Okay.

9              MR. GRIGGS:  -- that, you know, we did everything

10   in accordance with the rule.

11             THE COURT:  All right.  I believe I understand

12   your position.  Thank you for responding to my questions.

13             So now let's hear from St. Jude.  And why don't we

14   hear then anything that Boston Scientific wants to respond

15   with, and then I'll give the final word to the Plaintiff's

16   side.

17             MR. SHAH:  Yeah.

18             And, Judge, I mean, if there's something specific

19   you'd like me to cover, well, I have three points that I

20   thought of as this morning progressed that I'd like to go

21   over with you.

22             But, first, I have had this dispute on the initial

23   disclosures before in other cases.  And so in this case,

24   like all cases since then when I was a young attorney I had

25   that problem, I shouldn't say problem, but we had this

1  debate on whether the initial disclosures require to be

2  supplemented or not.

3          And so since then my practice has been, as it is

4  in this case, that my first interrogatory always is to

5  identify any witnesses you will be calling at trial or any

6  hearing in this case.

7          Interrogatory 1, you had asked me about

8  interrogatories before, Interrogatory Number 1 that I asked

9  says exactly that.  "Identify the name of any person you

10 intend to call at any hearing or trial in or related to this

11 matter."

12         NLC identified three fact witnesses, Dr. Niazi,

13 Mr. Stawicki, and then a representative from St. Jude.

14         To this day, today, standing here, Judge, that

15 interrogatory has not been amended to identify Dr. Burke.

16 And we know now know that Dr. Burke has been a fact witness

17 at least since October.

18         There's no excuse for not supplementing that.

19         I do not believe there's case law, and I'd love to

20 see if that says you don't have to respond to discovery like

21 an interrogatory if you provide it in writing in some other

22 format.  That's the purpose of this interrogatory is so that

23 we may be able to be able to rely upon it.

24         We are now months after the close of discovery.

25 Dr. Burke's not listed.

 1          That's the problem that we're dealing with here is

 2    that he is a surprise fact witness.

 3          And kind of dovetailing to my second point is, you

 4    know, I don't think willful ignorance is a substantial

 5    justification.

 6          We've heard time and time again for them to say,

 7    well, we just didn't know or didn't ask.  But infringement

 8    has been at the forefront of this case.

 9          They should have had a good faith basis to

10    establish indirect infringement against St. Jude before they

11    even brought this case.

12          And so it's a little troubling to hear that they

13    were dealing with Dr. Burke on the IPR issue but

14    infringement wasn't on their mind because it should have

15    been the reverse.  Infringement should have always been on

16    their mind.

17          And Dr. Burke's kind of summary testimony that, I

18    am the infringer, just as Mr. Carlson's report that I'm

19    realizing that -- I mean, frankly, I don't think I

20    understand the full scope of the problem that it's summaries

21    relating to licenses until today, that is significantly

22    problematic, Judge, because as you pointed out, we should be

23    provided the opportunity to find and take evidence that

24    would contradict, undermine, maybe not until we have to come

25    up with a different strategy, all of that discovery, both as

1    to Dr. Burke and as to Mr. Carlson.  We don't have that

2    opportunity.  I now would have to open discovery up.  We

3    would have to take hospital discovery, we'd have to take

4    third-party discovery on the damages.

5            To the extent that it's true that there's no

6    record and it's just going to be oral testimony, we may have

7    to take a survey.  Right?  We may have to take a survey of

8    other doctors to say, Well, is this consistent with your

9    practice?  Because I'm going to have someone on the stand

10   saying this is my practice.

11           There's just a floodgate of discovery that have to

12   be taken here.

13           And so -- and it's very troubling that after

14   discovery I'm hearing that these are all just summaries.

15   That's completely improper and we should have had before.

16           And then the last part I want to make is just on

17   the law.

18           I mean, there's cases today that are claimed that

19   I have not heard of, but the two cases that NLC cited in

20   their brief in response to our motion are both

21   distinguishable.

22           There's the first case which is out of Iowa, the

23   *Estate of Thompson*.  That case dealt with demonstrative

24   exhibits.  We're not talking about demonstratives here,

25   Judge, we're talking about late, central burdensome, factual

1    issues that would require opening up of discovery well after

2    discovery's closed.

3          And then the other case that they mentioned was

4    this *Downeast Ventures*, where, yes, in fact, there was new

5    -- a new theory allowed at trial.

6          But the key distinction in that case, Judge, was

7    first, it was a consistent theory that had been presented

8    before.

9          And, second, the witness was a prior 30(b)(6)

10   corporate witness who was espousing his new theory, which

11   was consistent with the prior damages theory.

12         So it was not an instance of new discovery being

13   added, it was just simply how it was being presented.

14         That's not what we have here.  What we have here

15   is in line with the cases we cited.

16         And so I'll start -- let me start with the

17   District of Minnesota case, which is *Lisdahl*, which is cited

18   at Page 16 of our brief.  It's 698 F. Supp. 2d 1081.  But

19   this case is almost exactly in line, although it's more in

20   the *Daubert* context, but the court says that they conclude

21   that, "The doctor at issue was properly excluded from

22   testifying as to a certain topic because the effort to admit

23   his testimony was a subversion of the disclosure

24   requirements imposed upon all litigants."

25         I mean, here he is not provided -- he's not

1    permitted to testify because he is trying to subvert the

2    fact discovery rules.  That's exactly what happened here.

3            Whether it was unintentional or was intentional,

4    it is not justified.  And where we are now is that Dr. Burke

5    had not been asked about these questions.  Dr.(sic) Carlson

6    had not been asked about these licenses and we're faced with

7    that.

8            There's another case that I think is also very

9    telling.  It's not from this circuit, it's a Fifth Circuit

10   case, but we cited it at Page 12 of our brief, which is the

11   *Geiserman* case, 893 F.2d 787.  And there the Court finds

12   that, "The reasons offered by the Plaintiff for their

13   failure to identify are weak at best."

14           It says, "As a result of their failure -- I'll

15   just read the quote, "Regardless of *Geiserman*'s intentions

16   or inattention which led to the flouting of discovery

17   deadlines, such delays are a particularly abhorrent -- are a

18   particularly abhorrent feature of today's trial practice.

19   They increase the cost of litigation to the detriment of the

20   parties immeshed in it.  They are one factor causing

21   disrespectful lawyers in a judicial process."

22           Now, maybe that's a little extreme but that's

23   precisely what's happened here, Judge.  We have -- you know,

24   it's been two years, almost three.  We're at close of fact

25   discovery and it's like we're starting again.  And that's

1    just not something that we should be doing on an issue that

2    St. Jude has raised upon motion, upon motion which is their

3    initial burden in which they knew about it.

4         So, again, as to both of these issues, you know,

5    maybe one last point to make is that Plaintiff has suggested

6    in its briefing that these aren't important issues, or

7    central issues.  They're not dispositive, they're just

8    factual issues that they came upon but it clearly is a

9    problem for Boston Scientific and St. Jude.  And so that --

10   maybe that's just another reason that weighs in favor of

11   striking these components of those expert reports.

12        THE COURT:  What about a final comment on what Mr.

13   Griggs is saying is that this is exclusion as both parties

14   are requesting is an extreme result and that, you know, that

15   discovery -- opening up discovery, they wouldn't be opposed

16   to and, you know, there's time?

17        MR. SHAH:  Well, a couple things.

18        I agree with Your Honor, I don't think there's

19   time.  And discovery was done -- we had interrogatories and

20   discovery in a way that we should have had all this

21   information before.

22        So to come to answer that latter part, I would be

23   loathed to agree to opening discovery again and incurring

24   those costs.  It is expensive.  My client is already upset

25   about the budget.

1           I certainly wouldn't want to do that unless, I
2    mean, if the Plaintiff wants to pick up the costs, that's
3    one thing, but we are where we are.
4           THE COURT:  What do you think the costs would be?
5           MR. SHAH:  To open up third-party discovery?  I
6    mean, I would --
7           THE COURT:  And then do additional expert
8    disclosures based upon new discovery.
9           MR. SHAH:  Yeah.  I mean, damages experts
10   are expensive.  And if there's surveys involved, I mean,
11   Judge, we're looking at $200,000, $300,000, all in.  I mean,
12   you have an expert on two sides that we'll be needing to
13   survey.
14          Right.  I mean, if it's correct that this can't
15   verified that Dr. Burke, in fact, uses it in an infringing
16   way, then we'd have to take a survey of doctors to see
17   whether or not that's consistent with his testimony.  That's
18   probably 50 to 100 grand right there.
19          We'd have to do the same thing potentially on the
20   damages side, because if these are just summaries of
21   licenses, who knows what methodology was used for those
22   summaries, and so other summaries would need to be created,
23   or analysis would need to be created based on these 5,000
24   documents.
25          My guess is -- I mean, knowing how much these

1    experts costs on the damages side, they're pretty expensive,

2    that's probably another $100,000.  And then, of course,

3    there's all the attorney time in between.  It is an

4    expensive proposition in between.

5         And then, of course, there would be the

6    third-party discovery to start all that, which we would have

7    to subpoena hospitals.  Hospitals have requirements.  And so

8    there's timing and we may need court orders.  I mean,

9    there's all the legal process in there.

10        It's not just as simple as saying, take the depos,

11   shoot out a Rule 45 subpoena to somebody.  It is, I think,

12   quite intense.  It would require a lot of work.

13        And then, you know, maybe because I'm answering in

14   the reverse, as to the extremeness of it, and I disagree,

15   but certainly whether it's extreme or not, I mean, let's say

16   it is extreme.  I think this is the type of case that

17   warrants it.  I mean, infringement is the only reason we are

18   here in the first place.

19        From day one they've been asserting that St.

20   Jude's indirectly infringed.  If they didn't think about

21   that, they didn't think to ask their expert about that for a

22   year and a half after he realized he was the infringer, I

23   think it warrants that type of extremist, particularly since

24   they're saying in their brief they don't even really even

25   need that.  That's just the cherry on top for them.  Well,

1    that's a problem for us.  That's significant.

2            And so if that's extreme, they knew the rules.

3    This is their case.  We have asked time and time again

4    through motions.  I don't know if we can see how we can give

5    them more notice that direct infringement is the

6    significant, as we see it, hole to allow them now after the

7    close of fact discovery to come in and add a physician who's

8    going to just say that without getting us adequate

9    disclosures in the interrogatories we asked, the document

10   requests we asked, or in the adequate period.  I think that

11   warrants that type of extreme measure.

12           But certainly, to the extent that Your Honor wants

13   to do it the other way, I would suggest then the ruling

14   should, you know -- humbly I would suggest that the -- what

15   we would have is that discovery open and Plaintiff pay for

16   the rest of discovery and we'll take that discovery.

17           I really don't want to do that but we're excited

18   about getting to dispositive motions in this case because I

19   think we'll be able to wrap this up, frankly, deal with some

20   of the other issues that my colleagues -- that Boston

21   Scientific alluded to.

22           But if Your Honor believed that it's too extreme,

23   that striking these issues is too extreme and that something

24   else should happen like discovery, then I would ask that

25   whether there's some sort of way to address with the

1     additional burden, because it is significant on St. Jude,

2     and I believe Boston Scientific would agree that it's going

3     to be pretty expensive to go ahead and proceed on these late

4     filed discovery issues.

5          THE COURT:  Thank you.

6          Let's hear from Boston Scientific.  And then

7     again, Mr. Griggs, you'll have the last word.

8          MR. GRIMSRUD:  Thank you, Your Honor.  I'll be

9     brief.

10          Yeah.  On the -- on these points that have been

11    raised, you have Dr. Burke and his opinion, for example,

12    Boston Scientific, as I was saying, thinks there's all sorts

13    of problems with it.

14          And, you know, we have the same issues in our

15    case, as far as, we served the interrogatory asking for

16    specifically for, Tell us who the direct infringers are.  No

17    response.  I mean, there's just -- no one's identified, so

18    we have all these same issues.

19          As far as when -- I think we had --

20          THE COURT:  You just, you have the same issue, but

21    you decided to not raise it now, but to raise it with a

22    *Daubert* motion?

23          MR. GRIMSRUD:  Yeah.  We had been -- we had been

24    planning to raise it later, as far as a case management, I

25    just wanted to just flag that for the Court, though, because

1   as far as case management goes, if it's more efficient, you

2   know, we'd be happy to accelerate that process, as well as

3   far as dealing with Dr. Burke.

4           I just want the Court to be aware that we think

5   that all of the same issues apply in our case.  It's more of

6   -- the question is more of when we were going to raise it.

7           THE COURT:  Okay.

8           MR. GRIMSRUD:  And so -- but as far as, you know,

9   the sanctions that you were talking about with, you know,

10  exclusion versus reopening discovery.

11          Reopening discovery, you know, obviously if it's

12  going to be reopened, it would be reopened in both cases.

13  And we're talking then about damages issues, infringement

14  issues, expert discovery, but also depositions of hospitals,

15  probably the hospital that Dr. Burke works at, potentially

16  people at the hospital, getting documents from those

17  hospitals.

18          Then there's, you know, the KT Mine, the Royalty

19  Source, potentially depositions of them, potentially

20  subpoenas for documents.

21          I mean, between the two cases, it's easily,

22  hundreds of thousands of dollars.

23          And so if we're reopening discovery, certainly NLC

24  should be paying for all that discovery.  That would be a

25  huge burden to impose on us.  It would be very expensive.

1          Now, stepping back though, we don't -- we think

2     the appropriate remedy is exclusion here for sure.  That is

3     not an extreme sanction, it's spelled out in Rule 37 that if

4     information is not produced timely, and there's not a

5     substantial justification, or it's not harmless, the

6     automatic rule is exclusion, the District of Minnesota is

7     clear on that.

8          There's many cases that talk about how it's a --

9     you know, how it's a self-invoking sanction, basically,

10    automatic exclusion, so it's not a partial remedy.

11         But -- but I agree exactly with what St. Jude was

12    saying is perfectly called for here where there's all this

13    information, factual information, that was not produced

14    during fact discovery, wasn't produced at the opening expert

15    report, and then was produced late.  And it should be -- it

16    definitely should be excluded.

17         If NLC wanted to rely on this information, NLC

18    should have gone out and had an obligation to go out and get

19    that information during fact discovery.  That's what fact

20    discovery's there for.  It's for the parties to go out and

21    get what they think they need factually to -- for their case

22    and NLC didn't do that.

23         And this is just very untimely and it should be

24    excluded.

25              THE COURT:  Thank you.

1          And so, Mr. Griggs, I will allow you, and I won't

2    pepper you with questions, I'll just allow you to summarize

3    your response and to address any points that you feel that

4    you haven't had an opportunity to address.

5          MR. GRIGGS:  Sure, Your Honor.

6          And I did -- I was doing a little bit of research

7    and I found a case out of the District of Nebraska.  It

8    talks about, again, listing documents and then subsequently

9    providing those documents in advance in the expert

10   deposition.

11         It's *E3 Biofuels v. Biothane,* the citation is 2013

12   WL 5729537.  And it's a 2013 case.  Again, that was just

13   very quick research that I was --

14         THE COURT:  Can you repeat the Westlaw citation?

15         MR. GRIGGS:  Sure.  It's --

16         THE COURT:  2013 WL 57 --

17         MR. GRIGGS:  29537.

18         THE COURT:  Great.

19         MR. GRIGGS:  And I can just read a couple of the

20   sentences.  "Having considered these factors, the court

21   finds that plaintiff's reported failure to provide an

22   exhaustive list of information that its experts considered

23   in reaching their opinions does not justify exclusion of its

24   experts testimony.  Plaintiff's expert report provide --

25   reports provide extensive lists of the facts or data

1    considered by each expert.  The retained expert's alleged

2    failures to provide all encompassing lists is harmless, as

3    Defendants have not been prejudiced by any such omission.

4    They have had to be deposed in this case."  And so on and so

5    forth.  And so --

6              THE COURT:  And that was for the exclusion of the

7    expert, right?

8              MR. GRIGGS:  Yes, I believe so.  Again, I'd have

9    to -- but, yes, I believe they're trying to exclude expert

10   testimony similar to what's going on here.

11             THE COURT:  The whole report, right?

12             MR. GRIGGS:  What was that?

13             THE COURT:  The whole report based upon --

14             MR. GRIGGS:  Yeah.  It's either the whole report

15   or it's a portion of the report.

16             THE COURT:  Okay.

17             MR. GRIGGS:  They say the testimony should be

18   excluded because they don't comply with 26(a)(2), which

19   requires to contain the facts and data.

20             And, you know, the court said it contains a list.

21   They'll get the experts filed before the deposition and then

22   so there's no prejudice or harm or anything there.

23             THE COURT:  Okay.

24             MR. GRIGGS:  So, again, that just dispute was not

25   about whether they needed to produce the documents, it was

1    whether the list was complete enough.

2         So, again, I -- I have not seen any case law that

3    says you need to turn over the entire expert file or every

4    piece of paper that the expert looked at in considering the

5    report.  You have to list that out.  And if the other party

6    wants it then, you know, they get it prior to the

7    deposition.

8         And, again, I believe that's how things should

9    have progressed here but, you know, they did not --

10        THE COURT:  With respect to Carlson.

11        MR. GRIGGS:  With respect to Carlson, yes.

12        And, again, I want to circle back to this, you

13   know, this -- this prejudice.  And, you know, it's talking

14   about the expense and the -- all of this.  You know, they

15   would have had to have borne that had this been, for

16   example, if we had a conversation with Burke and disclosed

17   him during fact discovery.

18        So just the sheer volume that's been -- and

19   expense associated with this, it's more of a time shifting

20   thing, because that would have been incurred had this been

21   timely -- you know, timely disclosed.

22        And so the fact that they have -- they may have to

23   do the work, you know, they would have had to have done that

24   before if that was -- if that was, you know, timely

25   disclosed in the event that the Court finds, that, you know,

1    we should have, so.

2          So the, you know, the amount of work that needs to

3    be done in response to this is -- is not prejudiced, you

4    know, that's just work that's associated with the case.

5          You know, the real question is are they prejudiced

6    in their ability to defend against this information?  Which

7    as I've cited a number of cases, including the one that I've

8    just, you know, cited to you, is they're afforded the time

9    to basically focus on depositions and allowing their experts

10   to respond to this, then there is no harm.

11         And, you know, the rules are about, you know,

12   giving -- making rulings based on the facts and the -- you

13   know, the full record in front.

14         And, you know, in this instance they were

15   disclosed, you know, a few days after NLC learned of this

16   information.

17         And I understand there's been some attacks on how

18   NLC may have, you know, conducted the litigation during fact

19   discovery but, you know, that's not part of the record.

20         And, you know, as I explained to Your Honor, you

21   know, it's not as if we were just sitting on our hands not

22   trying to uncover evidence of direct infringement, we were

23   walking down different paths.  And, you know, those paths

24   were dead ends.

25         And, you know, so then Dr. Burke offered this, we

1    disclosed it and, you know, that's where we are here today.

2         With respect to Mr. Carlson, you know, again, this

3    is -- this is not information that NLC had or provided to

4    him.  This information that he generated on his own as, you

5    know, a lot of experts will do.  They will go and they will

6    use their resources, generate their opinions and then, you

7    know, the basis for those opinions, the facts and the data

8    were disclosed in his report.

9         And when there was an issue raised as to where is

10   all the underlying data?  We promptly disclosed that.

11        And in advance, Mr. Carlson hasn't been deposed

12   yet.  You know, the expert report or the rebuttal expert

13   deadlines that are, you know, still -- we've already

14   extended that deadline.  So, you know, we're sort of right

15   in the middle of expert discovery right now.

16        So, again, I'd go back -- exclusion is -- is an

17   extreme remedy.  And, you know, it is prejudicial to NLC to

18   not be able to at least get past this stage of the case, you

19   know.

20        If there are going to be *Daubert* challenges,

21   sufficiency of the evidence relating to the, you know, not

22   having the underlying license agreements, those are for a

23   later point in the case.

24        But to cut that off at that stage even before

25   these expert depositions is -- is an extreme remedy and it's

1    not warranted here.

2              THE COURT:  Thank you.

3              Anything further?  Any final points?

4              I'm going to be telling you when to come back,

5    because I am going to do some followup work based upon the

6    arguments in the cases that were identified here.

7              Anything you'd like to add as a last point?

8              MR. GRIMSRUD:  Nothing from Boston Scientific.

9    Thank you, Your Honor.

10             THE COURT:  All right.

11             MR. SHAH:  Nothing from St. Jude.

12             THE COURT:  All right.  Then I think you did have

13   the last word.

14             So what I'm going to do, it's about quarter to

15   11:00 now, why don't you come back at 1:00 and I will give

16   you my decision.

17             MR. GRIGGS:  Thank you, Judge.

18             MR. SHAH:  Thank you.

19             (Recess at 10:45 a.m.)

20             (In open court at 1:34 p.m.)

21             THE COURT:  We are back on the record in the Niazi

22   matters and we were earlier hearing the two motions in case

23   Number 17-CV-5096 WMW/BRT and 17-CV-5094 WMW/BRT.

24             Why don't we, for the record, go ahead and get

25   appearances, Counsel, who are here after the break.

1              MR. GRIGGS:  On behalf of Plaintiff, Michael

2       Griggs.

3              THE COURT:  Thank you.

4              MR. SHAH:  Good afternoon, Your Honor.  Judge, on

5       behalf of St. Jude, Kal Shah.

6              THE COURT:  Thank you.

7              MR. GRIMSRUD:  On behalf of Boston Scientific,

8       Timothy Grimsrud.

9              MR. CHUNG:  Also on behalf Boston Scientific

10      Doowon Chung.

11             THE COURT:  Thank you.

12             I am now going to be deciding the two motions

13      before the Court.

14             For the record, St. Jude's motion is to strike

15      facts disclosed in Dr. Burke's expert report that were not

16      disclosed by the fact discovery deadline.

17             St. Jude also seeks to preclude Dr. Burke from

18      testifying as a fact witness due to late disclosure.

19             And St. Jude also seeks to strike facts not

20      disclosed during fact discovery relating to the Carlson

21      report and not produced with the report.

22             Boston Scientific joins in St. Jude's motion and

23      has separately sought to strike the late production of 5,000

24      documents and to strike any reference to those documents in

25      Carlson's expert report.

1          Before I go through and walk through my decision

2     and the analysis, I do want to make a record on the Court's

3     jurisdiction to hear the motion.

4          And these two motions before the Court do not seek

5     to exclude the entire expert opinion pursuant to *Daubert*,

6     which would be dispositive, according to the local rules in

7     this district.

8          Instead, all of the parties initially when we

9     talked about this motion agreed that the two motions before

10    the Court are nondispositive motions relating to the alleged

11    discovery disputes and sanctions pursuant to Rule 37.

12         So I want to make clear that I'm not deciding

13    these motions based a *Daubert* analysis and that any

14    *Daubert*-related motions will need to be filed pursuant to

15    the scheduling order on dispositive motions.

16         So now I'll turn to my ruling on the motions.

17         The common nondispositive issue before this Court

18    is whether facts and fact witnesses relied on by Plaintiff's

19    experts were disclosed too late.

20         And if I answer that question affirmatively in

21    that they were disclosed too late, according to the rules,

22    then the Court moves to a Rule 37 analysis as to whether the

23    fact witnesses should be excluded and expert reports, the

24    references to the newly-disclosed facts should be stricken

25    as a sanction.

1           We'll first discuss the answer to the first

2    question and that is, Was the identification of this

3    material that is at issue and the new fact witness produced

4    too late?

5           Plaintiff Niazi's primary argument in opposing St.

6    Jude's motion regarding Dr. Burke is that Plaintiff did not

7    withhold the identity of Dr. Burke as a fact witness and

8    Plaintiff did not disclose the facts too late.

9           And I'll quote from Niazi's brief.  "Rather NLC

10   learned of the information at issue during expert phase of

11   the case and timely disclosed it to St. Jude."  And that's

12   from the Niazi brief, Document 138 at Page 4.

13          Plaintiff Niazi further explains that, "NLC did

14   not discover this information until after the close of fact

15   discovery.  And upon discovery of this information promptly

16   disclosed it to St. Jude."  And, again, that's from Niazi's

17   brief at 30 -- 138.

18          Counsel filed a declaration declaring that Niazi

19   first learned that Dr. Burke directly infringed Claim 11 of

20   the method patent on October 4th, 2019.  And that Niazi

21   disclosed this new factual information on October 15th

22   through the Burke expert report.  And I'm referring to the

23   declaration of Mr. Griggs at Document Number 139.

24          In this case, Plaintiff was alerted to St. Jude's

25   evidentiary challenge regarding direct infringement of the

1    method claim.

2         And I looked to a filing on March 21st, 2019,

3    where St. Jude arguing -- argued the following.  And this is

4    St. Jude -- this is a document in the St. Jude case,

5    Document Number 69, and I'm going to quote the excerpt.

6         "Plaintiff's contentions, however, failed to

7    identify a single instance of direct infringement underlying

8    its assertion of indirect infringement do not reference

9    actual St. Jude product and arbitrarily apply claim language

10   to enforce infringement.  Plaintiff's contentions in short

11   are substantially hollow and should be stricken."

12        So that was St. Jude filing a motion back in March

13   alerting Plaintiff to this deficiency.  And I'll -- I should

14   mention it's an allegedly deficiency.

15        Plaintiff responded to that motion and Plaintiff

16   claimed that only theories needed to be disclosed.

17        So in Plaintiff's view the infringement

18   contentions only needed to disclose theories.

19        And then Plaintiff went on to say, and I quote,

20   "With the expectations that the parties will conduct

21   discovery relating to the evidence that underlies the

22   Plaintiff's infringement theories."  That's document Number

23   172.

24        "Plaintiff as the party with the burden to

25   establish infringement should have been diligent to timely

1    produce evidence to support its theory of infringement.

2          Plaintiff argues that 26(e) permits

3    supplementation and that it's supplemented in fact discovery

4    obligation by making the new fact witness known in writing

5    as part as an expert report.

6          Even if the Court agreed that supplementation

7    under Rule 26(e) to identify an important new witness and

8    important new facts could be disclosed within the pages of

9    an expert report, 26(e) does not operate to permit a party

10   to conduct fact discovery after the discovery deadline when

11   that discovery could have easily been conducted within the

12   fact discovery period."

13         Plaintiff's interpretation would encourage parties

14   to, and I quote, "subvert the very purpose of a Rule 26 by

15   waiting to ask for relevant information and then argue that

16   information was turned -- that the -- that they turned other

17   the information as soon as they received it."  See *Dedmon*,

18   D-E-D-M-O-N, *versus Continental Airlines*.  This is a case

19   out of the District of Colorado, August 5th, 2015, 215 WL

20   4639737.

21         Now Plaintiff's cited *Poitra versus School

22   District Number 1* at 311, F.R.D. 659.  And that's another

23   case out of the District of Colorado, December 31st, 2015.

24         As discussed in *Poitra*, and I quote, "Rule 26(e)

25   creates the duty supplement, not a right, and does not

1    create a loophole to be exploited by a party to its

2    advantage."

3         The *Poitra* case also discusses -- discusses that

4    "Supplementation of disclosures must be made in a timely

5    manner and that it must occur in a fashion that will allow

6    the opposing party to conduct meaningful discovery and avoid

7    undue delay in the progress of the case."

8         Fact discovery closed on September 13th, 2019.

9    Here Plaintiff admits that important facts and these

10   important facts and important fact witnesses, those

11   disclosures as far as Dr. Burke is concerned, could have

12   been inquired about during the fact discovery period had

13   Plaintiff's Counsel asked Dr. Burke for this information.

14        Plaintiff admits it had ongoing access to Dr.

15   Burke as a potential fact witness long before the fact

16   discovery deadline approached.  But Plaintiff does not

17   dispute that they began working with Dr. Burke during the

18   IPR period.

19        Dr. Burke recently testified and he concluded that

20   he was a direct infringer all the way back in 2018.  And now

21   I'm referring to the chart that was submitted, and there was

22   no opposition to the Court receiving that chart, and that

23   will be filed as Exhibit 1 to this hearing.

24        So as I've already discussed, the alleged gap in

25   Plaintiff's negligence was clearly highlighted for Plaintiff

1    by St. Jude.

2              And a fundamental topic of infringement could have

3    been easily explored by Plaintiff with Dr. Burke prior to

4    the September 13th deadline for fact discovery.

5              Even if Plaintiff's late disclosure was not

6    intended to sandbag, it is in the Court's view inexcusable.

7              Plaintiffs were in control of obtaining this

8    information and it should have been produced earlier.

9              The *Poitra* case confirms that a Plaintiff's good

10   faith alone may not be enough and that a party should not be

11   permitted to ignore disclosure obligations throughout the

12   discovery period and then avoid sanctions simply by claiming

13   his deficiencies were not willful.

14             So now I will turn to the Carlson report.

15             And before getting into that, I do want to just

16   make a record about how clear the deadlines were in this

17   case and how careful the Court was with respect to working

18   with the parties on the deadlines to make sure that this

19   case proceeded in a way that was efficient and consistent

20   with Rule 1.

21             This Court set clear deadlines for fact discovery,

22   including the service of third-party subpoenas in its

23   scheduling order.

24             This Court set deadlines for expert reports

25   following the close of fact discovery.

1          This Court's scheduling order framework was

2     predicated on the assumption that fact discovery would close

3     and that the parties, along with the experts, would digest

4     the facts and base their opinions on the facts.

5          Rule 26(a)(2)'s requirement that an expert report

6     contain the facts or data considered by a witness in forming

7     opinions does not trump the fact disclosure obligations in

8     the rules, and that includes Rule 26(a)(1) or the need to

9     timely respond to discovery requests.

10          The fact that a document is cited by a party's

11     expert and is -- strike that.  I'm going to quote from a

12     case entitled *Transamerica Life Insurance Company v.*

13     *Lincoln,* 255 F.R.D. 645.  And that's a Northern District of

14     Iowa, January 29 case, 2009.

15          And in that case, the court said that "The fact

16     that a document is cited by a party's expert and is publicly

17     available does not excuse that party from timely production

18     of that document if it is the subject of an appropriate

19     discovery request."  And that's even for a

20     publicly-available document.

21          The information referenced in the damages expert

22     report but which was not disclosed until demanded by St.

23     Jude was directly responsive to Defendant's discovery

24     requests.

25          I'll offer one example.  Boston Scientific's

1    Question Number 27, and I quote. "Documents that NLC may

2    rely on in any way to support its claim for damages."

3          Plaintiff explains that it did not produce the

4    information because it only needed to produce a list with

5    its expert reports even if those documents were not

6    available through previously-produced discovery.

7          This reason by Plaintiff ignores that Plaintiff

8    had an obligation to produce this information in discovery.

9    And at the very least to supplement responses to multiple

10   discovery requests.  And even if the parties don't believe

11   that supplementation of disclosures under 26(a) needs to be

12   done, the rule does require supplementation at times.  And

13   this Court ordered supplementation of initial disclosures to

14   be made in, I believe, February and March of last year.

15         The Court agrees that a list attached to an expert

16   report may be sufficient, but that list has to identify

17   things produced in discovery if they're not general

18   information.

19         The Court took a look at the *Bazarian*

20   *International* case cited by Plaintiff.  And this case

21   actually confirms this basic assumption that lists are

22   sometimes sufficient as long as those lists do provide for

23   the disclosure, the content of facts have -- are already

24   available.

25         And I took a look at the *Bazarian* case and it was

1    interesting.  This case cite is 315 F. Supp. 3d 101,

2    District of Columbia, October 25th, 2018.

3         And it wasn't totally clear from the case of

4    *Bazarian* on what this list was.  But in *Bazarian*, it

5    internally cited to a number of cases about the adequacy of

6    lists.

7         And in each of the cases that were internally

8    cited, the parenthetical talked about the list, including

9    books and article, review of relevant authority and I quote,

10   "discovery materials."

11        Another internal citation in the *Bazarian* case

12   included a parenthetical in an internal cite that discussed

13   that a list was appropriate because everything on the list

14   was produced as part of discovery.

15        The Court takes note of a case that I don't think

16   was cited by any of the parties and it is the *Ravo versus*

17   *Covidien* case out of the Western District of Pennsylvania,

18   55 F. Supp. 3d 766, Western District of Pennsylvania,

19   October 24th, 2014.

20        And the Judge in that case reiterated the basic

21   premise that I believe applies here.  And I quote, "An

22   expert cannot offer testimony based on documents not

23   produced in discovery because there is no principle way to

24   test that expert's recollection and opinion."

25        The Court also reviewed the *E3 Biofuels versus*

1   *Biothane* case cited by Plaintiff.  And that case is at 2013

2   WL 5729537, District of Nebraska, October 22nd, 2013.

3           In that case, the issue wasn't that the judge had

4   decided that the list was okay.  For purposes of the

5   decision in that case, the judge assumed that the list was

6   not sufficient and that for purposes of Rule 37 the failure

7   was harmless.

8           And so this case does not support that Plaintiff's

9   list which disclosed admittedly unavailable licenses or

10  licensing data was permitted under the rule was permitted

11  based upon the document requests that had been made and was

12  permitted based upon the rule for expert disclosure.  That

13  includes a requirement that the facts and data needs to be

14  included.

15          The Court finds that all of the factual

16  disclosures at issue were untimely produced.

17          Since the Court finds untimely disclosure, the

18  Court now proceeds to the factors for exclusion of the

19  evidence pursuant to Rule 37.

20          The Eighth Circuit has set forth four factors that

21  the Court considers in determining whether a failure to

22  disclose was justified or harmless.

23          Factor one is the importance of the excluded

24  material.

25          Factor two is the explanation for failing to

1  comply with the disclosure rules.

2          Factor three is the potential prejudice from

3  allowing the material to be used at trial.

4          And factor four is the availability of a

5  continuance to cure such prejudice.

6          And I am referring to the factors, and I believe

7  both parties have cited to this case, it's the *Citizens Bank*

8  *of Batesville, Arkansas versus Ford Motor*, 16 F.3d 965, 966

9  Eighth Circuit, 1994.

10          Regarding the first factor, it appears that the

11  parties agree that the potentially excluded factual material

12  in the Burke report is important.

13          With respect to the Carlson report, it's -- it's

14  unclear what the level of importance is.  The Plaintiff says

15  it will not introduce the underlying data but it would be

16  prejudice if the Court were to exclude the opinion.  And so

17  I'll find that the information is important and I will rule

18  that regarding factor number four, the information is

19  important.

20          I will note, however, that this finding, in my

21  view, does not factor one side or the other.

22          It's important, and I think that is certainly a

23  factor that points to -- would support either party.  So

24  I'll move onto the other factors.

25          And in factor two, the Court has already discussed

1    Plaintiff's explanation for failing to comply with discovery

2    as part of the question number one I had to answer, and

3    discovery -- discovery and disclosure obligations.

4             In the Court's view these raisins -- reasons favor

5    exclusion pursuant to Rule 37.

6             So now I'll move onto factor three.  And under

7    factor three, the Court looks at potential prejudice.

8             The Court finds that Defendants are prejudiced if

9    the -- if the Court does not exclude the evidence because

10   they should have had the opportunity to take discovery on

11   the factual information in a timely manner.

12            They should have had opportunity to work with

13   their clients and the experts earlier to digest factual

14   information that is core to Plaintiff's case.

15            The Court finds that there was unfair surprise as

16   far as the disclosure of Dr. Burke as a fact witness is

17   concerned.

18            The Court finds that a continuance will not cure

19   the problem created by Plaintiff's own doing.

20            Reopening fact discovery and opening of new

21   discovery to further examination of these new facts and the

22   impact of a new fact witness on infringement, and then to

23   look at the change in expert analyses will be expensive.

24   And a record, a clear record, was made on the expense that

25   that expense could involve hundreds and thousands of dollars

1    is significant.

2         Reopened discovery would likely involve the

3    participation of third parties.  As St. Jude notes, had Dr.

4    Burke's direct infringement been disclosed properly in

5    discovery, St. Jude could and would have sought documents,

6    communications and testimony related thereto.

7         St. Jude also could and would have taken

8    corresponding discovery, including that of hospitals and

9    manufacturers to determine the veracity and nature of Dr.

10   Burke's claims.

11        The fact that Defendant's experts might be able to

12   address the undisclosed information in their yet unserved

13   expert reports does not cure the prejudice.

14        Defendants have been denied use of this

15   information during the fact discovery period.

16        Thus, factor four shows that a continuance is not

17   available to cure the problem.

18        In sum, the Court's analysis of the factors with

19   respect to the Carlson report and the Burke report clearly

20   supports exclusion of the late disclosed evidence.

21        I'll conclude with a quote from the *Poitra* case

22   that was identified by Plaintiff here today as a case that

23   supported Plaintiff's position.  And I'll quote, "There

24   comes a time when an opposing party is entitled to make

25   informed decisions and to rely on the statements (or

1  silence) of the other side.  If the risk or consequences for

2  indecision should fall on one side or the other, it should

3  be the party with the affirmative disclosure obligation.

4  Any other resolution bodes ill for the just, speedy and

5  inexpensive determination of every action."

6       And, again, I'm quoting from *Poitras v. School*

7  *District* 311 F.R.D.  And that was cited earlier.

8       The Court will grant both motions.  And this order

9  will just be followed up with a text entry on the docket.

10  And this record will serve as the reasoning and analysis of

11  this Court's decision.

12       We're off the record.

13       (Off-the-record.)

14       (In Open Court at 2:00 p.m.)

15  THE COURT:  We are back on the record.

16       Off the record we were discussing some of the

17  timing of the remaining deadlines in the case.  And what I

18  will do is hear Boston Scientific's request or comment.

19       And if you could step up to the podium so we get a

20  good record of this.

21  MR. GRIMSRUD:  Yes, Your Honor.

22       With respect to the Dr. Burke ruling, since that's

23  an issue that St. Jude brought up, but it -- it applied all

24  the same arguments and rationale, I guess, you'd say applies

25  to the Boston Scientific case.

```
1              Dr. Burke issued a very, if similar, if not almost
2     identical opinion in the two cases.
3              And so, with respect to that, there's a number of
4     issues we have with Dr. Burke's report, but that's one of
5     them.
6              And I think the nondispositive expert deadline is
7     currently for motion practice is in January.
8              So given in light of the Court's ruling, we were
9     thinking that perhaps it makes sense to accelerate us
10    bringing that issue in front of Court.
11             It's going to be virtually identical to the issue
12    that was heard today, but we just wanted to raise that issue
13    and get clarity from a case management perspective how best
14    to handle that.
15             THE COURT:  All right.
16             Let me hear from Plaintiff's Counsel, Mr. Griggs.
17    And let you respond to that issue that was just raised.
18             MR. GRIGGS:  Again, I -- I don't see there's a
19    need to brief this out if the Court's going to rule in a
20    similar fashion.
21             So, I mean, we're comfortable saying that this
22    ruling applies in the Boston Scientific case as well, just
23    to avoid the, you know, the unnecessary briefing if they
24    truly are doing the same arguments and the same evidence,
25    and the same rationale that the Court just gave.
```

     1          THE COURT:  All right.  Do you want to file some

     2     sort of stipulations so that you've got an order that would

     3     apply to both cases so there's clarity?  And I'll start with

     4     you, Mr. Griggs?

     5          MR. GRIGGS:  Yeah.  We can put together a

     6     stipulation to file in the Boston Scientific case that just

     7     says that the ruling as it relates to the St. Jude's case

     8     applies with respect to the Dr. Burke aspect of that motion.

     9          THE COURT:  All right.

    10          MR. GRIGGS:  I agree that would be the most

    11     efficient way to proceed, Your Honor.

    12          THE COURT:  All right.  So let me go off the

    13     record again?  Oh -- well, let's hear from St. Jude.

    14          MR. SHAH:  Yes.  I'm sorry.  Just it may be

    15     similar in the first, with respect to the -- I mean, it may

    16     be kind of a moot point, but since the motion was granted

    17     and doctor and Mr. Carlson can't rely or testify about those

    18     docs, those 5,000 docs are technically still produced.

    19          I mean, should we do the same thing, submit a

    20     similar stipulation that they're not part of the record or

    21     that they are stricken?  Because I believe that's what your

    22     -- the St. Jude case are technically stricken from

    23     production, correct?  I'm sorry, from Boston Scientific

    24     case.

    25          THE COURT:  Right.  Boston Scientific's motion.

```
 1              MR. SHAH:  Correct.  If that's okay with Your
 2    Honor.  And then maybe Mr. Griggs and I can work out some
 3    similar stipulation with respect to our case.
 4              THE COURT:  Mr. Griggs, let me not assume that you
 5    would do something similar and let me hear what you'd like
 6    to do with respect to a -- same motion from the St. Jude
 7    folks on the 5,000 documents.
 8              MR. GRIGGS:  I think the ruling should just apply
 9    to both cases and we can work out whatever stipulations we
10    can work out so that there's (inaudible).
11              THE COURT:  I appreciate that we were able to work
12    through that.
13              Let's go off the record again.
14              (Court adjourned at 2:03 p.m.)
15              *          *          *
16                 DIGITAL REPORTER'S CERTIFICATE
17
18
19              I, Lynne M. Krenz, do certify the foregoing
      pages of typewritten material constitute a full, true and
      correct transcript of the digital recording, as they purport
20    to contain, of the proceedings recorded at the time and
      place hereinbefore mentioned.
21
22                      /s/Lynne M. Krenz
                        Lynne M. Krenz, RMR, CRR, CRC
23
24
25
```

1           UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2
    ------------------------------------------------------------
3                                    )
    Niazi Licensing Corporation,     )   File No. 17-CV-5096
4                                    )            (WMW/BRT)
            Plaintiff,               )
5                                    )
    vs.                              )   St. Paul, Minnesota
6                                    )   April 30, 2020
    St. Jude Medical S.C., Inc.,     )   1:30 p.m.
7                                    )
                                     )
8           Defendant.               )
    ------------------------------------------------------------
9

10

11        BEFORE THE HONORABLE BECKY R. THORSON
      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                **(TELEPHONIC MOTION HEARING)**
12

13

14

15

16

17

18

19

20
        Proceedings recorded by mechanical stenography via
21   telephonic conference; transcript produced by computer.

22

23

24

25

```
 1        APPEARANCES

 2     For the Plaintiff:          Boyle Fredrickson, S.C.
                                   Michael Griggs, Esq.
 3                                 840 N. Plankinton Ave
                                   Milwaukee, WI 53203
 4
       For the Defendant:          Benesch Friedlander Coplan &
 5                                 Aronoff
                                   Kalpesh Shah, Esq.
 6                                 Samuel Ruggio, Esq.
                                   71 S. Wacker Drive
 7                                 Suite 16th Floor
                                   Chicago, MN 60606
 8
                                   Merchant & Gould
 9                                 Rachel Hughey, Esq.
                                   150 South Fifth Street
10                                 Suite 2200
                                   Minneapolis, MN 55402
11
       Court Reporter:             Lynne M. Krenz, RMR, CRR, CRC
12                                 Suite 146
                                   316 North Robert Street
13                                 St. Paul, Minnesota 55101

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3

4                    (VIA TELECONFERENCE)

5          THE COURT:  Good afternoon.  This is Magistrate

6     Judge Thorson.

7          Before we --

8          MR. GRIGGS:  Good afternoon, Your Honor.

9          THE COURT:  I'm going to ask everyone to let me

10    begin by making some comments and first determining whether

11    we have the court reporter on the call.

12          (Court reporter responded.)

13          THE COURT:  Thank you.  I am next going to press

14    the button required to make an audio recording.

15          (Brief break.)

16          THE COURT:  This is Magistrate Judge Thorson and I

17    would like to begin by outlining some of the ground rules

18    before I get the introductions of counsel, though I

19    appreciate your patience.

20          I'd also like to confirm that my law clerk is on

21    the line.

22          THE CLERK:  Yes, Judge.  I'm here.  Thanks.

23          THE COURT:  Thank you.

24          Now, obviously we are conducting this hearing by

25    telephone because of all the restrictions and concerns due

1    to the COVID-19 pandemic.

2           I'm in chambers by myself but everyone else,

3    including the court reporter and my law clerk, are

4    participating remotely.

5           We will start in a minute here with appearances of

6    counsel, but I want to make sure we coordinate that since we

7    don't have the visual cues.  And I will first ask for the

8    plaintiff to introduce -- plaintiff's counsel to introduce

9    himself and then the lawyer arguing for St. Jude should

10   introduce herself or himself, and then also introduce the

11   other lawyers who are appearing in the case.  And I think

12   that will allow for a more coordinated presentation that

13   will avoid any talking over one another.

14          Now, after I get your introductions I am going to

15   continue to cover some ground rules and reminders, but let's

16   get appearances on the record, starting with the plaintiffs.

17          MR. GRIGGS:  Yes.  Good afternoon.  Thank you,

18   Your Honor.  Michael Griggs on behalf of the plaintiff.

19          THE COURT:  And for the defendant?

20          MR. SHAH:  Good afternoon, Your Honor.  Kal Shah

21   on behalf of defendant St. Jude.

22          And then with me on the phone as well, I believe

23   are Rachel Clark Hughey with Merchant & Gould, Sam Ruggio

24   with Benesch Law and then with the client, St. Jude, Rachel

25   Bach.

1            THE COURT:  Thank you.

2            Now because this hearing is being conducted by

3     telephone I want to just go through a few reminders.

4            Now, we have the court reporter, and I thank the

5     court reporter for being on the call and arranging her

6     schedule, but it will be very important for you to keep in

7     mind that we do have a court reporter taking down what you

8     say.

9            And so when you're on the phone, it's easy to

10    speed up, it's easy to be reading from something and to go

11    too fast.  And so please just put a little flag on your

12    notes, or on your desk, or whenever you are, to make sure to

13    really slow down and make sure to speak very clearly and

14    speak directly into whatever microphone you have on whatever

15    device you're using to participate.

16            Please also make sure every time you speak up to

17    say who you are.  And it is easy to forget that.  In court

18    we go back and forth across the courtroom, but here the

19    court reporter needs to know who you are before you start to

20    talk.

21            So every time the baton is passed in oral argument

22    today, state your name and ideally the party you represent.

23            Another important ground rule is for you to pause

24    if you're speaking in long sentences or before you move on

25    to a different point.  That allows me to ask questions and

1    ensures that you're at a good pace.

2         If you're not the one speaking, please mute your

3    device.  And that will help to avoid any background noise,

4    or any echoing or anything like that.

5         Now, one of the things I want to remember to say

6    is that the court reporter has my permission to jump in if

7    there's something about the way that this hearing is being

8    conducted where she does not believe she's able to make a

9    good record.  And so if you hear the court reporter jump in,

10   stop talking.

11        Another reminder, because we're all in our remote

12   locations, probably by ourselves, it feels more private than

13   it is.  This is a public hearing, this is a public

14   courtroom.  It's just a public courtroom that is being

15   offered by telephone.

16        And so if you feel that you need to cover

17   something that is confidential, you'll need to try to work

18   around it and speak in more general terms because the record

19   will be a public record.  And so once the cat's out of the

20   bag, if you're disclosing confidential information, that

21   will be difficult to take that back.  And so think about

22   that when you're covering certain information.

23        I don't think, based upon what I've seen in the

24   papers, that you'll need to cover anything confidential, but

25   it's just part of my points that I cover at the beginning of

1        these telephone hearings.

2                All right.  So let's begin the hearing.

3                This is the United States District Court for the

4        District of Minnesota, and we are here for hearing on St.

5        Jude's motion to enforce a court order and for sanctions.

6        For the record, this is Case Number 17-CV-5096 WMW/BRT.

7                I'd like to set the stage a little bit for this

8        motion to help the attorneys who will be arguing the motion

9        address the order that I issued back in December and the

10       allegation of a violation of that court order.

11               Back in December, this Court granted St. Jude's

12       motion regarding Dr. Burke.  I granted that motion from the

13       bench.  And then the transcript was ordered and made

14       available, I believe, a few days later.  That motion was

15       back in December.

16               Before presenting my decision from the bench,

17       after a recess I framed the Court's understanding of the

18       scope of St. Jude's motion.  And that framing can be found

19       at Page 95 of the hearing transcript and I quote, "For the

20       record, St. Jude's motion is to strike facts disclosed in

21       Dr. Burke's expert report that were not disclosed by the

22       fact discovery deadline.  St. Jude also seeks to preclude

23       Dr. Burke from testifying as a fact witness due to late

24       disclosure."

25               In its December motion, St. Jude objected that Dr.

1    Burke was being offered as a fact witness months after the

2    close of discovery.

3        At the hearing, St. Jude argued, and I quote, "We

4    are now months after the close of discovery.  Dr. Burke's

5    not listed.  That's the problem that we're dealing with here

6    is that he is a surprise fact witness."

7        St. Jude also argued that allowing Dr. Burke to

8    offer factual information at this phase would require the

9    reopening of discovery.

10       In my oral ruling in December I set forth the

11   analysis for granting St. Jude's motion.

12       After presenting analysis in granting the motion,

13   I said, and I quote, "The Court finds that all of the

14   factual disclosures at issue were untimely produced."

15       Then, since the Court found untimely disclosure, I

16   considered the exclusion of the evidence pursuant to

17   Rule 37.

18       The Court, in considering the exclusion of the

19   evidence, looked at the potential prejudice if Dr. Burke was

20   allowed to come into the case as a fact witness at that

21   time.

22       I'm going to quote, and it's a long quote, from

23   the record of the hearing.  Quote, "The Court finds that

24   defendants are prejudiced if the -- if the Court does not

25   exclude the evidence because they should have had the

1    opportunity to take discovery on the factual information in

2    a timely manner.  They should have had opportunity to work

3    with their clients and the experts earlier to digest factual

4    information that is core to Plaintiff's case.  The Court

5    finds that there was unfair surprise as far as the

6    disclosure of Dr. Burke as a fact witness is concerned.  The

7    Court finds that a continuance will not cure the problem

8    created by plaintiff's own doing.

9            Reopening that discovery and opening of new

10   discovery to further examination of these new facts and the

11   impact of a new fact witness on infringement, and then to

12   look at the change in expert analyses will be expensive.

13   And a record, a clear record was made on the expense -- that

14   the expense could involve hundreds and thousands of dollars

15   is significant.  Reopened discovery would likely involve the

16   participation of third-parties.  As St. Jude notes, had Dr.

17   Burke's direct infringement been disclosed properly in

18   discovery, St. Jude could and would have sought documents,

19   communications and testimony related thereto.

20           St. Jude also could and would have taken

21   corresponding discovery, including that of hospitals and

22   manufacturers to determine the veracity and nature of Dr.

23   Burke's claim.  The fact that defendant's expert might be

24   able to address the undisclosed information in their yet

25   unserved expert reports does not cure the prejudice.

1        Defendants have been denied use of this information during

2        the fact discovery period.  Thus factor four shows that a

3        continuance is not available to cure the problem."

4                The Court excluded the late disclosed factual

5        information.  The Court granted St. Jude's motion and stated

6        that the hearing record would serve as the reasoning and

7        analyses for this Court's decision.  That was my decision on

8        December 2nd, 2020, at docket number 145.

9                The transcript of the hearing was available as of

10       December 4th, 2019, and that is at docket 152.

11               After that introduction, I will now hear the

12       parties' arguments.

13               I'll begin with St. Jude, as this is their motion.

14               MR. SHAH:  Good afternoon, Judge.  Thank you very

15       much for that.

16               I think your recitation of the facts and the

17       background hit directly on point with respect to the basis

18       of our motion.

19               My client, St. Jude -- and I apologize, this is

20       Kal Shah on behalf of St. Jude.  My client, St. Jude, has

21       had to deal with what I would consider a repeated refusal

22       and violation by the plaintiff to abide by this Court's

23       order.

24               Your Honor just went through the expert and

25       discussion that we all had to go through in December of 2019

1    regarding this particular issue with Dr. Burke, who had been

2    on notice, as Your Honor would recall from their -- based on

3    our prior motions, not disclosing a slew of information --

4         (Phone beeping.)

5         MR. SHAH:  -- regarding use of St. Jude's

6    products, his experience, third-party, other physiologists.

7    And Your Honor clearly indicated that all of those facts

8    that were late disclosed were excluded.

9         Yet, you know, this is the third time now that we

10   are dealing with this at great expense to my client and,

11   frankly, I think this is a great expense to the Court.  Your

12   Honor addressed it, Judge Wright addressed it because there

13   was a motion challenging Your Honor's order, and all of that

14   was disregarded.

15        And where we are now today is Your Honor has to do

16   it again, but equally important -- and I think this is a

17   slap in the face to both my client and this Court, is that

18   plaintiff's have used the (indiscernible) information to

19   support their summary judgment and their *Daubert* motion.

20        So now this Court has to wade through not only

21   this motion to enforce, but all of that once again to

22   determine whether or not or where the Court should consider

23   what has or has not been stricken.

24        But, frankly, in our view, and I'm trying to hold

25   back some of my frustration, Your Honor, but this is utter

1    disregard for both the plaintiff -- for both defendant, St.

2    Jude, and for this Court, and for this Court's orders that

3    are clearly meant to provide a fair litigation profile for

4    both parties.

5            You know -- and I guess I'm happy to address

6    anything that you'd like to go through, but Your Honor could

7    not have been more clear, as you pointed out -- and one of

8    the things I planned on highlighting was the scope of your

9    order was not narrow.

10           Your Honor clearly said, "the Court finds that all

11   of the factual disclosures at issue were untimely produced."

12   And that's at Page 105 of your transcript.

13           Yet, as you'll see -- and I'm happy to go through

14   that, but paragraph, for instance, 12, paragraph 13,

15   paragraph 22, paragraph 26, paragraph 36 --

16           (Phone beeping.)

17   MR. SHAH:  -- of plaintiff's expert reports -- I'm

18   sorry, plaintiff's declaration by Dr. Burke, I'm sorry, for

19   in support of the summary judgment and in support -- or in

20   opposition to the *Daubert* motion have basically cookie

21   cutter copies of the very language that was addressed in our

22   prior motion and it's just back again.

23           And Your Honor, clearly struck --

24   MR. GRIGGS:  Your Honor, I'm sorry.  May I -- I

25   need to interject?

1          This is Michael Griggs.  I got dropped off the

2    call.  I have not heard -- I just got back on.  I did not

3    hear any of St. Jude's argument.

4          I apologize for that.  I don't know what happened.

5    But I cut out right when Mr. Shah just started speaking and

6    now I just jumped back in.

7          THE COURT:  This is Magistrate Judge Thorson.

8          I will ask Mr. Shah to begin his argument.  We

9    will not be obviously striking any of the record, the court

10    reporter will continue just to transcribe what we have.

11          But, Mr. Shah, if you could begin anew.

12          MR. SHAH:  Sure, Judge.  Rarely do I get

13    (indiscernible) so I'll give it a shot.

14          But, Your Honor -- and to just reiterate, and I'll

15    be a little more bit more brief, but our point is simply

16    this is a pattern by plaintiff of its violation and refusal

17    to abide by this Court's orders.

18          We had this very issue come up and my client, St.

19    Jude, briefed it at expense.  Your Honor kindly addressed it

20    after a full-day hearing, and taking resources and time away

21    from the Court.  We have a lengthy transcript that Your

22    Honor just quoted from.  And Your Honor could not have been

23    clearer as to the scope of Your Honor's order.

24          Specifically, as Your Honor pointed out, that the

25    Court found that all the factual disclosures that Dr. Burke

1    provided late were untimely disclosed and were

2    (indiscernible).

3         Your Honor also made clear that this particular

4    transcript was the basis and the scope of your order.  There

5    was no unequivocal -- it was unequivocal and there was no

6    confusion or room in any way for confusion as to the scope

7    in what Your Honor intended to do.

8         And in addition to that, plaintiff had the

9    opportunity and took the opportunity to challenge Her

10   Honor's order with Judge Wright.

11        Judge Wright's --

12        (Court reporter interrupted.)

13        MR. SHAH:  Yeah, I'm sorry.

14        (Phone beeping.)

15        MR. SHAH:  Let me see if I can -- give me one

16   moment, I'll take the headphones off and see if that's an

17   issue.

18        THE COURT:  This is Magistrate Thorson.

19        Mr. Shah, I want to make sure that you cover

20   everything that you wanted to cover in this new presentation

21   because Mr. Griggs was not on the call during the first

22   part.

23        And so I just want to make sure that you cover

24   everything that you covered earlier and don't just kind of

25   pick up in a summary fashion and give you that opportunity

1    and make clear that you should take that opportunity.

2              (Phone beeping.)

3              THE COURT:  Is -- this is Magistrate Judge

4    Thorson.

5              I keep hearing beeps coming in and out.  Is Mr.

6    Griggs on the call?

7              MR. GRIGGS:  Your Honor, again, I apologize.  I

8    got dropped off.  I've got a different phone now.  Hopefully

9    this will solve the problem.  I don't know what is going on,

10   but I am on now.  Again, I was off for the last minute or

11   two.

12             THE COURT:  All right.  What type of phone are

13   you -- are you on a different cell phone now?

14             MR. GRIGGS:  I'm on a different cell phone.  I was

15   using my work phone previously.  And I don't know if that

16   was the source of the problem but I switched over to my cell

17   phone, so hopefully that will not be an issue.

18             THE COURT:  All right.

19             A couple of reminders, the court reporter has

20   jumped in and has indicated that it's a little fuzzy with

21   the phone that or device that being used by Mr. Shah.

22             It's very important that you're speaking very

23   clearly into the microphone and that everybody else who is

24   not speaking is muted.  That will help the audio quality.

25             And so we are going to pretend that we are

1   starting all over again.  And I want Mr. Shah to be able to

2   speak more clearly into his device and I want Mr. Griggs to

3   have the benefit of hearing everything.

4        Now, I know that that feels like we're wasting

5   time, but we're not.

6        And so let's pretend that we just heard my

7   introduction and, Mr. Shah, introduce yourself and let's

8   begin.

9        MR. SHAH:  Thank you, Judge.  I'm just moving in

10  my house to see if I can get a better reception.  So let me

11  just get situated.

12        One second.  I'm trying to get upstairs where I'm

13  closer to a window and see if this is any better.

14        Is my sound coming through any better at this

15  point?

16        THE COURT:  It's better.

17        Just be very clear and enunciate even more clearly

18  than you already or typically do.  I'm not criticizing your

19  way of speaking, I'm just saying this has got to be very

20  slow, and deliberate, and clear.

21        And please remember to introduce yourself before

22  you begin speaking.

23        MR. SHAH:  Okay.

24        Okay, Judge.  And, again, if I do for some reason

25  cut in or out, please let me know, but I have switched

1    locations.

2         So on behalf of St. Jude, this is Kal Shah.  And I

3    thank you, Your Honor, for your time this afternoon.

4         And we bring this motion somewhat regrettably but

5    because we have to because this is just part of plaintiff's

6    continued pattern of failing to abide by and frankly

7    violating this Court's orders.

8         As Your Honor just recited in December of 2019, we

9    brought an initial motion based on disclosure that were

10   provided in Dr. Burke's expert disclosure that related to

11   factual issues that should have long prior been disclosed,

12   to allow St. Jude to take proper discovery.  This related to

13   use of the particular products at issue.  It related to

14   alleged conversations with other physiologists, and a range

15   of factual components and issues that were central to this

16   case that until the expert deadline had not been disclosed.

17        Those issues were presented to Your Honor in a

18   motion to strike by St. Jude.  Your Honor held a full-day

19   hearing in addition to briefing on that.

20        And as Your Honor pointed out at the outset, Your

21   Honor found, and I quote from Page 105, "That the Court

22   finds that all of the factual disclosures at issue were

23   untimely produced."

24        Your Honor also was clear, and that was at

25   page 109 of the record, this is docket entry 152, the

1    transcript from the hearing on our prior motion for St.

2    Jude, "That this record will serve as the reasoning and

3    analysis of this Court's decision."

4           The Court was clear and unambiguous as to the

5    scope of Your Honor's motion in granting of our order to

6    strike.  Your Honor was also clear as to where we could

7    find, to the extent there was any confusion, what the scope

8    of that was and how it would entail -- what it entails.

9           Subsequent to that we are here today, Judge,

10   because plaintiff sought to appeal that with Judge Wright.

11   Judge Wright affirmed.  And so from that point forward these

12   factual disclosures that were highlighted, both in our

13   motion and also identified and discussed in Your Honor's

14   order in that transcript, should no longer be part of this

15   case.

16          Yet, as far as -- when it came time for

17   dispositive motions and when it came with to plaintiff's

18   opposition to our *Daubert* motion, we saw all of these again.

19   And as we pointed out in our motion, not only do we see

20   these issues again, sometimes slightly reworded, but there

21   are paragraphs and sections in Dr. Burke's new declaration

22   that he submitted in opposition to the *Daubert* motion and in

23   support of the summary judgment that are in direct violation

24   and include the exact same language that Your Honor

25   addressed and struck back in December of 2019.  There

1      frankly, Your Honor, is no excuse for that that we can come

2      up with.

3              Your Honor found back in December of 2019 that

4      plaintiff's failure to provide this timely was

5      "inexcusable."  Yet here we are months later in the context

6      of discovery -- dispositive motions and *Daubert* dealing with

7      this all again.

8              And it is costly to St. Jude.  This is now the

9      third time we have had to deal with this and spend money on

10     this issue.  And it extends, obviously, not just to this

11     issue, but we had to then address it and figure out what to

12     do in our *Daubert* motion and, of course, in summary judgment

13     because plaintiff is relying on this, even though he should

14     not be able to.

15             And then, of course, there's the cost in briefing

16     and the costs to this Court in having to address all of this

17     again.  On top of which there is a Court order that has been

18     violated and there's, you know, the general notion of the

19     respect for the law of the case in this Court's prior

20     findings.

21             And so at this juncture, Judge, really we're kind

22     of at our wits' end.  I'm looking to Your Honor to enforce

23     what Your Honor already has done, and we should not need

24     further enforcement of, is to have these provisions and

25     these factual disclosures no longer in the case.

1        And given where we are and the scope of this

2    violation, we believe that includes and is not limited to

3    dismissal of the case entirely.

4        As you may recall, there's only one claim left,

5    and that claim they're relying on Dr. Burke for purposes of

6    direct infringement.  And much if not most of these facts

7    relate to that.

8        But at the very least to strike this declaration

9    in its entirety, that's the new declaration provided at

10   docket number 195.  That should be stricken in its entirety.

11   And we believe, again, at the very least that that should be

12   stricken and so should any corresponding motion that would

13   include St. Jude's -- I'm sorry, plaintiff's summary

14   judgment motion.  And it would include granting St. Jude's

15   *Daubert* motion because the opposition relies on that.

16       And, of course, we should get our fees.  We

17   believe St. Jude should not have had to have briefed this in

18   the first instance.

19       As Your Honor found at docket 152 in that court

20   hearing, the initial violation was a violation of this

21   Court's order and that in and of itself warranted sanctions.

22   Here we are now a third time.  Certainly my client should

23   get his fees back for having to go through this effort.

24       Now I'm happy to, if Your Honor would like, to go

25   through those similarities in the prior declaration that was

1    stricken or the expert report versus the current

2    declaration, but that's set forth pretty clearly in our

3    briefing.  And so to the extent there's questions I'll do

4    that.  But I think it's important to just give you the

5    framework and emphasize the harm and prejudice that's

6    befallen my client as a result of having to continually

7    check plaintiff's compliance with this Court's orders.

8              THE COURT:  Thank you.

9              This is Magistrate Judge Thorson.  Can you address

10   plaintiff's argument that St. Jude waived any objections to

11   factual information being provided by Dr. Burke?

12             MR. SHAH:  Sure, Judge.

13             I mean, I've not quite followed their argument.  I

14   believe their argument is that because we referenced the

15   motion to strike in the background section of our summary

16   judgment motion, that that consisted of a waiver of this

17   Court's order.

18             I would say two things in that respect.

19             First, it's a Court order, so it's not just

20   something we would waive or we can waive, Your Honor ordered

21   this.

22             Second, providing -- and we've addressed this in

23   our summary judgment brief, I believe we've addressed it --

24   if it's an argument they made in this here as well -- I'm

25   sorry, I'll take a look, I did have to leave rooms.

 1          But I believe -- I shouldn't say I believe, in

 2     this particular instance we did not at any point rely on the

 3     stricken material in a substantive way.  We provided it by

 4     way of background to emphasize the history of this case and

 5     the limited nature of evidence that's available to the

 6     plaintiff with respect to, for instance, direct infringement

 7     because plaintiff had relied upon, but was stricken, this

 8     particular (indiscernible) background that we're talking

 9     about.

10          We did not as the -- for example, some of the

11     cases have opened the door by introducing this information

12     in an affirmative way, rather we simply suggested to the

13     Court that there is very limited information in the record

14     on direct infringement.  And that's in --

15     particularly should be considered in reference to the motion

16     to strike.

17          And quite frankly, that part of that obviously

18     proved to be very important in that (indiscernible) this

19     declaration (indiscernible) indication that this motion had

20     ever occurred or was ever granted.

21          So certainly, I guess the bottom line is that we

22     don't (indiscernible) certainly there was not an intentional

23     relinquishment of some right, which is what a waiver

24     required on the law by St. Jude, and we don't think that in

25     any way the law supports, or the use or the reference to

1    this particular motion, generally speaking, as it was just a

2    reference to what had occurred historically somehow could

3    constitute a waiver.

4              THE COURT:  This is Magistrate Judge Thorson.

5              I don't want to fail to say that you're still a

6    little bit difficult to hear because of the device and --

7    it's -- and so I think you really, really, need to slow down

8    and pause in case I need to break in or the court reporter

9    needs to break in here.  So just be mindful that it is not a

10   very clear connection.

11             I want to follow up on the waiver issue to

12   understand what was used by St. Jude in the motion papers

13   filed in support of the dispositive motions.

14             Are you saying that the testimony of Dr. Burke

15   that was referenced by plaintiff's counsel in this motion to

16   strike was only used by St. Jude to explain that that

17   information should be stricken?  I'm confused.

18             MR. SHAH:  Yes.  Yes, Judge.  And I switched

19   again, but I will talk even more slowly.

20             I believe -- and I unfortunately had to leave my

21   desk so I can't pull up that paper.  Mr. Ruggio is also on.

22   He may be able to confirm as I speak after, because I don't

23   want to misspeak.  I don't have our summary judgment

24   document right in front of me because I had to leave space

25   based on the phone call.

1       But my understanding and recollection is that we

2    did not quote even the sections that we're talking about in

3    our motion for summary judgment or dispositive motion

4    papers, rather there was a reference to the docket entry and

5    the overall motion practice indicating that this had

6    occurred, meaning that there was a close of fact discovery.

7    But prior to the close of fact discovery, there was little,

8    if any -- I believe there was no evidence of direct

9    infringement.

10       And to keep in mind that Dr. Burke cannot keep a

11   basis of an argument for direct infringement.  And then

12   citing to the record with respect to this particular back

13   and forth that occurred over the course of time with Your

14   Honor's order and Judge Wright's affirmation.

15       I don't believe -- and hopefully Mr. Ruggio can

16   confirm while he's here, that in our summary judgment papers

17   we affirmatively quoted the statements that are at issue

18   here.

19       THE COURT:  Thank you.

20       This is Magistrate Judge Thorson.  I am not

21   inviting anyone else to jump in here at this point.

22       If your colleague would like to send you an e-mail

23   or something, that's fine, but I'm not going to have other

24   lawyers jumping in to clarify things at this point.

25       I do have another question, and that is that the

1    material that is now at issue in this motion has already

2    been submitted to the district judge.  My understanding is

3    that a hearing was held on the dispositive motions yesterday

4    and I'm curious as to whether this issue came up

5    specifically in the briefing and at the hearing?

6        MR. SHAH:  Your Honor, this is Kal Shah on behalf

7    of St. Jude's again.

8        The Judge, Judge Wright, here had to split the

9    oral arguments.  So before we were scheduled to perform oral

10   argument yesterday as to both the dispositive motions --

11   well, I should say summary judgment motions, as well as

12   *Daubert* motions, yesterday that was changed.  So yesterday

13   it was relegated only to the *Daubert* motion.  And so we did

14   have an argument on *Daubert*.

15       This issue was raised in our *Daubert* brief in the

16   form of footnote that we are moving to strike and that it's

17   improper for them to have relied on the declaration of Dr.

18   Burke.  But it did not come up substantially because we were

19   addressing, frankly, plaintiff's violation of what we

20   believe -- what we believe is plaintiff's violation of

21   another Court order, which is that the parties, as Your

22   Honor may recall earlier, had said that the parties must

23   address both sides' claim constructions in their expert

24   reports and Dr. Burke testified that he had not done that,

25   and that we were -- we were debating the merits of our

1    *Daubert* motion in that light, more so than the use of the

2    declaration.

3            Although, I will say, that plaintiff did rely on

4    the declaration to suggest various components of their

5    argument, which is another reason why, you know, it's

6    improperly moved to strike that declaration.

7            THE COURT:  Thank you.  I will -- this is

8    Magistrate Judge Thorson.  I will now turn the virtual

9    podium over to Mr. Griggs, who is here on behalf of the

10   plaintiff.

11           MR. GRIGGS:  Yes.  Thank you, Your Honor.  This is

12   Michael Griggs on behalf of the plaintiff's NLC.

13           I'd first like to discuss the scope of relief that

14   St. Jude asked for on the original motion to strike.  I

15   think we've outlined this in our papers.

16           That motion was directed to evidence of direct

17   infringement that was presented by Dr. Burke in his report.

18   St. Jude identified three or four paragraphs on pages 25 and

19   26 as the problematic disclosures in the report.  And that

20   was the focus of the original motion to strike.

21           As we noted, it is -- those paragraphs and those

22   pages are what is identified in St. Jude's request for

23   relief.  And so that is the scope of what the original

24   motion to strike was directed to.

25           As we also pointed out, five of the six paragraphs

1      that are challenged in the instant motion were included in

2      Dr. Burke's report, but they were not mentioned or targeted

3      in that original motion to strike.

4              And so NLC's submission of those should not be and

5      cannot be considered a violation of the Court's order when

6      they were not previously at issue.

7              St. Jude now is attempting to greatly broaden what

8      it had asked for previously and is seeking drastic sanction

9      based on this broadening of scope.

10             I think it's important when you walk through the

11     actual paragraphs at issue here, and I'd like to do that.

12     We did that in our brief.

13             If you look at our brief on page 4, the first

14     paragraph is paragraph 12.  And I don't see anything in

15     there that can be fairly characterized as evidence of direct

16     infringement.

17             What paragraph 12 is directed to is Dr. Burke's

18     general history, and general use and familiarity with St.

19     Jude's products.  Again, this paragraph was included in Dr.

20     Burke's expert report.  It was not targeted by St. Jude the

21     first time around, yet now St. Jude is seeking to strike

22     this and arguing that the order encompasses this paragraph

23     that was never previously targeted or discussed during the

24     first go-around.

25             If you look at paragraph 13, which is on page 5 of

1    NLC's brief, this is a single-sentence paragraph which says,

2    "I have firsthand knowledge of the St. Jude's CPS catheters

3    because I have used these catheters."  And then there's a

4    highlighted portion, "in accordance with St. Jude's

5    instructional and marketing materials on many occasions

6    during my medical practice to implant permanent pacing leads

7    into the coronary sinus and its branches."

8         Again, prior to St. Jude filing this motion, NLC

9    agreed to remove the -- or withdraw the highlighted text

10   there.

11        With that removal there is nothing in Paragraph 13

12   that relates or could be characterized as evidence of direct

13   infringement.  It doesn't mention in any way in which

14   anything is being used.  Again, this is background

15   information that was not targeted on the first go-around.

16   All it is being used for is to demonstrate that Dr. Burke

17   has familiarity with St. Jude's products.  And I believe he

18   is allowed to say that.

19        On Page 6 of NLC's brief, paragraph 25 is another

20   paragraph that is targeted in the instant motion.

21   Paragraph 25 says, "St. Jude's instructions for the CPS Aim

22   inner catheter direct an electrophysiologist to advance a

23   guide wire through the inner catheter and outer catheters

24   and into a branch vein of the coronary sinus, allowing for a

25   range of diameter that includes a .014-inch guide wire."

1     And then there is a screen shot from that particular

2     instruction.

3          Again, this was not targeted in St. Jude's

4     original motion and it has nothing to do with direct

5     infringement.  This is part of Dr. Burke's analysis of the

6     instruction that St. Jude has identified the submission of

7     this paragraph as a violation the Court's prior order.

8          On page 7, paragraph 26, this relates to using a

9     guide wire for an over-the-wire lead.  Again, this paragraph

10    was not targeted the first time around.

11         So the submission of this paragraph now cannot be

12    considered to be a violation of the Court's order when St.

13    Jude did not target this and did not subject this to its

14    motion that it previously brought.

15         Similarly, Paragraph 28 is -- was also in Dr.

16    Burke's report and was not targeted the first go-around.

17    This, again, relates to Dr. Burke's analysis with respect to

18    the telescoping action.

19         In paragraph 28, that's on page 8 of NLC's brief,

20    you can see the highlighted -- the highlighted phrase there,

21    NLC has agreed to withdraw that phrase as it, you know,

22    could possibly be construed as some sort of evidence of

23    direct infringement.

24         And, again, St. Jude didn't even identify this

25    particular phrase as problematic, it was just, you know,

1    asking to strike the entirety of paragraph 28 even though it

2    was not previously challenged.

3         And then paragraph 36 of Dr. Burke's summary

4    judgment declaration is what really is and was the focus of

5    St. Jude's initial motion to strike.  This correlated to the

6    paragraphs under a heading in Dr. Burke's report of evidence

7    of direct infringement.  And as we've laid out in the

8    report, Dr. Burke and NLC took care to edit this to remove

9    references of direct infringement.

10        And so the -- the claim that there is some sort of

11   willful violation, or blind violation or, you know,

12   repeated conduct in violation of the Court's order simply

13   isn't true.

14        When you look back at what St. Jude -- how they

15   framed the issue and the relief they asked for in the

16   original motion to strike, it was targeted to pages 25 and

17   26 of Dr. Burke's expert report.

18        And when you compare that to the declaration that

19   correlates to paragraph 36 of the summary judgment

20   declaration which, as we've laid out in the brief, was

21   edited to remove what NLC believes was the excluded

22   statements.

23        And so that is -- the proper focus of this motion

24   should be on paragraph 36, those prior paragraphs that were

25   unchallenged before should not be a basis for sanctions when

         1    St. Jude did not target those in the initial motion.  As we

         2    mentioned here, that would be sanctioned by ambush.

         3          NLC took great care and heeded the Court's order

         4    in revising the statements and removing the statements that

         5    didn't understand to be excluded based on the way St. Jude

         6    presented its prior motion and based on the relief that it

         7    asked for.

         8          So if anything, if there is considered to be any

         9    type of violation here, it should be focused on what was

        10    done with respect to paragraph 36.

        11          I'd also like to address the waiver issue.  As we

        12    pointed out, the fact of the matter is is that St. Jude

        13    submitted deposition testimony where St. Jude, while it was

        14    deposing Dr. Burke, elicited testimony about direct

        15    infringement.

        16          As we pointed out under Rule 56, the Court is free

        17    to consider that since it has been submitted into the

        18    record, regardless of the purpose.

        19          So I believe that can fairly constitute a waiver

        20    on the issue since St. Jude submitted it.  There is no need

        21    to submit it.  NLC had no intent and is certainly not

        22    intending to submit any evidence of direct infringement by

        23    Dr. Burke or others.

        24          And NLC in its summary judgment papers, the

        25    argument does not argue that there is direct infringement on

1    behalf of Dr. Burke or others.  NLC's arguments are based on

2    admissions by St. Jude's witnesses and based on

3    circumstantial evidence relating to the instructions.

4         So whatever reason St. Jude decided to submit this

5    deposition testimony is irrelevant.  It has been submitted

6    into the record and it is fair game for the Court to

7    consider it.

8         So I believe this goes to the harm or the

9    prejudice where the most direct evidence of direct

10   infringement as it relates to Dr. Burke's direct

11   infringement was submitted by St. Jude, not by NLC here.

12        I'd like to circle back around also to this

13   drastic relief that St. Jude is requesting right now.

14        First, as we pointed out in the papers, St. Jude

15   is relying on Rule 37.  Based on my reading of Rule 37, it

16   does not appear to be an appropriate basis.

17        Rule 37 is relating to ordered discovery matters,

18   for example, failing to comply with an order compelling

19   document production or to present a witness for deposition.

20   This is -- Rule 37 is what we looked at during the original

21   motion to strike.

22        So it's unclear and it does not seem that Rule 37

23   provides a proper legal basis for the relief that St. Jude

24   is seeking.

25        And that aside, we've cited the case law about the

1    analysis and the showings that must be made in order to

2    enter drastic remedies such as strike -- well, dismissal of

3    the case first, striking pleadings, awarding attorney's fees

4    and so on.

5         The case law says there has to be a willful

6    violation of a court order here.  A deliberate willful

7    violation of a court order, bad faith.

8         And as we've laid out and as I've just explained,

9    you know, NLC is not committing anything in bad faith here.

10   On the contrary, NLC took very careful steps based on its

11   review of the Court's order and based on St. Jude's motion

12   in the relief it requested to attempt to comply with that.

13   And I believe that NLC has done that.

14        You know, there was no deliberate resubmission of

15   anything that NLC would -- would believe to be in violation

16   of the Court's order.

17        We just walked through those other paragraphs that

18   St. Jude is targeting and there is nothing in there that

19   relates to direct infringement.  NLC has agreed to withdraw

20   anything that even comes possibly close to that type of a

21   characterization.

22        NLC removed most of -- most of what was on pages

23   25 and 26.  And certainly removed all the explicit

24   references to direct enrichment.

25        So NLC and Dr. Burke have taken careful steps to

1    comply with the order yet now is faced with a motion for

2    sanctions and allegations of bad faith, willful violation of

3    an order, deliberate misconduct.

4         One of cases talking about attorneys' fees of the

5    filing -- the Temple of Justice, practicing fraud on the

6    Court.  That, you know, is just an unfortunate

7    characterization by St. Jude and that is not what has

8    happened here.  So to the extent the Court is -- finds

9    there to be some sort of violation here, it certainly is not

10    willful.

11         And if there is a violation, the appropriate

12    remedy is for the Court to either strike those portions --

13    and, again, it should be focused on paragraph 36, to strike

14    those portions that it believes are in violation or -- or

15    just to simply disregard it.

16         You know, again, Your Honor, this is not the risk

17    that's associated with presenting this to a jury.  The Court

18    is aware of the scope of its order and the Court can

19    disregard what it wants to disregard to the extent it

20    believes that the submission was in violation of the Court's

21    order.

22         So in summary, St. Jude in its motion is greatly

23    expanding the scope of what it asked for when it filed its

24    original motion to strike, which was focused on three or

25    four paragraphs on pages 25 and 26 of Dr. Burke's original

 1    reports.

 2           Now St. Jude comes in challenging a number of

 3    other paragraphs that, A, don't have anything to do with

 4    direct infringement.  And more importantly, B, were never

 5    challenged the first time around.

 6           And on top of that, St. Jude is seeking dismissal

 7    and attorneys' fees for submission of previously

 8    unchallenged statements.  That -- like I said, that would be

 9    sanctioned by ambush and would be unfair to NLC.

10           THE COURT:  Thank you, Mr. Griggs.

11           This is Magistrate Judge Thorson.

12           Mr. Griggs, I hoped that I would set up the

13    hearing today in a way that would have you respond to my

14    order.  And to restate on the record, I framed what I

15    believed to be the motion before the Court.

16           I quoted at the beginning of the hearing, and I'll

17    quote it, again, for the record, "St. Jude's motion is to

18    strike facts disclosed in Dr. Burke's report that were not

19    disclosed during the fact discovery deadline.  St. Jude also

20    speaks to preclude Dr. Burke from testifying as a fact

21    witness due to late disclosure."

22           That's my framing of the motion.  I granted the

23    motion and issued an order that addressed what had been done

24    with respect to the expert report, but I was pretty clear

25    that you can't disclose a fact witness and present factual

1    testimony after the fact discovery deadline.

2           And my order, and the reasoning for my order was

3    clear.  The facts need to be disclosed during the fact

4    discovery period that both parties have the opportunity to

5    examine the facts and then the experts opine.  That was

6    clear in the discussion.

7           And my order frames what we're dealing with here

8    today, not the particular paragraphs that were raised by St.

9    Jude.  I made clear that Dr. Burke could not be a fact

10   witness when you never disclosed him as a fact witness, and

11   he cannot present facts.  That was the framing and that was

12   the order.

13          And so you need to respond.  Not going back to

14   what you're saying that St. Jude argued, but you need to

15   respond to my order because that's the order that I'm

16   looking at.  I was there.  I tried to set it up, but my

17   framing and my order is what you need to deal with.

18          Can you respond to my order, not your framing of

19   the order, but the Judge's framing of the motion and the

20   subsequent granting of the motion?

21          MR. GRIGGS:  Yes, Your Honor.  Thank you.

22          And, again, I'd like to walk back through the

23   particular paragraphs that are at issue here.

24          And if you look at paragraph 12, again, this is --

25   this is background with respect to an expert's.  It's facts

1     that support Dr. Burke's expertise.  I believe that is

2     appropriate to include in an expert report.

3             And, again, my understanding of what was at issue

4     before was facts not -- it was facts related to direct

5     infringement.  I mean, there is inherently an expert who's

6     going to provide background information.

7             For example, Dr. Benditt in his similarly says,

8     I've been a doctor for so and so long.  I have done, you

9     know, numerous coronary sinus.  None of that was disclosed

10    by St. Jude in fact discovery.  That is a typical type of

11    background information that is provided in an expert report.

12    That is what is in paragraph 12.

13            And, again, St. Jude did not identify this the

14    first time around.  Their motion was focused on evidence of

15    direct infringement.  And I don't see how paragraph 12 can

16    be in any way construed as evidence of direct infringement.

17            If you look at --

18            THE COURT:  What --

19            MR. GRIGGS:  -- paragraph --

20            THE COURT:  I'm sorry to interrupt you.  It's very

21    -- it's very difficult if there's no pause.

22            But let me direct you to paragraph 26.  And this

23    is at document number 195, where plaintiff is presenting Dr.

24    Burke's declaration stating -- and I quote here from

25    paragraph 26, "St. Jude's instructions state that a guide

1     wire may be used if desire.  However, in my experience a

2     guide wire is almost always used (over 99 percent of the

3     time) when delivering an over-the-wire lead.

4           It is not recommended or practical to implant an

5     over-the-wire lead without using a guide wire.  Further, it

6     is my understanding and experience that

7     electrophysiologists, including myself, almost always, or

8     almost exclusively use over-the-wire leads as opposed to

9     stylet-drive leads.  For example, in my practice I implant

10    over-the-wire leads over 99 percent of the time for a

11    coronary sinus branch pacing.  Based upon my conversations

12    and experiences with other electrophysiologists, I believe

13    that the frequency at which I use the over-the-wire leads is

14    representative of the general electrophysiologist

15    population."

16          Why isn't that a new fact?

17          MR. GRIGGS:  Your Honor, that is opinion

18    testimony.

19          This isn't like a survey or a factual, he is

20    saying, here's is my experience, and it's even phrased as,

21    my belief.

22          You know, this -- this is based on his experience.

23    It's opinion testimony, it's not fact.  And that is, you

24    know, precisely what experts do.

25          So, I -- again, you know, I understand this to be

1     an expression of opinion here.  He is saying, you know, here

2     is my general practice, here's what I believe other people

3     do.  You know, that's an opinion, that is not -- that is not

4     a fact.  That's not factual matter, that's an opinion.

5              THE COURT:  He's stating what he does.

6              MR. GRIGGS:  He is.  But, again, I mean, that goes

7     as a foundation for his opinion.

8              You know, I don't think St. Jude asked a discovery

9     request about, you know, how often do doctors use wires with

10    leads.  You know, I -- I don't -- I'm trying to understand

11    here, you know, what an expert is allowed to say if he's not

12    allowed to say something that's as presented in

13    paragraph 26.

14             Again -- and maybe we can agree to disagree but,

15    you know, in my experience, I mean, this is an opinion.

16    This is a typical statement that would be made by an expert

17    saying, you know, I -- I have experience in this area.  This

18    is how I've done it and I believe this is how other people

19    do it.  That's an opinion.

20             THE COURT:  All right.  What about paragraph 36?

21    Is that a fact or opinion?

22             MR. GRIGGS:  Your Honor, that's styled in the same

23    way.  And it's saying in his own personal experience here's

24    how -- how I use these and this is how I believe other

25    people use them.

 1          Again, it's not -- it's not based on fact or

 2     survey evidence or anything, this is an opinion.  It's just

 3     based on his experience working as a doctor.

 4          THE COURT:  All right.  Are there any facts in

 5     your expert's declaration at docket number 195 that you

 6     think cross -- that are facts and not opinions that would be

 7     now, upon reflection, that you would think crossed over the

 8     line as to what we did in December?

 9          MR. GRIGGS:  Your Honor, I think what -- what

10     comments -- and again, I've focused on the six paragraphs

11     that St. Jude identified in their motion.  And within those

12     paragraphs I've highlighted what I believed would

13     encroach -- or could possibly be characterized as

14     encroaching on the Court's order.

15          For example, paragraph 13, on page 5 of NLC's

16     brief, paragraph 13 says, "I have firsthand knowledge of St.

17     Jude's catheters because I've used these catheters and we

18     highlighted in accordance with St. Jude's instructional and

19     marking materials."

20          You know, that statement could be arguably

21     construed as some sort of vague reference to direct

22     infringement, so we've agreed to withdraw that.

23          But when you withdraw that, the statement says, "I

24     have firsthand knowledge of St. Jude's CPS catheters because

25     I have used these catheters on many occasions during my

1    medical practice to implant permanent pacing leads into the

2    coronary sinus and its branches."  Again, this is just

3    purely a background foundational statement for Dr. Burke

4    showing that he is familiar with St. Jude's products because

5    he's used them.

6         There was one other instance where we had

7    agreed -- if you just bear with me, it's Paragraph 28.  This

8    is on Page 8 of NLC's brief.

9         Again, and this is -- Paragraph 28 relates to Dr.

10   Burke explaining some aspects of St. Jude's instructions.

11   And then there was the highlighted part at the end of this

12   paragraph that says, "And used everyday by

13   electrophysiologists around the world."

14        Again, that could possibly be characterized as

15   some sort of vague reference to direct infringement and

16   we've agreed to withdraw that statement.

17        But the remainder of that is Dr. Burke's opinion

18   and analysis with respect to St. Jude's instructions.

19        THE COURT:  Help me understand, Mr. Griggs, what

20   -- and I'm trying to understand, what is the distinction

21   that you're drawing between the sentence that you say you

22   would have agreed to withdraw about his -- Dr. Burke's

23   experience and the experiences that I highlighted for you in

24   paragraphs 26 and 36?

25        MR. GRIGGS:  Because 26 and 36 don't relate to the

Case 2:1v-1864-BRT Document 1253 Page: 242 Filed: 07/02/2021 Page 42 of 69

1   issue of direct infringement.  Direct infringement is the

2   question of, has a doctor followed the steps of claim 11?

3   You know, that's the issue of direct infringement.

4          So talking about, you know, whether doctors used a

5   guide wire when doing an over-the-wire lead, you know, that

6   is not -- that doesn't relate to the issue of direct

7   infringement.  There's no statement there about how they're

8   using it.  And, again, it all -- it all circles back that

9   this is, you know, Dr. Burke's opinion based on his

10  experience within the field.

11         THE COURT:  And, Mr. Griggs, again, I very much

12  apologize for interrupting, I'm not trying to cut you off in

13  any way.

14         But why is it that you think my order was specific

15  to the direct infringement?

16         MR. GRIGGS:  Because that is how -- that is what

17  St. Jude asks for.

18         THE COURT:  But what about my order that I read a

19  couple of times, and that you've had available and you

20  appealed and Judge Wright didn't -- didn't change the

21  finding?

22         My order is not narrow to a particular type of new

23  fact.  How is it that you think my order was -- my order,

24  I'm -- I need you to point to something I said in my order

25  that gives you the idea that it was so limited.

1      MR. GRIGGS:  Well, because, I'm reading it.  I'm

2  looking at it right now on page 95, you know, and the Court

3  says, "For the record, St. Jude's motion is to strike facts

4  disclosed in Dr. Burke's expert report that were not

5  disclosed by the fact discovery deadline."

6      So when I read that, you know, I need a little bit

7  more specificity and I look back at what St. Jude asked for.

8  And what they were asking for was facts of direct

9  infringement.

10      THE COURT:  And one other followup question to

11  address, Mr. Griggs, is that the whole basis for my ruling

12  was that fact discovery had closed and you hadn't identified

13  Dr. Burke as a fact witness, and so you couldn't use him to

14  offer factual information.

15      So let's -- let's go along with your idea that the

16  order somehow would relate to your framing of the -- of the

17  of the motion in the order.  Why would you do that again?

18  Why would you disclose factual information in a new

19  document?

20      So let's -- let's say that you had something

21  totally unrelated or maybe a new witness, why do you think

22  you could do that under the scheduling order?

23      MR. GRIGGS:  Well, Your Honor, I think the dispute

24  is that I don't believe that's factual information, as we've

25  just walked through the paragraphs that were challenged.

 1    And, again, it -- those weren't challenged the first time

 2    around by St. Jude.  They were not identified.

 3        And I'm looking through the Court's order, I'm

 4    looking on page 97 and the Court says, "In this case

 5    plaintiff was alerted to St. Jude's evidentiary challenge

 6    regarding direct infringement of the method claim."

 7        And then on page 98 it says, "Plaintiff's

 8    contentions, however, failed to identify a single instance

 9    of direct infringement underlying its assertion of indirect

10    infringement."

11        THE COURT:  Yes.

12        And, Mr. Griggs, I recall that that argument was

13    based on that you had clear notice that you should

14    diligently go get facts before the close of fact discovery,

15    I don't think that framed the motion.  That was just an

16    argument about why you weren't diligent in getting that

17    discovery during the fact discovery period.

18        And so it was a kind of a hand waive to you knew

19    that this was a gap.  So that, in my view, doesn't frame my

20    order.

21        MR. GRIGGS:  Well, Your Honor, those were

22    statements from your order.

23        Here's another one on page 108 of your order.  It

24    says, "Reopened discovery would likely involve the

25    participation of third parties.  As the St. Jude notes, had

 1    Dr. Burke's direct infringement been disclosed properly in

 2    discovery, St. Jude could and would have sought documents,

 3    communications and testimony related thereto."

 4         And, Your Honor, I'm pointing these out because

 5    when you read through your order in conjunction with St.

 6    Jude's motion, it was focused on facts relating to the issue

 7    of direct infringement.

 8         St. Jude identified pages 25 and 26 of Dr. Burke's

 9    initial report and that was the scope.  That is what they

10    asked for in their -- in their relief.  When you read

11    through the Court's orders -- I understand the Court sort of

12    broadly framed the issue at the beginning, but when you read

13    through the discussion it's about the factual evidence

14    relating to direct infringement.

15         And so those other paragraphs, the other five

16    paragraphs that we've been discussing, other than

17    paragraph 36, those do not relate to direct infringement.

18    And I question whether they even would constitute facts to

19    begin with, other than facts relating to Dr. Burke's

20    experience that support -- that provide a foundation for his

21    opinion.

22         With respect to paragraph 36, which corresponded

23    to the statements on pages 25 and 26 of Dr. Burke's initial

24    report, those were the facts.

25         They were -- Dr. Burke stated, I am a direct

1    infringer.  I have been, you know, infringing this -- or I

2    began infringing on such and such date.  And I have spoke to

3    other electrophysiologists and they are direct infringers.

4         Those are the facts that were targeted in St.

5    Jude's motion and that were stripped out by Dr. Burke and

6    NLC, and they were not presented in this declaration.

7         So circling back around, the -- the original

8    motion was related to facts relating to direct infringement

9    when you read through the Court's order, when you read

10   through St. Jude's motion and that is what NLC understands

11   to be, and that is what NLC abided by when it submitted this

12   declaration.

13        THE COURT:  All right.  I think you've shared your

14   position.

15        I'll turn it back to St. Jude.  And we'll ask Mr.

16   Shah to just remember that your device hasn't been as clear

17   and so please, again, speak directly into the device, and

18   keep it -- keep it slow.

19        MR. SHAH:  Judge, this is Kal Shah on behalf of

20   St. Jude.  I have moved right next to the window, so I hope

21   this will help.  I'm unfortunately limited in my technology.

22        But a few -- I'd kind of like to point out three

23   things in response.

24        First, as Your Honor pointed out, the scope of the

25   order was not (indiscernible) somehow this notion of direct

1    infringement.  Any claim by (indiscernible) that somehow --

2    well, even plaintiff's, you know, framing of that motion is

3    just an indication of their willful and complete failure to

4    abide by your order.

5          Let me start with what we actually put in our

6    original motion since that appears to be plaintiff's

7    foundation.  On the very first page of our argument, this is

8    at document number 130 --

9          THE COURT:  All right.  Let me -- slow down.

10    Let's slow down, Mr. Shah.

11          Let us all just be able to have the opportunity to

12    turn to that document.  What document is that?

13          MR. SHAH:  Sure.  It's Document 130 in the record.

14          THE COURT:  All right.  So just hold on.  Yes.

15          (Court reporter interrupted.)

16          THE COURT:  All right.  Thank you.  I appreciate

17    that good advice.  And will just emphasis that we have to be

18    very slow and deliberate with our presentation.

19          MR. SHAH:  Thank you.

20          THE COURT:  Pause after every sentence.

21          MR. SHAH:  Yes, Judge.

22          I also -- this is Kal Shah on behalf of St. Jude.

23          I also am going to move outside where I get better

24    signal.  However, if the background noise is too much,

25    please let me know.

1          I'm just going to sit here on my front steps.

2     Perhaps that will be a little better as far as the signal.

3          So as I was saying, Your Honor, document 130 was

4     our original motion to strike.  And if you look even just at

5     our introduction, the very first page before I get to the

6     argument we note, and this is document 130, Page 2 of 18 in

7     our introduction we note, that at "after a month" -- I'm

8     sorry, "over a month after the close of fact discovery in

9     the expert report of Dr. Martin Burke, plaintiff's expert on

10    infringement, Dr. Burke provides vague and unsubstantiated

11    statements that he personally engaged in direct infringement

12    use."

13         He then goes on to say, "He claims that others did

14    too, citing nebulous interactions, experiences and

15    conversations with other electrophysiologists.  These

16    statements are not expert but factual evidence."

17         We continue, Judge, in that same document,

18    starting on Page 7, which is the argument.  And we outline

19    not only the direct infringement components, but the factual

20    components.

21         And you'll see on Page 7 of 18 of document 130

22    express reference, again, to certain "based upon my

23    conversations and experiences with other

24    electrophysiologists," and there's other aspects there about

25    his facts or his use.

1          As Your Honor may recall, and certainly we have

2     discussed today, that was the scope of your order.  There

3     are facts relating to other physiologists in any context

4     that were not disclosed.

5          We did not have the opportunity to depose them as

6     Your Honor pointed out.  We did not have the opportunity to

7     take that third-party discovery, as plaintiff even concedes

8     today, that was the scope of your order, not just direct

9     infringement, but any fact that was not yet of the record

10    that should have been in the record that plaintiff intended

11    to rely upon.

12         Secondly, Judge, even if we were to limit this,

13    and this is where I think the willfulness of plaintiff's

14    conduct comes into play, even if the original order and

15    motion were limited to direct infringement, the statements

16    that we have pointed out, many of them, relate directly to

17    direct infringement.

18         So, for instance, I think there was discussion

19    about paragraph 26 where there's a discussion upon -- first

20    based upon, quote -- this is paragraph 26 of docket number

21    195, Dr. Burke's declaration at issue.  And I quote, and

22    this is part of the quote that Your Honor went through,

23    quote, "Based upon my conversation and experiences with

24    other electrophysiologists."  Let me stop there.

25         First, in and of itself that is problematic.

```
 1              We had -- and Your Honor decided that random

 2      discussions are undisclosed conversations that we could not

 3      take discovery on (indiscernible) --

 4              THE COURT:  You're breaking up.  You're breaking

 5      up.  This is Judge Thorson.

 6              MR. SHAH:  Thank you, Judge.  I'm not -- it must

 7      be just a bad connection for this call.

 8              Okay.  Let me try again here.

 9              At docket entry 195, paragraph 26, did you get

10      that?  Were we all there or did that not get there?

11              THE COURT:  Why don't you cover that.  I'm not

12      sure your reception outside is any better.

13              But, I don't think you're slowing down enough and

14      I don't think you're pausing between sentences enough.

15              It's really hard to do, it's awkward, but it will

16      be helpful.

17              MR. SHAH:  Thank you.

18              I am moving to another location.  And I will try

19      and also to slow down further.

20              What I was saying --

21              THE COURT:  This is Judge Thorson.  I'm sorry to

22      interrupt, but just don't talk while you're moving from

23      location to location.  Get situated in the location and then

24      begin speaking.

25              MR. SHAH:  Thank you, Judge.  I actually have
```

1    turned off my headphones.  I am talking now directly into my

2    device.

3         THE COURT:  Thank you.

4         MR. SHAH:  Okay.  Let me -- let me try, again,

5    Your Honor.

6         What I was getting at as far as my second point, I

7    think the first point I made and I was moving on from was

8    simply the same point Your Honor made, which is your order

9    was not lifted to just direct infringement.  It was clear

10   and encompassed new facts that were not previously disclosed

11   that plaintiff's sought to introduce through Dr. Burke.

12        And that is consistent with St. Jude's motion

13   wherein, for instance, at docket 130, we identified not only

14   Dr. Burke's alleged personal use of St. Jude's products, but

15   also Dr. Burke's alleged conversations and interviews or

16   surveys, quote, unquote, that were not disclosed, that he

17   relied upon with respect to -- for a factual component of

18   his opinion.

19        That was clearly sought as a problem or identified

20   as a problem in our motion and it was clearly granted with

21   respect to all aspects including those factual components.

22        And importantly, as I think everyone recognized

23   today, that was because of the burden and discovery that we

24   were deprived of as a result.

25        So turning next I think to Plaintiff's argument,

1    however, is somehow this testimony is impermissible because

2    it does not -- because it does not relate to direct

3    infringement.

4              I would have two responses really to that.

5              First, direct infringement, of course, is factual.

6              Second, these paragraphs relate to direct

7    infringement, albeit, somewhat craftily in that they break

8    it up into components, but that really indicates the willful

9    nature of Plaintiff's violation.  Instead of this time

10   saying, I, Dr. Burke, use them and others used St. Jude's

11   products this way, he breaks it up into, I believe others do

12   and I have used this product.  And then separately, if you

13   use it this way it infringes, so one plus one still equals

14   two.

15             And as an example, I was taking a look, for

16   instance, at Paragraph 12, let's start with, at Docket 195,

17   which is the declaration at issue.

18             First, "I have personally used various St. Jude's

19   catheters to implant St. Jude permanent pacing leads into

20   the coronary sinus in my medical practice over the past

21   12 years."

22             Well, of course, that is direct infringement

23   because plaintiff asserts that using a St. Jude catheter to

24   implant a St. Jude lead is infringing.

25             But it goes on in that same paragraph and says,

1    "Using St. Jude medical systems 20 to 30 percent of the time

2    in these procedures, greater than 80 percent of the time, I

3    have used St. Jude's sheaths and leads together as a

4    system."

5           Again, Judge, that goes to direct infringement.

6    Not only is he saying that he uses St. Jude systems, which

7    Your Honor, I cannot now go and find out whether that's true

8    or not, I have no record or evidence of a single instance of

9    Dr. Burke performing surgery, let alone the components he's

10   used.

11          And that's an important distinction.  While he may

12   have the background to be an expert, if he is going to

13   testify that he is using our product, the accused product in

14   a certain way and has done so, that is direct infringement.

15          And he goes even further here to suggest that

16   because he does it 80 percent of the time, as we mentioned

17   in one of the other paragraphs, others must as well.  I

18   don't know who those others are and what is happening.

19          There is a discussion Your Honor pointed out,

20   paragraph 36, this is at Docket 195.  "I believe that the

21   frequency at which I use a delivery system, leads, and a

22   pacing device from the manufacturer is representative of

23   general electrophysiologist population."

24          Again, Judge, that's still direct infringement.

25   Not only is it direct infringement, it goes to, I directly

1    infringe but so does the general population.  And that's how

2    plaintiff seeks to bypass their requirement to prove direct

3    infringement by having Dr. Burke say, well, I do it and I

4    think everybody else does it at this frequency.

5           So, ultimately, whether you use Plaintiff's

6    interpretations of your order or you use what I believe is

7    your own words and the actual interpretation, there is no

8    excuse for those paragraphs.

9           And plaintiff's position that somehow the order

10   should be read or your order should be read based on their

11   varying level of interpretation, or that we should have

12   known what paragraphs they may rely upon in the future is

13   simply not tenable.

14          We took the effort to come to Your Honor to get

15   the relief we sought.  Plaintiffs should not have used any

16   of those facts, that they're here again and they're here

17   both in the context of testimony that I cannot now go look

18   at from a factual perspective, as well as they directly bear

19   on direct infringement drastically and completely in

20   violation of Your Honor's order.

21          Again, I apologize for the connection but

22   hopefully that last part was better than the starting part.

23          THE COURT:  Thank you.  This is Magistrate Judge

24   Thorson.

25          I'd like you to respond to Mr. Griggs' argument

1    that the information that I cited in paragraphs 26 and 36

2    are not fact but are opinion and shouldn't be subject to any

3    sanction on no matter how my order is interpreted because it

4    is opinion and not fact.

5            MR. SHAH:  What -- Your Honor, I guess I would say

6    that in two ways.

7            First, as I read those paragraphs, he's clearly

8    stating a fact.

9            For instance, paragraph 36, begins with, "In my

10   own personal experience."  That preface is, I am telling you

11   a fact from my personal experience.  And then he continues,

12   "I typically (probably over 80 percent of the time) use a

13   delivery system."  And he goes on.

14           But that is clearly a fact.  That he would like

15   the jury to adopt that fact, that 80 percent of the time a

16   doctor like him would use this particular system as a whole,

17   i.e., directly infringes.

18           It's both a fact and it's an improper fact that

19   relates to direct infringement, and it's particularly

20   problematic because it's layered.

21           First, it's a fact because I personally do this,

22   believe me, I'm an expert testifying.

23           Second, it relates to direct infringement because,

24   hey, if I do it then you should believe that 80 percent of

25   the rest of the doctors are doing this, too.

1    So you -- he is clearly conveying a fact adopted

2    as a greater fact with no evidence or support.  That's

3    paragraph 36, at least in part.

4         Paragraph 26 I think is another one you mentioned.

5    Again, as you mentioned, he is discussing not only use, but

6    he goes to say, "I implant over-the-wire leads over

7    99 percent of the time for coronary sinus branch pacing."

8         That is a fact that he is conveying, a statistical

9    fact, no less, of 99 percent of the time what he claims his

10   process is that I cannot check in any way, because I can't

11   get hospital records to see if that's consistent.  I can't

12   talk to other doctors or people that may have been in the

13   room.

14        But importantly, that also goes to direct

15   infringement, which I think is particularly problematic and

16   why plaintiff's argument here just does not happen or it

17   just rings hallow, then flies in the face of Your Honor's

18   order.  Because he wants the rest of the jury -- or the jury

19   to believe that 99 percent of the time this procedure will

20   be done and is used.  And so, therefore, St. Jude's products

21   must be infringing or used in an infringing way, by doctors,

22   i.e., direct infringement.

23        And that's the only reason you would go on and

24   say, "Based on my conversation and experience is" -- I'm

25   sorry, let me start again.

```
 1              Paragraph 195, again at -- I'm sorry,

 2    paragraph 26, docket 195, he also has that language, "Based

 3    upon my conversations and experience with other

 4    electrophysiologists, I believe that the frequency at which

 5    I use over-the-wire leads is representative of the

 6    electrophysiologist population."

 7              Again, Judge, two issues.

 8              First, there are several claim facts.  He had

 9    conversations and he has experiences with physiologists,

10    that's a fact, that's not an opinion.  He's not saying, I

11    think I've done this or that is a fact that he is claiming

12    he's done.

13              He also says that he uses this product at a

14    certain frequency and then he's offering a fact that's

15    unsupported that I cannot test, that like others that goes

16    further to direct infringement, which is that the frequency

17    at which he uses this technique is the same as everybody

18    also.

19              And plaintiff elsewhere says in their report that

20    if you use this technique you must infringe.

21              So, again, that goes to the entire willfulness and

22    improper nature of this -- of this declaration in that

23    they've chopped up into finer pieces what Your Honor said

24    they can't do to try to get for direct infringement and also

25    facts that Your Honor has already ordered they cannot do.
```

```
 1                THE COURT:  Thank you.

 2                Mr. Griggs, I'll let you take the time you need to

 3      respond and to have the last word here.

 4                MR. GRIGGS:  Thank you, Your Honor.

 5                And, you know, counsel's suggestion that there is

 6      something deliberate or diabolical going on here that we've

 7      chopped up and reorganized is just simply not true.

 8                This language is in Dr. Burke's original expert

 9      report in the way that it's presented with -- regarding what

10      Mr. Shah was just referencing.  This is not some

11      after-the-fact reconfiguration.

12                Moreover, to read NLC's summary judgment papers,

13      NLC is not arguing that it has direct evidence of direct

14      infringement.

15                Counsel is trying to put forth some sort of

16      argument that NLC is not making.  It is not relying on these

17      paragraphs as evidence of direct infringement.

18                So, again, to suggest there's some sort of willful

19      manipulation of Dr. Burke's declaration in an attempt to

20      circumvent the Court's order, again, it's just unfortunate

21      and inaccurate.

22                As I explained earlier, St. Jude's original motion

23      was directed to disclosure of facts relating to direct

24      infringement.  St. Jude identified what it believed those

25      facts to be and it identified those in paragraph -- or pages
```

```
1     25 and 26 of Dr. Burke's expert report.

2          When we were craft -- when NLC was crafting this

3     declaration with Dr. Burke, that was the guidance that we

4     used, we removed what we believed to be all explicit

5     references to direct infringement and then submitted the

6     declaration.

7          As I said, if you review NLC's summary judgment

8     papers, NLC is not hopping -- you know, hop, skip and

9     jumping around and saying, all right, look at paragraph 25,

10    and then look at 26, and then look at 24.  When you put it

11    all together, that equals direct infringement.  That's an

12    argument that St. Jude's counsel is presenting here, but

13    it's not what NLC is presenting, it was not NLC's intent.

14         St. Jude's counsel is attempting to -- to concoct

15    some sort of willful circumvention of the Court's order

16    which simply is not present here.

17         You know, again, with respect to these facts, Dr.

18    Burke is allowed to say -- or should be allowed to say that

19    he has used these.  And he should be able to say, I use a

20    wire 99 percent of the time.  That's just background as to

21    how Dr. Burke uses it.  It has no bearing on direct

22    infringement.

23         So, with that said, St. Jude is asking for very

24    drastic sanctions.  They are asking for dismissal.  They are

25    asking to strike Dr. Burke's declaration in its entirety.
```

1      They're asking to strike NLC's summary judgment motion in

2      its entirety.  Those sanctions are very extreme and should

3      be rarely entered by the Court.

4           Here, to the extent the Court believes there's

5      some violation, the appropriate sanction would be to strike

6      those portions that the Court believes were submitted in

7      violation of the Court's order.  And, again, I believe that

8      analysis should focus on paragraph 36.

9           The other paragraphs were included in Dr. Burke's

10     expert report, they were not identified by St. Jude in its

11     motion or in its request for a lead, so I don't -- I believe

12     they're outside the scope of the Court's order.

13          So unless the Court has any other questions for

14     me, NLC respectfully requests that the Court deny St. Jude's

15     motion in its entirety.

16          THE COURT:  Thank you.

17          I think what I'll do here is I am going to take a

18     brief recess and then I will come back and give you my

19     decision.

20          I think in light of the connection that we have, I

21     think I am going to end the recording and get off the call

22     and then I will reinitiate the call so that the parties can

23     dial back in.  And let's -- it is 3:07 central time now.

24     Why don't we reconvene at 3:30.

25          And so I will be the host on the call and get you

```
1    back on the line and confirm that we got counsel on the

2    line, and then I will issue my order.

3              And let me ask the court reporter, if that's

4    acceptable with your schedule.

5              (Court Reporter spoke.)

6              THE COURT:  So we are in recess and we will be

7    back at 3:30.

8              (Recess at 3:08 p.m.)

9              (Reconvene at 3:34 p.m.)

10             THE COURT:  This is Magistrate Judge Thorson and

11   we are back on the record.

12             Let me first ask if the court reporter is on the

13   line, and can hear me?

14             (Court Reporter spoke.)

15             THE COURT:  Thank you.  Now let me hear if, Mr.

16   Griggs, if you're on the phone?

17             MR. GRIGGS:  Yes.  Thank you, Your Honor.  I'm

18   here.

19             THE COURT:  Thank you.  And Mr. Griggs is

20   plaintiff's counsel in this case.

21             And is Mr. Shah on the phone?

22             MR. SHAH:  I am, Judge.  Thank you.

23             THE COURT:  All right.  Thank you.

24             We are back on the record in the matter in Case

25   Number 17-CV-5096 WMW/BRT.  And we have taken a brief
```

1    recess.

2              I have heard oral argument today on St. Jude's

3    motion and I have prepared a decision that I will give you

4    from the bench.

5              St. Jude has brought a motion to enforce this

6    Court's order and force sanctions.

7              This Court's order of December 2nd was clear and

8    not pinpointed to particular paragraph.

9              Simply stated, Dr. Burke was precluded from

10   offering testimony of fact in this case because he was not

11   timely disclosed as a fact witness.

12             Once again, after believing this issue was put to

13   rest with a prompt and clear order, Dr. Burke has resurfaced

14   as a fact witness in the dispositive motion briefing.

15             The Court finds that there was no waiver of an

16   objection to late-disclosed fact witnesses by St. Jude.

17             The Court finds that the insertion of facts into

18   the Burke declaration violates this Court's order.

19             Finding a violation, once again, the Court must

20   turn to the issue of sanctions.

21             Rule 37 authorizes the Court to impose sanctions.

22   The Court finds that there was an order regarding discovery

23   and in this Court's view there was a willful violation of

24   the order.

25             This does not mean that there was bad faith.  I

1    believe Mr. Griggs that he did not intend to practice a

2    fraud upon the Court.  But my order was clear and I find a

3    willful violation.

4         The issue of prejudice, however, is the closer

5    call.  The closer call, for a number of reasons, but most

6    importantly because a sanction less extreme than dismissal

7    may address the issue.

8         I should also note -- and, of course, as counsel

9    are aware, this Court does not have the power to order

10   dismissal of the case as a sanction because that would be a

11   dispositive order.

12        This Court could only recommend dismissal.  And so

13   with all of this in mind the Court will order the less

14   extreme sanction of exclusion.

15        The Court will order, and the Court does order

16   today, that the facts disclosed by Dr. Burke that were not

17   disclosed by the fact discovery deadline be stricken from

18   plaintiff's materials submitted to the Court for purposes of

19   the pending dispositive motion.

20        The Court will also award attorney fees and costs

21   to defendants for the fees and costs associated with

22   bringing this motion.

23        St. Jude attempted to resolve this dispute before

24   filing its motion.  Response by plaintiff was not

25   substantially justified and there are no other circumstances

1    that would make an award of reasonable expenses unjust.  And

2    I'm referring to Federal Rule of Civil Procedure 37(a)(5)(A)

3    I through III.

4         The Court will confer with Judge Wright's chambers

5    of the procedural mechanics of striking the improperly

6    presented factual material so the process is sufficient for

7    Judge Wright and her chambers.

8         What starts this process, each side must submit

9    copies of documents highlighting the portions that should be

10   stricken pursuant to this order.  And those submissions

11   should be made by both sides by May 7th, 2020.

12        Meanwhile, on or before May 7th, 2020, counsel for

13   the defendants should file an affidavit supporting their

14   requests for attorney fees and costs along with any

15   supporting documents.

16        Plaintiff may file an objection to the amount of

17   fees and of the costs reasonableness by May 11, 2020, not to

18   be confused with any appeal plaintiff's May 11 submission,

19   if made, may not reargue whether or not fees and costs

20   should be awarded.

21        This hearing's record serves as a reasoning and

22   analysis of this Court's decision.

23        We are in recess.

24        MR. GRIGGS:  Your Honor?

25        THE COURT:  Yes.

```
1              MR. GRIGGS:  I'm sorry, I just wanted to clarify

2      the submissions.

3              THE COURT:  You'll have to, wait.  Stop.  Stop.

4      You have to identify yourself.

5              MR. GRIGGS:  I'm sorry, this is Michael Griggs on

6      behalf of the plaintiff.

7              I just wanted to clarify submission for May 7th.

8      You said each side independently is going to submit

9      highlighted material that each side believes should be

10     subject to the exclusion order?

11             THE COURT:  Yes.  And my order is clear, all facts

12     not disclosed by the fact discovery deadline are to be

13     excluded.

14             So this is not a rearguing of the order.  It is

15     your side's view of which parts of which paragraphs -- and I

16     haven't gone through all of the dispositive motion

17     materials, and so I will receive those materials by each

18     side.  This is not an opportunity to reargue.

19             And please understand I'm not suggesting that you

20     don't have the independent right to appeal my order to Judge

21     Wright, but I request each side's submission of the

22     documents, we've covered a couple of them, but I don't know

23     what else is there, so I want to approach Judge Wright with

24     the benefit of getting that submission.

25             MR. GRIGGS:  And, Your Honor, one more point of
```

1    clarification.

2            Is it the six paragraphs identified in St. Jude's

3    motion or is it the entire declaration?

4            THE COURT:  Pardon?

5            MR. GRIGGS:  My understanding we're supposed to

6    review Dr. Burke's declaration for fact.

7            Is the review of the entire declaration or is it

8    just the six paragraphs identified in St. Jude's motion?

9            THE COURT:  It is the entire declaration.  I am

10   not making a paragraph-by-paragraph ruling.

11           My ruling is that -- and I'll go back to it.

12   Facts disclosed by Dr. Burke that were not disclosed by the

13   fact discovery deadline be stricken from plaintiff's

14   materials submitted to the Court for purposes of the pending

15   dispositive motion.

16           So it's not limited to Document 195.  I haven't

17   gone through the record to see if Dr. Burke has offered

18   other facts that were not disclosed during the fact

19   discovery period.

20           And so you need to look at your materials,

21   plaintiff's materials, that are submitted to the district

22   judge and then to highlight facts that Dr. Burke is

23   presenting that were not disclosed by the fact discovery

24   deadline.

25           MR. GRIGGS:  Okay.  Thank you, Your Honor.  This

1    is Michael Griggs.

2            THE COURT:  I appreciate the question.  Thank you.

3            MR. SHAH:  Judge, Kal Shah on behalf of St. Jude.

4    If I may ask a quick question?

5            THE COURT:  You may.

6            MR. SHAH:  Judge, with respect to the -- first,

7    thank you very much for your time and effort today.

8            But the question is, with respect to our

9    submission with respect to fees, would it make more sense to

10   just push those dates back a week so we can include the fees

11   it's going cost to take us to go through and mark up these

12   documents as well that stems directly from this motion

13   practice?

14           THE COURT:  That is probably worth an amended

15   timeframe.

16           I will push that back to be May 10th.

17           MR. SHAH:  Thank you, Judge.

18           THE COURT:  So my order is amended to change the

19   deadline for St. Jude's submission of fees and costs, and

20   that is now May 10th.  That may be a Sunday.  We'll say May

21   11th.

22           So for clarity in the record, St. Jude's

23   submission of an affidavit supporting fees and costs is due

24   May 11th, 2020.

25           MR. SHAH:  Thank you, Judge.

```
1              THE COURT:  Anything else from the plaintiff?
2              MR. GRIGGS:  No, nothing.  Thank you, Your Honor.
3              THE COURT:  Anything else from the defendant?
4              MR. SHAH:  No, Judge.  Thank you, again.
5              THE COURT:  All right.  Thank you.
6              And my -- I thank the court reporter for bearing
7     with us.  It was a lesson on having a little bit more of a
8     sound check before we get started.  And I will incorporate
9     that and we'll do that.
10             And so my apologies to the court reporter for
11    having to struggle through some of the conditions here that
12    she was subject to.  I know the lawyers were very prepared
13    on the substance and I appreciate that.
14             I think getting into a setting where there are no
15    headphones, I think that's an ongoing issue, and looking at
16    the looking at some testing with my colleagues might be
17    helpful, too.
18             But I do appreciate that everyone was very
19    prepared, and everyone was able to respond to my questions,
20    and I appreciate that very much.
21             So, with that we are in recess.  Thank you.
22             (Court adjourned at 3:47 p.m.)
23                        *  *  *  *  *  *
24
25
```

1

2                              **REPORTER'S CERTIFICATE**

3

4

                I, Lynne M. Krenz, do certify the foregoing
5       pages of typewritten material constitute a full, true and
        correct transcript of my original stenograph notes, as they
6       purport to contain, of the proceedings reported by me at the
        time and place hereinbefore mentioned.

7

8                       /s/Lynne M. Krenz
                        Lynne M. Krenz, RMR, CRR, CRC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Niazi Licensing Corporation,                     Case No. 17-cv-5096 (WMW/BRT)

                    Plaintiff,

                                                 **ORDER**

        v.

St. Jude Medical S.C., Inc.,

                    Defendant.

---

Plaintiff Niazi Licensing Corporation (NLC) and Defendant St. Jude Medical S.C., Inc. (St. Jude), cross-move to exclude expert testimony. (Dkts. 164, 196.) For the reasons addressed below, NLC's motion to exclude Dr. Arthur Erdman is denied, St. Jude's motion to exclude Dr. Martin Burke is denied, St. Jude's motion exclude Brad Carlson is granted in part and denied in part, and St. Jude's improper request for reconsideration is denied.

## BACKGROUND

NLC owns United States Patent No. 6,638,268 (the '268 Patent), which issued on October 28, 2003. The '268 Patent is directed to a catheter system that can be inserted into the coronary sinus of the heart. This catheter system allows medical professionals to administer fluids and introduce pacing leads to the coronary sinus. Although the use of catheters in general was well established by 2003, the '268 Patent describes an invention that, based on its structure and shape, purportedly is better suited for "use in the coronary sinus, especially in patients suffering from congestive heart failure." The '268 Patent

claims a double catheter system with an "outer, resilient catheter having shape memory and a hook-shaped distal end" and an "inner, pliable catheter slidably disposed in the outer catheter." The '268 Patent also claims methods of using the catheter system.

NLC initiated this patent infringement lawsuit against St. Jude on November 13, 2017. NLC alleges that St. Jude infringed the '268 Patent either literally or through the doctrine of equivalents. According to NLC, St. Jude directly infringes the '268 Patent by using, manufacturing, selling, or offering to sell infringing catheter systems. NLC also alleges that St. Jude indirectly infringes the '268 Patent by inducing its customers—namely, medical professionals—to infringe the '268 Patent.

The '268 Patent includes 27 claims, some of which are directed to configurations of the catheter and some of which are directed to the method of using the catheter system. NLC alleges that St. Jude infringes independent Claims 1, 11, 13, 18 and 24 and dependent Claims 10, 14, 15, 19, 23, 25, 26, and 27. The Court determined that Claims 1, 13, 18, and 24 are invalid as indefinite and that because Claims 10, 14, 15, 19, 23, 25, 26, and 27 depend on Claims 1, 13, 18, and 24, they also are indefinite. Only a single method claim remains: Claim 11, which relates to a series of steps for "using a double catheter." On October 21, 2019, the Court issued a claim construction order as to Claim 11, construing "the catheter" to mean "the double catheter" and concluding that "Claim 11 is infringed only when the steps are performed in the order listed."

On November 4, 2019, St. Jude moved to strike facts disclosed in the expert reports of NLC's technical expert, Dr. Martin Burke, and NLC's damages expert, Brad Carlson, because those facts were not disclosed before the fact-discovery deadline. On

December 2, 2019, United States Magistrate Judge Becky R. Thorson granted St. Jude's motion to strike. NLC appealed, and the Court affirmed the magistrate judge's December 2, 2019 Order. Currently pending before the Court are NLC's motion to exclude the expert testimony of St. Jude's technical expert Dr. Arthur Erdman and St. Jude's motion to exclude the expert testimony of NLC's experts Dr. Burke and Carlson.

## ANALYSIS

The admissibility of expert testimony is a question of law for the district court that is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)     the testimony is based on sufficient facts or data;
> (c)     the testimony is the product of reliable principles and methods; and
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir.

2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion. *Id.* (internal quotation marks omitted). Determinations as to the admissibility of expert testimony are within the district court's discretion. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997) (reviewing for an abuse of discretion).

It is a district court's obligation to ensure that testimony admitted under Rule 702 "is not only relevant, but [also] reliable." *Daubert*, 509 U.S. at 589. When determining reliability, a district court evaluates the expert's method as to (1) whether the method can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the method's known or potential rate of error, and (4) the method's general acceptance. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94). These factors are not exhaustive, and the district court must evaluate the reliability of expert testimony based on the facts of the case. *Id.* A district court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted). When weighing these factors, the district court functions as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Questions regarding the factual basis of an expert's testimony ordinarily, however, are issues of credibility of the expert's testimony, not issues of admissibility. *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co. v Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## I.  NLC's Motion to Exclude Expert Testimony of Dr. Erdman

NLC moves to exclude the testimony of St. Jude's technical expert, Dr. Erdman. NLC argues that Dr. Erdman does not qualify as an expert under Rule 702 because he is not a medical doctor or electrophysiologist and, therefore, he is unable to testify regarding the medical procedure of implanting permanent pacing leads in a lateral branch of a coronary sinus. NLC also contends that permitting Dr. Erdman to present testimony on the issues of invalidity and non-infringement will unfairly prejudice NLC. St. Jude counters that Dr. Erdman will testify regarding the engineering aspects of non-infringement and invalidity, Dr. Erdman has skill in the art, and his testimony is offered in conjunction with Dr. David Benditt, an electrophysiologist. Moreover, St. Jude contends, NLC fails to challenge any aspect of Dr. Erdman's experience or any specific qualification or opinion of Dr. Erdman.

Rule 702 requires an expert to possess "knowledge, skill, experience, training or education sufficient to assist the trier of fact." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (internal quotation marks omitted); *accord* Fed. R. Evid. 702. And such knowledge, skill, experience, training, or education must match "the

subject matter of the witness's testimony." *Robinson*, 447 F.3d at 1101. When issues of infringement and invalidity are disputed, courts analyze them from the perspective of a person having ordinary skill in the art. *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008). To opine on those issues that require the examination of evidence from the perspective of one of ordinary skill in the art, a witness must qualify as an expert in the pertinent art. *Id.* at 1363. There also must be an "adequate relationship between [the expert's] experience and the claimed invention." *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010) (distinguishing *Sundance* and holding that the proffered expert had the "knowledge, skill, experience, training, [and] education" of a "specialized" nature that was likely to "assist the trier of fact to understand the evidence or to determine" infringement for the purposes of Rule 702 (internal quotation marks omitted)).[1] Any gap in an expert witness's qualifications or knowledge generally pertains to the weight of the testimony, not its admissibility. *Robinson*, 447 F.3d at 1100.

St. Jude offers Dr. Erdman as a technical expert who will opine on the engineering aspects of non-infringement, invalidity, and the "specific aspects of the properties of the materials required to perform claim 11" of the '268 Patent. The parties agree that the disputed technology at issue, a catheter delivery system, involves design principals that are driven by the expertise of an engineer. Dr. Erdman's qualifications include a Ph.D. in

---

[1]     *See also Birchwood Labs., Inc. v. Battenfeld Techs., Inc.*, No. 09-3555, 2012 WL 2045757, at *8 (D. Minn. May 21, 2012) (concluding that printing expert's testimony was relevant to the field of art when the patent-in-suit claimed firearm shooting targets because "[t]he general field of printing is not the whole field of relevant prior art, but printing is an important aspect of the relevant field of printed shooting targets").

mechanical engineering. He is the Director of the University of Minnesota's Medical Devices Center, serves as the Richard C. Jordan Professor and is a Morse Alumni Distinguished Teaching Professor of mechanical engineering at the University of Minnesota. Dr. Erdman has 45 years of experience in mechanical design, bioengineering, and medical device and product design, including catheter design. His credentials demonstrate that he possesses knowledge, skill, experience, training, and education sufficient to assist the trier of fact. Moreover, Dr. Erdman's education, experience, and training match the subject matter of his testimony.

NLC argues that Dr. Erdman is not qualified in the pertinent art. This argument, however, contradicts NLC's position as to who, in this instance, would be a person of ordinary skill in the art (POSITA). Even when parties attempt to narrowly construe who constitutes a POSITA, courts construe a POSITA broadly to account for a wide variety of expertise, experiences, and avenues of relevant knowledge acquired. *See, e.g.*, *Merck Sharp & Dohme Pharm. v. Teva Pharm. USA, Inc.*, No. 07-1596 (GEB)(DEA), 2009 WL 3153316, at *46 (D.N.J. Aug. 19, 2009) (defining POSITA as "one with substantial training in the chemical and biological sciences with an advanced degree in chemistry, training in the areas of synthetic organic chemistry and medicinal chemistry, and who has substantial experience working in the research and development of leukotriene antagonists *or* who understands the prior art references and [has] the capacity to draw inferences from them, individually and overall, in designing $LTD_4$ antagonists").

NLC has defined a POSITA in this case as "an electrophysiologist or an engineer familiar with the anatomy of the coronary sinus in a normal heart, and familiar with the

procedures and existing equipment used to conduct those procedures." To be considered a POSITA, according to NLC, an "engineer would have to have been familiar with the anatomy of the coronary sinus of a normal heart, as understood at the time, as well as with the then existing procedures conducted within the coronary sinus by electrophysiologists." But NLC attacks Dr. Erdman's qualifications based on his inability to implant or direct a physician to implant a permanent pacing lead into the coronary sinus and based on the fact that he is not a medical doctor. In doing so, NLC fails to demonstrate how Dr. Erdman's qualifications do not permit him to serve as a POSITA in this instance. Contrary to NLC's position, Dr. Erdman's credentials qualify him as a technical expert who can opine on factual matters that require the perspective of one of ordinary skill in the art under NLC's POSITA definition—which includes expertise as "an engineer"—and as generally defined. Moreover, there is an adequate relationship between the claimed invention, a catheter delivery system, and Dr. Erdman's experience, which includes catheter design. NLC identifies no evidence that, as a biomedical engineer, Dr. Erdman is not qualified in the relevant art.

Equally unpersuasive are NLC's arguments that Dr. Erdman's testimony must be excluded because he is not a medical doctor, that he has never implanted a permanent pacing lead, and that he has never personally witnessed an electrophysiologist implant a permanent pacing lead in the coronary sinus. The record demonstrates that St. Jude does not rely on Dr. Erdman's experience with the placement *procedure* to establish him as an expert. Instead, Dr. Erdman's testimony relates to "specific aspects of the *properties of the materials* required to perform claim 11" of the '268 Patent. (Emphasis added.) These

material properties include the "physical strength and support capabilities of various components of the dual catheter system at issue relative to the specific sequence of steps recited in claim 11." Based on Dr. Erdman's education and experience in the fields of mechanical and biomedical engineering and his specific experiences related to catheter design, there is an adequate relationship between Dr. Erdman's experience and the claimed invention. Dr. Erdman applies that expertise to the facts of this case by examining the method described in Claim 11. NLC identifies no evidence to the contrary, nor does NLC argue that Dr. Erdman's background is unrelated to catheter delivery design.

NLC's attack on Dr. Erdman's experience with the catheters and leads involved in the procedure offers insufficient grounds to exclude Dr. Erdman, especially when Dr. Erdman's credentials, knowledge, skill, and training are considered. *See Robinson*, 447 F.3d at 1100 (an expert must merely possess "knowledge, skill, experience training or education sufficient to assist the trier of fact" that matches his or her proffered opinions (internal quotation marks omitted)). NLC identifies no other basis on which to exclude Dr. Erdman's testimony as NLC does not challenge the *substance* of Dr. Erdman's opinions. Dr. Erdman's testimony must be useful to the factfinder, based on sufficient facts or data, the product of reliable principles, and the result of reliable application of those principals and methods to the facts of the case. Fed. R. Evid. 702. NLC has not challenged Dr. Erdman on any of these grounds. To the extent NLC seeks to challenge the factual basis for Dr. Erdman's opinions or any purported gaps between

Dr. Erdman's expertise and the proffered testimony, NLC may do so on cross-examination.

In summary, because NLC's challenge to Dr. Erdman's qualifications lacks merit, NLC's motion to exclude Dr. Erdman's opinions and testimony is denied.

## II.      St. Jude's Motion to Exclude Expert Testimony of Dr. Burke

St. Jude moves to exclude the opinions of NLC's technical expert Dr. Burke as unsupported by sufficient facts and counter to the law and the facts of the case because Dr. Burke's opinions do not comport with this Court's October 21, 2019 claim construction order.  NLC argues that Dr. Burke's misunderstanding of the difference between direct and indirect infringement is not a basis on which Dr. Burke can be disqualified.  The fact that Dr. Burke did not read the Court's claim construction order is not a basis for disqualification, NLC contends.  Moreover, NLC maintains, Dr. Burke applied the Court's claim construction as to the order in which Claim 11 must be performed as well as the claim construction of "the catheter."  The Court addresses each proffered basis for exclusion in turn.

### A.      Dr. Burke's Understanding of Direct and Indirect Infringement

The opinions of Dr. Burke should be excluded, St. Jude argues, because Dr. Burke demonstrated that he does not understand the difference between direct and indirect infringement.  Testimony proffered by a witness who lacks the relevant *technical* expertise does not meet the standard of admissibility under Rule 702.  *Sundance, Inc.*, 550 F.3d at 1363.  But a challenge to an infringement expert's expertise in *patent law* may not undermine the expert's qualifications and testimony in the area of expertise in

which the expert is offered. *See, e.g.*, *WNS Holdings, LLC v. United Parcel Serv., Inc.*, No. 08-CV-275-bbc, 2009 WL 2136961, at *4 (W.D. Wis. July 14, 2009) ("Plaintiff's challenges to Cotton's lack of expertise in patent law do not undermine Cotton's qualifications and testimony as an avionics expert."), *aff'd*, 368 F. App'x 144 (Fed. Cir. 2010). "Experts routinely rely upon other experts hired by the party they represent for expertise outside their field." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015) (internal quotation marks omitted).

NLC offers Dr. Burke as an expert in electrophysiology to opine on the medical procedure for implanting permanent pacing leads into the coronary sinus. The parties do not dispute Dr. Burke's technical qualifications as St. Jude does not challenge Dr. Burke's knowledge, skill, or expertise as they relate to the method and devices at issue. Instead, St. Jude challenges Dr. Burke's ability to explain and understand the difference between direct and indirect infringement. But NLC does not offer Dr. Burke as an expert on patent law. And such a challenge is meritless when an expert witness's relevant expertise lies outside of the law. *See, e.g.*, *WNS Holdings, LLC*, 2009 WL 2136961, at *4. St. Jude cites no case law, nor has the Court's research produced any, that suggests that a technical expert *must* be capable of reciting the difference between direct and indirect infringement or that such an inability is an appropriate basis for exclusion.

Therefore, the Court denies St. Jude's motion to exclude Dr. Burke's opinions and testimony on this basis.

## B.    Dr. Burke's Review of the Court's Claim Construction Order

St. Jude also argues that the opinions of Dr. Burke should be excluded because Dr. Burke did not read the Court's claim construction order.

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."    Fed. R. Evid. 703.    In the patent-infringement context, an expert's opinion has sufficient foundation when the expert has examined the accused method, the patented method, and the court's claim construction order, which are "the items most germane to forming an infringement opinion."    *LTJ Enters. v. Custom Mktg. Co.*, 168 F. Supp. 3d 1202, 1209 (D. Minn. 2016).    An expert may use the Court's definitions in its claim construction order, as relayed by counsel, when forming an expert opinion.    *Arason Enters., Inc. v. CabinetBed Inc.*, No. 16-cv-03001-PAB-NRN, 2019 WL 4597863, at *4. (D. Colo. Sept. 23, 2019) (refusing to disqualify an expert because the expert did not read the court's claim construction in full and instead relied on the court's constructions as provided by counsel).

In this instance, St. Jude attacks Dr. Burke's expert opinion based on Dr. Burke's failure to personally read the Court's claim construction order.    NLC represents that Dr. Burke "understood from counsel that the Court had interpreted Claim 11 to require that the steps be performed in order," and Dr. Burke affirms as much in his declaration and in his rebuttal opinion on validity.    Although Dr. Burke did not read the Court's claim construction order, the claim construction was communicated to him through counsel.    At worst, Dr. Burke may have lacked the context provided by preforming an independent reading of the Court's claim construction order.    But St. Jude fails to offer any argument

or legal authority as to the adverse effect of this manner of preparation on the admissibility of Dr. Burke's opinions.

Accordingly, the Court declines to exclude Dr. Burke's opinions and testimony on this basis.

### C.    Dr. Burke's Application of the Court's Claim Construction Order

St. Jude next challenges the admissibility of Dr. Burke's opinions on the ground that he did not apply the Court's construction of Claim 11.

Expert testimony that is unsupported by sufficient facts or contrary to the facts of a case is inadmissible.  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).  "Once a district court has construed the relevant claim terms" in a patent, "that legal determination governs."  *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1321 (Fed. Cir. 2009).  Expert testimony that conflicts with a district court's claim construction is inadmissible.  *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (discussing with approval the district court's decision to exclude expert testimony that "attempted to resurrect a claim construction that the district court already rejected").  Likewise, expert testimony that ignores or fails to consider a district court's claim construction is inadmissible.  *See, e.g.*, *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 913 (Fed. Cir. 2012) (discussing exclusion of expert testimony that "ignored the court's claim construction" as "inadmissible under *Daubert*").  But expert testimony that merely is contradictory to prior testimony may be subject to cross-examination, not exclusion under *Daubert* or Rule 702.   *In re AndroGel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336, 1356 (N.D. Ga. 2012) (concluding that any inconsistency

between expert's deposition testimony and expert report "may be the subject of cross examination, but does not justify exclusion").

Dr. Burke's disputed opinion relates to the order in which Claim 11 must be performed. The Court's October 21, 2019 claim construction order concluded that the steps of Claim 11 must be performed in the order listed and that "Claim 11 is infringed *only* when the steps are performed in the order listed." (Emphasis added.) St. Jude points to several admissions made by Dr. Burke during his deposition regarding his application of the claim construction order. For example, Dr. Burke admitted that he applied the steps out of the sequence detailed in Claim 11 and that such an application may give rise to infringement. In addition, Dr. Burke marked an illustration during his deposition in a manner that suggests he applied the steps of Claim 11 out of sequence when rendering his infringement opinion.

Although testimony based on Dr. Burke's decision to apply the steps of Claim 11 out of order would be of little use to the jury because the question of infringement relates to completion of the steps of Claim 11 *in order*, a fulsome view of Dr. Burke's expert report and deposition testimony provides no grounds for his exclusion. Contradictory expert testimony is grounds for cross-examination, not exclusion. *Janopoulos v. Harvey L. Walner & Assocs., Ltd.*, 866 F. Supp. 1086, 1096 (N.D. Ill. 1994) ("[D]iscrepancies in [an expert's] testimony and declaration go to the weight rather than the admissibility of his opinions."). And deposition testimony that contradicts an expert report bears on the weight afforded the expert report, not on whether the expert should be precluded from testifying. *See, e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir.

2010) ("When the methodology is sound, and the evidence relied upon [is] sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").

St. Jude identifies numerous instances in which Dr. Burke contradicts *himself*, arguing that, because these internal inconsistences contradict this Court's claim construction order, Dr. Burke should be excluded. But Dr. Burke applied the Court's claim construction. Contrary to St. Jude's representations, during his deposition, Dr. Burke testified as follows:

> Q. And so what I'd like to know on behalf of St. Jude then is when you were assessing whether they infringed or not, would the presence of additional steps within claim 11, meaning you performed all of the steps listed in claim 11, but there were other steps done in between, would fall within the scope of infringement or noninfringement, as you applied the standard in this case?
>
> . . .
>
> A. Yea, I generally, as I understand it, relate it to the scope of my testimony as it relates to St. Jude infringing, *that they have to follow these steps.*

(Emphasis added). This exchange suggests that Dr. Burke was aware that the steps in Claim 11 must be followed in the order listed to give rise to infringement. And at other points in his deposition and expert reports, Dr. Burke acknowledges that the steps in Claim 11 must be completed in the order listed.

For example, St. Jude contends that Dr. Burke was presented with the St. Jude Instructions for Use (IFU) at his deposition and asked to identify the presence of each

step in Claim 11 in the sequence each step appeared in the IFU. In response, Dr. Burke identified and marked the steps out of sequential order as 4, 3, 2, and 1, in a manner that is contrary to the Court's claim construction order. Dr. Burke's testimony is inconsistent with his expert report in which he tracks each claim element in sequential order alongside St. Jude's product literature instructions in sequential order, as is required by the Court's claim construction order. Such inconsistencies between an expert report and deposition testimony are not a basis for exclusion. *See, e.g.*, *i4i Ltd. P'ship*, 598 F.3d at 852.

The evidence identified by St. Jude does not constitute grounds to exclude Dr. Burke. At best, St. Jude has identified inconsistent or contradictory positions between Dr. Burke's expert reports and Dr. Burke's deposition testimony. Such inconsistences are matters for cross-examination, not grounds for exclusion. Accordingly, the Court denies St. Jude's motion to exclude Dr. Burke's opinions and testimony on this basis.

## D. Dr. Burke's Application of the Court's Construction of "the catheter"

St. Jude also argues that Dr. Burke's opinions should be excluded because he did not apply the Court's construction of "the catheter."

When a district court has construed the relevant claim terms, that legal determination governs. *Exergen Corp.*, 575 F.3d at 1321. A party may not contradict a district court's claim construction. *Id*. And an expert witness may not present testimony that conflicts with the district court's claim construction. *See Finjan*, 626 F.3d at 1207. Expert testimony that ignores or fails to consider the district court's claim construction is inadmissible. *See, e.g.*, *MarcTec, LLC*, 664 F.3d at 913.

In the Court's October 21, 2019 claim construction order, the Court construed "the catheter" to mean "the double catheter." Claim 11 defines "double catheter" to include an "outer catheter and an inner catheter." St. Jude relies on several admissions by Dr. Burke during his deposition pertaining to his application of the Court's construction of "the catheter." Dr. Burke was questioned during his deposition about the definition of "the catheter" and whether, in his application of Claim 11, "the catheter" referred to a "single catheter, the inner and the outer catheter, or any version." In response, Dr. Burke testified that in his application of Claim 11, "the catheter" pertained to "any version." St. Jude now argues that this testimony renders Dr. Burke's opinion unreliable because he did not apply the Court's construction of "the catheter."

Although it is true that failure to apply the Court's claim construction of "the catheter" is impermissible, a fulsome view of Dr. Burke's expert report and deposition testimony suggests that exclusion of his opinions and testimony is unwarranted on this basis. Dr. Burke was questioned about whether following the steps of Claim 11 with the use of an electrophysiology catheter before completion of the final step of Claim 11 would constitute infringement. In response, Dr. Burke testified that he "would stick to the concept that claim 11 is a method for placing an electrical lead in a lateral branch of a coronary sinus vein *using a catheter, including an outer and inner cath[eter]*." (Emphasis added). Dr. Burke also was questioned about whether use of the stylet method would result in infringement. Dr. Burke responded that "with . . . a dual outer and inner sheath system that has engaged the branch using a guidewire, you can infringe using the stylet method." In each response, Dr. Burke explicitly refers to the double catheter

whether by referring to the component parts comprising the double catheter or by referring to the catheter and the component parts.

Moreover, it appears from Dr. Burke's expert report that he applied the Court's construction of "the catheter."  Notably, in addressing steps 1 and 2 of Claim 11, Dr. Burke opines that "[t]he instructions for the CPS inner catheters . . . direct the electrophysiologist to insert the inner and other catheter into the coronary sinus" and that "St. Jude's instructions for the inner [catheter] direct an electrophysiologist to advance a guide wire through the inner and outer catheters."  In addressing step 3 of Claim 11, Dr. Burke opines that "[t]his step describes using the double catheter in a telescoping manner," and that "St. Jude's instructions for the inner catheter explicitly direct electrophysiologists to use the inner and outer catheters . . . , which an electrophysiologists would understand as advancing the inner catheter out of the front of the outer catheter along the guide wire."  Dr. Burke refers to the double catheter by identifying the double catheter's component parts, namely, an inner and outer catheter. This aspect of Dr. Burke's report is consistent with the Court's claim construction.

Accordingly, because Dr. Burke's expert report is consistent with this Court's claim construction order, his opinions and testimony will not be excluded.[2]

### III.    St. Jude's Motion to Exclude Expert Testimony of Carlson

St. Jude also moves to exclude the opinions of Carlson, NLC's damages expert, as unreliable and speculative.  In particular, St. Jude challenges Carlson's damages opinions

---

[2]    Should Dr. Burke attempt to testify at trial in a manner that is contrary to the Court's claim construction, the Court will address any objection.  That is not the Court's expectation, however.

that pertain to the appropriate royalty base, arguing that Carlson fails to apportion damages to the value attributable to the claimed method and improperly assumes that all of St. Jude's inner catheters are used in an infringing manner.[3]

Reasonable royalty damages are, by statute, "the minimum amount of infringement damages 'adequate to compensate for the infringement.' " *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012) (quoting 35 U.S.C. § 284). Generally, reasonable royalties must "be based not on the entire product, but instead on the smallest salable patent-practicing unit." *Id.* at 67 (internal quotation marks omitted). As a "narrow exception" to this general rule, the "entire market value rule" permits a patentee to recover a royalty based on the revenue for an entire multi-component product if the patentee can show that "the patented feature drives the demand for [the] entire multi-component product." *Id.*

NLC concedes in its brief that "[t]his is not an entire market value rule case." Indeed, Carlson does not purport to invoke the entire-market-value rule in his report, nor does he attempt to establish a relationship between the claimed method and customer demand for any combination of St. Jude's products. To the contrary, Carlson observes in

---

[3]     St. Jude seeks exclusion of Carlson's opinions and testimony in their entirety, but St. Jude's arguments are directed solely at Carlson's opinions as to the royalty base. For instance, although St. Jude's reply brief repeatedly refers to Carlson's calculation of the royalty rate as "inflated," St. Jude offers no substantive factual or legal argument that specifically challenges Carlson's calculation of the royalty rate. As such, the Court limits its analysis to whether Carlson's royalty base opinions and testimony should be excluded. *See, e.g.*, *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328–31 (Fed. Cir. 2014) (separately evaluating admissibility of expert opinions pertaining to royalty base and royalty rate, and concluding that the former were inadmissible whereas the latter were admissible).

his report that Claim 11 of the '268 Patent requires "an outer catheter, an inner catheter, a guide wire, and a lead," and that "these components comprise the smallest saleable component that is used by an electrophysiologist to practice the claimed methods." As such, Carlson derives a royalty base from this purported "smallest saleable" patent-practicing unit based on St. Jude's revenues for these four components.

When, as here, the entire-market-value rule is not implicated, "principles of apportionment apply." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). Because damages awarded for patent infringement "must reflect the value attributable to the infringing features of the product, and no more," apportionment requires a damages expert to "separate the value of the allegedly infringing features from the value of all other features." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks omitted). Apportionment may be addressed in numerous ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). The parties do not dispute that apportionment is required in this case. Instead, the parties dispute whether Carlson reliably applied apportionment when calculating the royalty base.

NLC contends that "Carlson has appropriately apportioned the royalty base by limiting the royalty base to sales of the components recited in the claim." These components, according to Carlson's report, comprise the smallest salable patent-

practicing unit.  But "the requirement that a patentee identify damages associated with the smallest salable patent-practicing unit is simply a step toward meeting the requirement of apportionment."  *VirnetX*, 767 F.3d at 1327.  When "the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . , the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology."  *Id.*  Although "this process may involve some degree of approximation" as "absolute precision" is not required, a district court must "exercise[ ] its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment [are] allowed to reach the jury."  *Id.* at 1328.  Accordingly, "a patentee must be reasonable (though may be approximate) when seeking to identify a patent-practicing unit, tangible or intangible, with a close relation to the patented feature."  *Id.* at 1329.  The record reflects that Carlson has not done so here.

In his report, Carlson concludes that the "smallest saleable" patent-practicing unit comprises "an outer catheter, an inner catheter, a guide wire, and a lead," because these four components are recited in Claim 11 of the '268 Patent.  But NLC has identified no legal authority for satisfying the apportionment requirement in this way.  Indeed, courts have rejected such an approach.  *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310, 1338 (Fed. Cir. 2009) (observing that expert's use of "the price of the entire computer as a royalty base" for a method claim was improper, even though a computer was recited in the claim language); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283–85 (N.D.N.Y. 2009) (same).  Even if a component is "valuable, important,

or even essential" to practicing a patented method, "the patented feature must be separated" from the unpatented elements of the component. *VirnetX*, 767 F.3d at 1329 (quoting *LaserDynamics*, 694 F.3d at 68). An expert's testimony as to a royalty base is inadmissible if the expert "fail[s] to apportion value between the patented features and the vast number of non-patented features contained in the accused products" because such an approach does not "carefully tie proof of damages to the claimed invention's footprint in the marketplace." *Id.* at 1329 (internal quotation marks omitted).

Claim 11 of the '268 Patent pertains to a "method for placing an electrical lead in a lateral branch of a coronary sinus vein using a double catheter." Claim 11 covers a method, not the components involved in practicing the method. Carlson did not even attempt to identify, let alone subtract, the value of any unpatented aspects of the four components that comprise his definition of the royalty base. For instance, although leads are recited in Claim 11, the '268 Patent does not teach or disclose leads. The parties' experts do not dispute this fact. Dr. Burke, NLC's technical expert, testified that the '268 Patent provides no discussion of how to accomplish the electrical features of a lead and that the leads "weren't part and parcel to the '268 Patent." The entirety of the '268 Patent's scope is limited to a "double catheter" for use in the "coronary sinus." This scope does not include leads. As such, Carlson's royalty base accounts for more than the *method* claimed. *See Cornell Univ.*, 609 F. Supp. 2d at 283–84 (excluding damages expert because the damages assessment was "in excess of the contribution of the claimed invention to this market"); *see also LaserDynamics*, 694 F.3d at 68 (rejecting damages award because the patent only covered a method practiced using an optical disc drive, but

damages were based on the entire computer). As in *VirnetX*, in this case, Carlson failed to apportion value between the claimed method and any other valuable features contained in the accused products. *See* 767 F.3d at 1329. In doing so, Carlson essentially opines that St. Jude's inner catheter, outer catheter, guide wire, and leads have no value other than to perform the claimed method. But the record does not support such a conclusion. Even NLC's technical expert, Dr. Burke, has testified that a lead is a "very complex" component with features that are not part of the claimed invention.

NLC contends that Carlson properly excluded "other devices involved in the medical procedure, such as pacemakers and defibrillators." But this fact does not excuse NLC from its obligation to apportion value with respect to the four components that comprise Carlson's royalty base. *See id.* at 1327 (explaining that when "the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . , the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology"). Even assuming that the four components Carlson used to calculate the royalty base represent the smallest salable patent-practicing unit, identifying the damages associated with these components "is simply a step toward meeting the requirement of apportionment," and is not sufficient on its own. *Id.*

NLC also contends that "Carlson used the inner catheter sales as a limiter to apportion the unit sales of outer catheters and leads." Carlson opines that, in a given year, St. Jude's gross profit margin for inner catheters has ranged from approximately 60 percent to 70 percent, St. Jude's gross profit margin for outer catheters has ranged from

approximately 83 percent to 86 percent, and St. Jude's gross profit margin for leads has ranged from approximately 82 percent to 89 percent. To calculate the royalty base, Carlson limits the number of outer catheters and leads by using the number of inner catheter sales for the same year because, according to Carlson, St. Jude's inner catheters had the lowest number of per-unit sales. But although this methodology reduces the overall royalty base, this reduction has no logical connection to the proportionate value of these components that is attributable to the claimed method of the '268 Patent. The purpose of apportionment is to ensure that a reasonable royalty damages award is "based on the incremental value that the patented invention adds to the end product." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp, LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (explaining that when a patent claim "recite[s] both conventional elements and unconventional elements, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone" (internal quotation marks omitted)). Carlson's reduction of the royalty base fails to do so here. Because Carlson's method *arbitrarily* reduces the royalty base for outer catheters and leads to match the per-unit sales of inner catheters, his method does not "carefully tie proof of damages to the claimed invention's footprint in the market place." *VirnetX*, 767 F.3d at 1329 (internal quotation marks omitted).

It is true that, rather than addressing apportionment when calculating the royalty *base*, an expert may instead address apportionment by adjusting of the royalty *rate* "so as to discount the value of the product's non-patented features." *Exmark*, 879 F.3d at 1348

(internal quotation marks omitted).  But NLC does not argue, and the record does not reflect, that Carlson used such an approach here.  To the contrary, when addressing the royalty rate calculation in his report, Carlson opines that the "portion of the realizable profit that should be credited to the invention supports a higher royalty rate."  According to Carlson, this is because "the claimed invention is not divorceable from St. Jude's catheters" and "the patent encompasses the entire product, not merely some component of the product."  As such, Carlson's calculation of the royalty rate expressly does *not* discount the value of the non-patented features of an inner catheter, outer catheter, guide wire, or lead—instead, Carlson concludes that no such value exists.

For these reasons, Carlson's calculation of the royalty base does not comport with settled principles of apportionment and, therefore, must be excluded.  *VirnetX*, 767 F.3d at 1328.  Accordingly, St. Jude's motion to exclude Carlson's opinions and testimony is granted in part.  Carlson's opinions and testimony as to the royalty base are inadmissible.

### IV.    St. Jude's Request for Reconsideration

St. Jude requests that the Court reconsider its ruling on its construction of "the catheter" because of "the clear confusion expressed by NLC's own expert **even after** this Court's claim construction ruling."  In support of its motion, St. Jude explains that "the ambiguity caused by the claim's failure to provide an antecedent basis for 'the catheter' injects confusion and allows gamesmanship as to which catheter is referenced, and where infringement begins and ends."

 "Except with the court's prior permission, a party must not file a motion to reconsider. . . .  A party who seeks permission to file a motion to reconsider must first file

and serve a letter of no more than two pages requesting such permission." LR 7.1(j). To the extent that St. Jude requests that the Court reconsider its prior ruling, that motion is not properly before the Court because St. Jude neither sought nor received permission from this Court before requesting reconsideration. Accordingly, St. Jude's request for reconsideration is denied.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.      Plaintiff Niazi Licensing Corporation's motion to exclude the expert testimony of Dr. Arthur Erdman, (Dkt. 196), is **DENIED**.

2.      Defendant St. Jude Medical S.C., Inc.'s motion to exclude the expert testimony of Dr. Martin Burke and Brad Carlson, (Dkt. 164), is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. St. Jude's motion is **GRANTED** as to the opinions and testimony of Carlson that pertain to the royalty base, which are excluded as addressed in Part III of this Order.

   b. St. Jude's motion is **DENIED** in all other respects.

Dated:  September 14, 2020                    s/Wilhelmina M. Wright
                                              Wilhelmina M. Wright
                                              United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Niazi Licensing Corporation,

           Plaintiff,

v.

St. Jude Medical S.C., Inc.,

           Defendant.

Case No. 17-cv-5096 (WMW/BRT)

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

This patent-infringement matter is before the Court on the parties' cross-motions for summary judgment. (Dkts. 180, 184.) For the reasons addressed below, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.

## BACKGROUND

Plaintiff Niazi Licensing Corporation (NLC) owns United States Patent No. 6,638,268 (the '268 Patent), which pertains to a catheter system that can be inserted into the coronary sinus of the heart. This catheter system allows medical professionals to administer fluids and introduce pacing leads to the coronary sinus. Although the use of catheters was known in 2003 when the '268 Patent issued, the '268 Patent describes an invention that, based on its structure and shape, purportedly is better suited for "use in the coronary sinus, especially in patients suffering from congestive heart failure." The '268 Patent claims a double catheter system with an "outer, resilient catheter having shape

memory and a hook-shaped distal end" and an "inner, pliable catheter slidably disposed in the outer catheter." The patent also claims methods of using the catheter system.

NLC commenced this patent-infringement action against Defendant St. Jude Medical S.C., Inc. (St. Jude), on November 13, 2017. NLC alleges that St. Jude has indirectly infringed the '268 Patent by inducing its customers—namely, medical professionals—to infringe the '268 Patent. Only a single method claim remains in dispute in this lawsuit: Claim 11 of the '268 Patent, which claims a series of steps for "using a double catheter." In its entirety, Claim 11 provides as follows:

> **11.** A method for placing an electrical lead in a lateral branch of a coronary sinus vein using a double catheter including an outer catheter and an inner catheter slidably disposed inside the outer catheter, comprising:
>
> inserting the catheter into the coronary sinus;
>
> advancing a guide wire through the catheter into a coronary sinus lateral branch vein;
>
> advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;
>
> inserting the lead through the outer and inner catheters to a target location in the branch vein; and
>
> withdrawing the catheter leaving the lead in the branch vein.

In its October 21, 2019 claim construction order, the Court construed "the catheter" to mean "the double catheter" and held that "Claim 11 is infringed only when the steps are performed in the order listed."

The parties now cross-move for summary judgment. NLC argues that it is entitled to summary judgment in its favor on the issues of infringement, St. Jude's invalidity defenses, and St. Jude's challenge to NLC's entitlement to damages that accrued before the inventor assigned the '268 Patent to NLC. According to NLC, this matter should proceed to trial only on the issues of willful infringement and damages. St. Jude argues that it is entitled to summary judgment in its favor as to infringement and, in the alternative, contends that NLC cannot obtain pre-assignment damages as a matter of law.

## ANALYSIS

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, a district court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014). When asserting that a fact is genuinely disputed, the nonmoving party must "submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts" in support of that assertion. *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831–32 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(c)(1)(A). A nonmoving party may not "rest on mere allegations or denials but must demonstrate on

the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted).

## I.    Infringement

NLC and St. Jude cross-move for summary judgment as to St. Jude's alleged infringement of Claim 11 of the '268 Patent.  A finding of infringement of a method claim requires that "each and every step of the method or process was performed." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013).  By contrast, summary judgment of non-infringement is appropriate if, after resolving all reasonable factual inferences in favor of the patentee, "no reasonable jury could find infringement."  *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1130 (Fed. Cir. 2011).

It is undisputed that St. Jude does not itself perform the patented medical procedure.  Instead, NLC alleges that St. Jude has indirectly infringed Claim 11 of the '268 Patent by inducing its customers—namely, medical professionals—to practice the patented method via St. Jude's product instructions and marketing materials.  "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002)

(citation omitted).  The Court addresses, in turn, the issues of direct infringement and St. Jude's knowledge and intent.

### A.    Direct Infringement

Liability for the inducement of patent infringement "may arise if, but only if, there is . . . direct infringement."  *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) (internal quotation marks and alterations omitted).  "A method patent claims a number of steps," and a method patent "is not infringed unless all the steps are carried out."  *Id.*  "Direct infringement of a method claim can be based on even one instance of the claimed method being performed."  *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1359 (Fed. Cir. 2012).  But a defendant "cannot be liable for inducing infringement" if the "performance of all the claimed steps cannot be attributed to a single person."  *Limelight Networks*, 572 U.S. at 923.

This Court previously held that Claim 11 of the '268 Patent is infringed only if the steps of the patented method are performed in the order listed.  As such, to be entitled to summary judgment of infringement, NLC must prove that St. Jude induced a single person to actually perform every step of Claim 11 in the exact order that those steps are listed in the '268 Patent.  *See Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398–99 (Fed. Cir. 2014).  Conversely, if NLC fails to prove that any one step of the method was not so performed, St. Jude is entitled to summary judgment of non-infringement.  *See Aristocrat Techs.*, 709 F.3d at 1362; *cf. Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016).

5

NLC first contends that St. Jude's experts have admitted that direct infringement has occurred. In support of this argument, NLC relies on the following statement from the rebuttal report of St. Jude's damages expert, Dr. Mohan Rao: "In fact, based on my discussion with [St. Jude's technical expert] Dr. [David] Benditt, I understand that in practice, physicians utilize the method as listed in Claim 11 of the '268 patent less than 1 percent of the time." But for at least two reasons, this evidence is insufficient to satisfy NLC's burden to prove infringement. First, the statement in Dr. Rao's expert report is hearsay within hearsay and, therefore, inadmissible in evidence. *See Rainforest Cafe, Inc. v. Amazon, Inc.*, 86 F. Supp. 2d 886, 902–03 (D. Minn. 1999) (observing that "testimony of a witness that another individual told him or her" a particular statement "is inadmissible hearsay"); *Multi-Tech Sys., Inc. v. Hayes Microcomputer Prods., Inc.*, 800 F. Supp. 825, 844 (D. Minn. 1992) (observing that plaintiff "may not rely solely on inadmissible hearsay" to prevail on summary judgment).[1]

Second, even if Dr. Rao's statement were not inadmissible hearsay, it is inadmissible for another reason: namely, because it clearly reflects a hypothetical assumption, which is unfounded speculation. The purpose of Dr. Rao's rebuttal expert

---

[1]  NLC contends that Dr. Rao's statement is not hearsay, pursuant to Rule 801(d)(2)(B), Fed. R. Evid., which provides that a statement is not hearsay if the statement "is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true." To be admissible under this rule, "the Court must determine, by a preponderance of the evidence, that a reasonable jury could properly find Defendant adopted the [statement] as an admission." *Cowden v. BNSF Ry. Co.*, 980 F. Supp. 2d 1106, 1119 (E.D. Mo. 2013). The record in this case does not establish that St. Jude "adopted or believed to be true," as a factual admission of liability, the statement from Dr. Rao's report on which NLC relies. To the contrary, St. Jude has consistently maintained that it has *not* infringed the '268 Patent.

report is to opine as to the extent of NLC's recoverable damages *assuming* that NLC were to prove infringement, which is not an uncommon practice. *See, e.g.*, *Sys. Dev. Integration v. Comput. Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012) ("It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion. To hold otherwise would be illogical.").  Neither Dr. Rao nor Dr. Benditt purport to have either personal knowledge or data from which they have concluded that direct infringement of Claim 11 of the '268 Patent has occurred.  Instead, the statement in Dr. Rao's report reflects Dr. Benditt hypothesizing as to the possibility of infringement occurring, which cannot demonstrate infringement.[2] *See ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313–14 (Fed. Cir. 2007) (observing that hypothetical instances of infringement cannot establish liability, which requires evidence of "specific instances of direct infringement" or that defendant's product "necessarily infringes").  To hold otherwise would permit a patentee to satisfy its affirmative burden of proof any time an accused infringer denies infringement liability but attempts to mitigate potential damages by offering, in the alternative, a rebuttal expert opinion on the issue of damages

---

[2]  In addition to being speculative, Dr. Benditt's alleged statement (as paraphrased by Dr. Rao) that "physicians utilize the method as listed in Claim 11 of the '268 patent less than 1 percent of the time" cannot establish infringement for at least two other reasons.  First, use of the patented method "less than 1 percent of the time" includes the possibility that the patented method is never used.  Second, nothing in Dr. Benditt's alleged statement establishes a connection between St. Jude and any use of the patented method.  Indeed, Dr. Benditt's speculation that the patented method might be used "less than 1 percent of the time" does not suggest that *St. Jude's customers*, using *St. Jude's written instructions*, are among those rare physicians who might use the patented method.  As such, even if this evidence were not purely speculative double hearsay, this evidence would be insufficient to satisfy NLC's burden to prove that St. Jude induced at least one of its customers to infringe Claim 11 of the '268 Patent.

based on an assumption of liability. Such a result would be illogical and contrary to the law, common sense, and common practice. *See, e.g.*, *Sys. Dev. Integration*, 886 F. Supp. 2d at 882. Because the expert statements on which NLC relies are inherently hypothetical and speculative, such evidence is insufficient to prove direct infringement.[3]

NLC next argues that the written instructions St. Jude provides to end-users of its catheter products are circumstantial evidence of direct infringement. "In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *ACCO Brands*, 501 F.3d at 1313. "Hypothetical instances of direct infringement are insufficient to establish . . . indirect infringement," and the "mere sale of a product capable of substantial non-infringing uses does not constitute indirect infringement of a patent." *Id.* at 1313–14 (internal quotation marks omitted).

It is true that a patentee may prove infringement using circumstantial evidence. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012). But the "[c]ircumstantial evidence must show that at least one person directly infringed an asserted claim during the relevant time period." *Id.* Such evidence is insufficient if it merely shows that the defendant's product is "capable of" infringing and the defendant's "user manuals simply described how to use the product in an infringing manner." *Id.* at 1365. Instead, to prove direct infringement through circumstantial evidence when a

---

[3] NLC contends that Dr. Rao's statement is *not* speculative because he prefaces the statement with the phrase "[i]n fact." Simply put, it is absurd to argue that beginning a sentence with a figure of speech such as "in fact" converts any speculation that follows into non-speculative evidence. NLC's argument lacks merit.

defendant has sold products that merely are *capable of* infringing, the patentee must present evidence that "the accused infringer designed its products to practice the claimed invention and instructed its customers to use the accused product in an infringing way." *Id.* (observing that defendants "go beyond *describing* the infringing mode; they *recommended* that customers use the infringing mode" (emphasis added)). Such instructions must evince the defendant's "intent to *encourage* infringement," and "[m]erely describing" an infringing use "is not the same as recommending, encouraging, or promoting an infringing use, or suggesting that an infringing use should be performed." *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (internal quotation marks, alterations, and citations omitted). Accordingly, to prevail, NLC must present evidence that St. Jude affirmatively instructs, encourages, or recommends that its customers use its products to perform the steps of Claim 11 in the order that those steps are listed in the '268 Patent.

Claim 11 includes five steps:

> [1] inserting the catheter into the coronary sinus;
>
> [2] advancing a guide wire through the catheter into a coronary sinus lateral branch vein;
>
> [3] advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;
>
> [4] inserting the lead through the outer and inner catheters to a target location in the branch vein; and
>
> [5] withdrawing the catheter leaving the lead in the branch vein.

The Court next addresses, in turn, NLC's evidence as to each of these five steps.[4]

### 1. Step 1

The first step of Claim 11 is "inserting the catheter into the coronary sinus." The Court previously construed "the catheter" to mean "the double catheter"—*i.e.*, both the inner and outer catheter. NLC contends that St. Jude induces its customers to perform this step in its written instructions by directing users to "[i]nsert the inner catheter into the outer guide catheter." But prior to this instruction, St. Jude's written instructions direct users to "[f]ollow normal accepted practice for . . . outer guide catheter insertion." This instruction indicates that the outer catheter should be inserted *before* the inner catheter is inserted rather than inserting both catheters simultaneously. This is inconsistent with the claimed method as construed by the Court. Therefore, NLC's evidence does not establish that St. Jude instructed customers to perform the first step of the Claim 11 method.

### 2. Step 2

The second step of Claim 11 is "advancing a guide wire through the catheter into a coronary sinus lateral branch vein." According to NLC, St. Jude instructs users to perform this step by directing users to, "[i]f desired, insert a guidewire . . . through the inner catheter lumen into the branch vein." But Claim 11 requires performing this step *before* advancing the inner catheter into the branch vein. In contrast, St. Jude's

---

[4]     In opposing St. Jude's motion for summary judgment of non-infringement, NLC relies on an "abbreviated overview" of the same arguments and evidence that NLC relies on in its motion for summary judgment of infringement. As such, NLC's arguments and affirmative evidence of infringement are coextensive with its arguments and evidence seeking to counter St. Jude's non-infringement arguments.

instructions reference the use of a guidewire only *after* first directing users to "subselect[ ] the desired coronary sinus branch vein" when inserting the inner catheter. As such, St. Jude's written instructions do not follow the same order listed in Claim 11 and, therefore, do not instruct customers to infringe the patented method.

In addition, St. Jude's instructions do not recommend or encourage the use of a guidewire. Instead, the instructions provide that a physician *may* insert a guidewire "[i]f desired." Evidence that a defendant's "user manuals simply describe[ ] how to use the product in an infringing manner" without affirmatively *recommending* that customers do so is insufficient circumstantial proof of infringement. *Toshiba Corp.*, 681 F.3d at 1365 (observing as significant the fact that defendants "go beyond *describing* the infringing mode; they *recommended* that customers use the infringing mode" (emphasis added)). Notably, the record undisputedly establishes that St. Jude has sold significantly fewer guidewires than inner catheters, which further suggests that St. Jude does not recommend or encourage the use of a guidewire. Moreover, NLC's reliance on articles, instructions, and marketing materials produced by individuals and entities other than St. Jude is inapposite. Such evidence is immaterial because it has no relevance to whether *St. Jude* recommended or encouraged infringement.

In summary, NLC's evidence does not establish that St. Jude instructed customers to perform the second step of the Claim 11 method because St. Jude's written instructions merely describe the use of a guidewire without recommending or encouraging such use,

and the written instructions are not consistent with the order in which the steps of the method are listed in Claim 11.

### 3. Step 3

The third step of Claim 11 is "advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein." As evidence of infringement, NLC first relies on testimony by St. Jude's technical expert that it "is desirable" to advance the inner catheter into a branch vein. But such testimony does not establish that St. Jude encouraged or recommended doing so in a manner that infringes Claim 11 of the '268 Patent.

NLC also relies on the following excerpts from St. Jude's written instructions:

> 5. If desired, insert a guidewire (up to 0.035 inch (0.089 cm) diameter) through the inner catheter lumen into the branch vein.

> 6. If desired, advance the outer guide catheter over the inner catheter into the branch vein.

However, neither of these instructions describes advancing an inner catheter (1) out of the front end of an outer catheter, (2) along a guidewire, or (3) into a branch vein, all of which are required by step three of the patented method. To the contrary, as addressed above, St. Jude's written instructions describe advancing the inner catheter into a branch vein *before* the *optional* insertion of a guidewire.[5] And St. Jude's instructions clearly involve advancing "the outer guide catheter" into the branch vein, *not* advancing the

---

[5] Indeed, St. Jude's sixth step describes optionally advancing the outer catheter "over the inner catheter into the branch vein," which suggests that the inner catheter has previously been advanced into the branch vein.

inner catheter into the branch vein as required by the third step of Claim 11. Moreover, St. Jude's instructions preface both the insertion of a guidewire *and* the advancement of the outer catheter into the branch vein with the phrase "[i]f desired." As such, even if St. Jude's instructions correctly described the patented method (which they do not), these steps are neither encouraged nor recommended by St. Jude.[6] Instead, these steps are merely described as steps that St. Jude's products are capable of performing. This type of circumstantial evidence is insufficient to prove infringement. *See Toshiba Corp.*, 681 F.3d at 1365 (distinguishing user manuals that "simply described" how to perform an infringing method from instructions that affirmatively "recommended" doing so).

For these reasons, NLC's evidence does not establish that St. Jude instructed customers to perform the third step of the Claim 11 method.

### 4. Step 4

The fourth step of Claim 11 is "inserting the lead through the outer and inner catheters to a target location in the branch vein." According to NLC, St. Jude directs

---

[6] NLC contends that "the only reason to use a .035 guide wire is to advance the inner catheter into the branch vein" and that "when a physician advances the outer catheter into the branch vein . . . the inner catheter and the outer catheter are manipulated in a telescoping fashion that includes advancing the inner catheter into the branch vein." But even if it is true that a physician *could* interpret St. Jude's instructions in this manner, St. Jude's instructions for the use of its products do not describe, recommend, or encourage such an interpretation. Significantly, "instructions that require one to look outside the label to understand the alleged implicit encouragement [to infringe] do not, without more, induce infringement." *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1369 (Fed. Cir. 2017) (internal quotation marks omitted). Moreover, St. Jude's instructions do not *recommend* use of a .035-inch guidewire. The instructions merely indicate that, *if* a guidewire is used, the guidewire can be "up to 0.035 inch (0.089 cm) diameter" in size.

users to perform this step of the patented method in the eighth step of St. Jude's written instructions, which provides: "Introduce the lead through the inner catheter and into position in the branch vein. If desired, an over-the-wire technique may be used." Although this step of St. Jude's instructions indicates that use of an over-the-wire technique is optional, an over-the-wire technique is not required by the fourth step of Claim 11. As such, St. Jude's written instructions direct users to insert a lead through the outer and inner catheters to a target location in the branch vein, which is all that is required by the fourth step of Claim 11.

### 5. Step 5

The fifth step of Claim 11 is "withdrawing the catheter leaving the lead in the branch vein." Because this Court previously construed "the catheter" to mean "the double catheter" (*i.e.*, both the inner and outer catheter), this step of Claim 11 requires the inner and outer catheters to be withdrawn simultaneously. St. Jude's written instructions, however, describe *only* the removal of the inner catheter. NLC cites no evidence that St. Jude instructs, encourages, or recommends removing both the inner catheter and the outer catheter simultaneously.[7] Therefore, NLC's evidence does not establish that St. Jude instructed customers to perform the fifth step of the Claim 11 method.

The Court is mindful that a patentee may prove induced infringement with circumstantial evidence "that the accused inducer promoted the infringing use with

---

[7] To the contrary, the record includes the following testimony from St. Jude's technical expert, Dr. Benditt, about removing the inner and outer catheter simultaneously: "[N]obody does that. Well, nobody that I know of does that. Too hazardous to remove them in one step."

knowledge that such use directly infringes the patent claims." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 976 F.3d 1347, 1352 (Fed. Cir. 2020). But when, as here, an alleged infringer's instruction manuals do not "teach all of the steps of the claimed method together, much less in the required order," a patentee's circumstantial evidence of infringement "requires too speculative a leap to conclude that any customer actually performed the claimed method." *E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (affirming summary judgment of noninfringement). Such is the case here. St. Jude's written instructions do not precisely describe all of the steps of the claimed method. The instructions do not describe those steps in the order required by the patented method. And the instructions do not affirmatively recommend each step of the patented method because some of the required steps are characterized as optional. As such, the leap required to conclude from NLC's circumstantial evidence that any of St. Jude's customers actually performed the patented method is too speculative. *See id.*

In summary, NLC's evidence does not demonstrate that St. Jude instructed, encouraged, or recommended the performance of each of the five steps of the patented method, either in the order listed in Claim 11 of the '268 Patent or otherwise. Accordingly, the record contains insufficient evidence of direct infringement—a necessary element of NLC's induced-infringement claim.

## B. Knowledge and Intent

In addition to proof that direct infringement occurred, an induced-infringement claim requires the defendant to know that the induced acts result in patent infringement.

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011). A plaintiff also must establish that it was the defendant's specific intent to encourage another's infringement. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Here, the parties' dispute primarily pertains to whether NLC has presented evidence that St. Jude specifically intended to encourage infringement of Claim 11.

NLC relies exclusively on St. Jude's written product instructions as circumstantial evidence of St. Jude's alleged intent to induce infringement. When evaluating whether product instructions evince the requisite intent to induce infringement, "[t]he focus is not on whether the instructions describe the mode of infringement, but rather on whether the instructions teach an infringing use of the device such that [the court is] willing to infer from those instructions an affirmative intent to infringe the patent." *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 701 (Fed. Cir. 2019) (internal quotation marks omitted). Thus, when a plaintiff attempts to prove intent through a product label or instruction manual, courts must examine whether the instruction "encourages, recommends, or promotes infringement," because "[m]erely describing the infringing use, or knowing of the possibility of infringement, will not suffice." *Id.* at 701–02 (internal quotation marks and alterations omitted). In particular, when product instructions describe an infringing step but make clear that such step is optional, the instructions are insufficient to demonstrate an intent to encourage infringement. *See, e.g., id.* at 702 (concluding that defendant's product instructions did "not encourage infringement" when they described as optional certain steps in the patented method).

As addressed above, St. Jude's written instructions do not encourage, recommend, or promote infringement for at least three reasons. First, St. Jude's instructions substantively differ from steps of the patented method in several ways, including the absence of any direction to insert or withdraw the inner and outer catheters simultaneously and the absence of any direction to advance an inner catheter out the front end of an outer catheter along a guidewire. Second, even if St. Jude's written instructions accurately described every step of the patented method, there is no evidence that St. Jude has instructed its customers to perform those steps in the precise order listed in Claim 11 of the '268 Patent. Third, several steps in St. Jude's written instructions are optional, which a physician may perform "[i]f desired." A patentee cannot demonstrate that a defendant specifically intended to induce infringement based solely on a defendant's instructions if those instructions expressly describe as optional the performance of a step that is necessary to infringe the patented method. *See id.* (affirming summary judgment of noninfringement because product instructions, which described steps of the patented method as optional, did not demonstrate that defendant intended to "encourage infringement"). Nor does such evidence create a material dispute of fact as to the intent element, even if the defendant has actual knowledge that some users of its product might be infringing the plaintiff's patent. *Id.*

In summary, to succeed on a claim of indirect infringement by inducement, NLC must prove both direct infringement by at least one person *and* that St. Jude knowingly induced infringement and possessed specific intent to encourage another's infringement.

As addressed above, NLC has failed to present evidence to support either of these two essential elements of its patent-infringement claim. Accordingly, NLC's motion for summary judgment of infringement is denied and St. Jude's motion for summary judgment of non-infringement is granted.

## II. Invalidity and Damages

In the alternative, NLC argues that it is entitled to summary judgment on St. Jude's two invalidity defenses. Also, the parties dispute the scope of damages that NLC is entitled to recover. In light of the Court's conclusion that St. Jude is entitled to summary judgment of non-infringement, the Court declines to address these alternative arguments.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1. Plaintiff Niazi Licensing Corporation's motion for summary judgment, (Dkt. 180), is **DENIED**.

2. Defendant St. Jude Medical S.C., Inc.'s motion for summary judgment, (Dkt. 184), is **GRANTED**.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: March 23, 2021

s/Wilhelmina M. Wright
Wilhelmina M. Wright
United States District Judge

# Exhibit A

US006638268B2

(12) **United States Patent**

Niazi

(10) Patent No.: **US 6,638,268 B2**
(45) Date of Patent: **Oct. 28, 2003**

(54) **CATHETER TO CANNULATE THE CORONARY SINUS**

(76) Inventor: **Imran K. Niazi**, 9080 Upper River Rd., River Hills, WI (US) 53217

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 150 days.

(21) Appl. No.: **09/828,502**

(22) Filed: **Apr. 6, 2001**

(65) **Prior Publication Data**

US 2001/0052345 A1 Dec. 20, 2001

**Related U.S. Application Data**

(60) Provisional application No. 60/195,701, filed on Apr. 7, 2000.

(51) Int. Cl.[7] ........................................... **A61M 25/098**
(52) U.S. Cl. ...................... **604/528**; 604/528; 604/523; 604/530; 604/164.01; 604/264; 604/96.01
(58) Field of Search ................................ 604/528, 523, 604/164.01, 530, 264, 266, 96.01, 93.01, 95.01

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,790,831 A | * | 12/1988 | Skrikiski | 604/282 |
| 4,886,506 A | * | 12/1989 | Lovgren et al. | 604/280 |
| 5,290,229 A | * | 3/1994 | Paskar | 604/95 |
| 5,336,182 A | * | 8/1994 | Lundquist et al. | 604/95 |
| 5,505,698 A | * | 4/1996 | Booth et al. | 604/96 |
| 5,584,803 A | * | 12/1996 | Stevens et al. | 604/4 |
| 5,643,231 A | | 7/1997 | Lurie et al. | 604/282 |
| 5,690,611 A | | 11/1997 | Swartz et al. | 604/53 |
| 5,782,741 A | | 7/1998 | Bradshaw et al. | 600/3 |

| | | | | |
|---|---|---|---|---|
| 5,785,706 A | | 7/1998 | Bednarek | 606/41 |
| 5,807,249 A | | 9/1998 | Qin et al. | 600/374 |
| 5,824,031 A | * | 10/1998 | Cookston et al. | 607/122 |
| 5,846,229 A | * | 12/1998 | Berg | 604/281 |
| 5,879,295 A | | 3/1999 | Li et al. | 600/373 |
| 5,916,214 A | | 6/1999 | Cosio et al. | 606/41 |
| 6,001,085 A | | 12/1999 | Lurie et al. | 604/282 |
| 6,002,955 A | | 12/1999 | Willems et al. | 600/374 |
| 6,006,137 A | * | 12/1999 | Williams | 607/119 |
| 6,022,341 A | * | 2/2000 | Lentz | 604/523 |
| 6,080,151 A | | 6/2000 | Swartz et al. | 606/45 |
| 6,090,084 A | | 7/2000 | Hassett et al. | 606/281 |
| 6,093,173 A | * | 7/2000 | Balceta et al. | 604/164 |
| 6,122,552 A | * | 9/2000 | Tockman et al. | 607/116 |
| 6,179,809 B1 | * | 1/2001 | Khairkhahan et al. | 604/95.01 |
| 6,228,052 B1 | * | 5/2001 | Pohndorf | 604/96.01 |
| 6,273,881 B1 | * | 8/2001 | Kiemeneij | 604/532 |
| 2002/0103474 A1 | * | 8/2002 | Voda | 604/530 |

* cited by examiner

*Primary Examiner*—Ira S. Lazarus
*Assistant Examiner*—Tu Cam Nguyen
(74) *Attorney, Agent, or Firm*—Philip G. Meyers

(57) **ABSTRACT**

A double catheter includes an outer, resilient catheter having shape memory and a hook-shaped distal end, an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, the inner catheter preferably having an internal lumen suitable for the introduction of contrast media, and a mechanism operable from the proximal end of the outer catheter for changing the curvature of the hook shaped distal end of the outer catheter. Such a catheter of the invention can cannulate the coronary sinus without significant manipulation.

**27 Claims, 5 Drawing Sheets**





*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*

*FIG. 5*

*FIG. 6*



*FIG. 7*

*FIG. 8*

US 6,638,268 B2

1

# CATHETER TO CANNULATE THE CORONARY SINUS

This application claims priority of U.S. Provisional Application No. 60/195,701, filed Apr. 7, 2000.

## FIELD OF THE INVENTION

This invention relates to medical devices, particularly to catheters of the type used to cannulate the coronary sinus.

## BACKGROUND OF THE INVENTION

The coronary sinus is a venous structure that is three to four centimeters in length and one centimeter in diameter. It forms a part of the venous drainage of the heart. The coronary sinus arises from the posterior inferior aspect of the right atrium and courses over the posterior surface of the heart, ending in the great cardiac vein. It is the final common venous drainage of most of the heart.

Cannulation of the coronary sinus has until recently not been considered important from a medical viewpoint. Medical researchers have cannulated the coronary sinus in animals and in humans to obtain information about the functioning of the heart. Cardiac surgeons will, during cardiac surgery, cannulate the coronary sinus for retrograde cardioplegia. However, routine cannulation of the coronary sinus is not performed when there is no therapeutic advantage to performing coronary sinus angiography.

It has recently become apparent that the coronary sinus and its branches can be used to place catheters (fine pacing catheters) on the epicardium of the left ventricle. The left ventricle can then be paced via these catheters. Preliminary studies show that pacing the left ventricle produces significant benefit in patients with heart failure, especially those with conduction disturbances. Therefore, studies are underway to study the coronary sinus anatomy and place the pacing catheters in the appropriate branch of the coronary sinus. Unlike for coronary arterial circulation, there are no presently available preformed catheters that will slip easily into the coronary sinus. U.S. Pat. No. 5,423,772 exemplifies one proposed device designed for use in the coronary sinus wherein the catheter has a double curve.

Congestive heart failure is one of the commonest diagnoses leading to hospital admission in the United States. There are 2 to 5 million patients diagnosed with CHF in the U.S. annually, and 15 million worldwide. Treatment of heart failure consists of medications, and cardiac transplantation in severe cases. Other forms of surgery, e.g. valve surgery, are also sometimes helpful. Attention has recently focused on resynchronization therapy. About 30–50% of people with severe CHF have asynchronous contraction of the cardiac chambers. This can be corrected by pacing the right atrium, the right ventricle and the left ventricle at optimal intervals to provide synchrony. Leads to pace the right atrium and right ventricle have been used for years. Recently, leads have been devised to pace the left ventricle by passing the lead through the coronary sinus into a branch vein that overlies the left ventricle. Delivery systems to guide the leads into the appropriate branch veins are now being researched.

Currently available catheters and catheter systems have several disadvantages which render lead delivery difficult. For example, the anatomy of the right atrium and the coronary sinus origin is different in patients with congestive heart failure than in patients with normal sized hearts. These differences in part form the basis for the design of the delivery system of the present invention. Such differences

2

include that the os of the coronary sinus lies higher in the right atrium in such persons than in normal persons. The eustachian ridge is unusually prominent, and the right atrium is usually larger than normal. Subeustachian fossae are more well developed in the large right atria. There is great variation in the size of the coronary sinus and its shape and direction, and the target coronary branch veins arise at acute angles from the main coronary sinus in many patients. This renders it difficult to pass a lead into these branches. Venous valves obstruct the passage of the lead. These are variably placed, frequently close to the origin of the coronary veins. The present invention provides a catheter especially adapted for use in the coronary sinus, especially in patients suffering from congestive heart failure.

## SUMMARY OF THE INVENTION

A double catheter according to one aspect of the invention includes an outer, resilient catheter having shape memory and a hook-shaped distal end configured for cannulation of the coronary sinus, an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, the inner catheter preferably having an internal lumen suitable for the introduction of a fluid, such as contrast media, into the coronary sinus and also for passage of a pacing lead, and a mechanism operable from the proximal end of the outer catheter for changing the curvature of the hook shaped distal end of the outer catheter. Such a catheter of the invention can cannulate the coronary sinus without significant manipulation, enable an angiogram of the coronary sinus by means of an occlusive balloon which includes the proximal coronary sinus at the time of contrast media injection, serve as a conduit for the passage of a fine coronary sinus pacing lead (5 French in diameter), provide backup support for introducing this lead over a guide wire into the distal branches, and minimize the steps necessary for the placement of a coronary sinus lead, thereby allowing rapid introduction of such a lead.

The invention further provides a method of using a catheter to place a pacing lead in a transverse branch of the coronary sinus in order to treat a related condition such as congestive heart failure. Such a method for placing an electrical lead in a lateral branch of a coronary sinus vein using a double catheter includes the steps of inserting the catheter into the coronary sinus, advancing a guide wire through the catheter into a coronary sinus lateral branch vein, advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein, inserting the lead through the outer and inner catheters to a target location in the branch vein, and withdrawing the catheter leaving the lead in the branch vein. If necessary, the curvature of the double catheter can be adjusted in order to enter the coronary sinus. These and other aspects of the invention are discussed in the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWING

In the accompanying drawing, wherein like numeral denote like elements:

FIG. 1 is a side view of a double catheter of the invention;

FIG. 2 is a side view of the outer catheter of FIG. 1;

FIG. 3 is a side view a second embodiment of a catheter according to the invention;

FIGS. 4 and 5 are diagrams illustrating preferred shapes for the outer guide and obturator of FIG. 3;

US 6,638,268 B2

3

FIG. **6** is a diagram illustrating an alternative inner catheter for use in the embodiment of FIG. **3**; and

FIGS. **7** and **8** are diagrams illustrating use of the catheter of FIG. **3** a method of introducing a pacing lead according to the invention.

## DESCRIPTION OF PREFERRED EMBODIMENTS

FIGS. **1** and **2** illustrate a double catheter **10** according to the invention having a typical length of 60 cm. An outer catheter **11** is made of a braided silastic or similar material to allow torque control and stiffness. An inner catheter **12**, which slides in and out of outer catheter **11**, is constructed of a more pliable, soft material such as silicone. The combination of outer and inner catheters **11**, **12** provides a number of advantages, including variability in the reach of the catheter, and outer catheter stiffness necessary for manipulation along with inner catheter softness, which permits safe cannulation of the coronary sinus and advancement of catheter **11** into the distal coronary sinus for purposes of support. It also allows the inner catheter **12** to conform to the torturous course of a coronary sinus.

Inner catheter **12** fits into lumen **15** of outer catheter **11**, and is preferably coated with a hydrophilic lubricious material which allows catheter **12** to slide in and out of outer catheter **11** with ease. A proximal end **13** of inner catheter **12** terminates in a hemostatic valve **14** having an adjustable diaphragm. Valve **14** prevents leakage of blood when a 5 French pacing lead is introduced through inner catheter **12** into the coronary system. Preferably, a distal end **16** of inner catheter **12** has a tip **17**, for example, about 1 cm long, made of a material softer than the remainder of inner catheter **12**. This may, for example, be accomplished by making tip **17** thinner than the remainder of catheter **12**, or by making a bilayered inner catheter **12** wherein the one layer extends further than the other to form the tip and optionally is made of a material softer than that of the other layer.

Outer catheter **11** has several functions. Because of its stiffness and torque, it can be manipulated in the right atrium to allow cannulation of the coronary sinus. Such stiffness also lends support to the pacing lead as it is introduced into the distal coronary system. A distal end **16** of inner catheter **11** has an external inflatable cuff or balloon **21**. Balloon **21** can be inflated by air by means of a syringe **22** connected to balloon **21** as described below. Inflation of balloon **21** allows occlusion of the proximal coronary sinus, which is necessary for obtaining a coronary sinus angiogram.

The proximal end of outer catheter **11** has several features. A port **26** including a shutoff valve **30** is provided for introduction of air into balloon **21**. This port **26** is connected by means of a passage **27** in the wall of catheter **11** with the distal balloon **21**. A torque coupling **28** of a type known in the art may be tightened down on inner catheter **12** to prevent it from moving within outer catheter **11**. A torque screw **29** is attached to a cable or wire **31** that runs in the wall of outer catheter **11** and may be wound over one or more small rounded corners or small pulleys **35** set in the wall of catheter **11**. This cable **31** is anchored, as by embedding a enlarged end thereof, at a point **34** close to a tip **32** of outer catheter **11**. Rotation of torque screw **29** causes cable **31** to be retracted, which changes the shape of the outer catheter **11** (making the hooked shape more pronounced as shown by the arrow) and counter-rotation does the opposite. Torque screw **29** may, for example, comprise a spool or reel having an external circumferential groove on which cable **31** is attached and is wound or unwound as

4

needed. A port **36** with an associated shutoff valve **37** is provided through the wall of outer catheter **11** for delivering a saline flush through lumen **15**.

For optimum deployment in the coronary sinus, inner and outer catheters **11**, **12** preferably have a predetermined shape and a certain degree of stiffness to maintain such shape during manipulation in the heart, but still flexible enough to bend when required. As shown in FIG. **2**, the hook-shaped distal end of outer catheter **11** may comprise substantially straight segments spanning three bends **41**, **42** and **43**. First bend **41** adjoining a straight, proximal portion **44** of outer catheter **11** is in the range of about 130° to 180°, especially 130° to 175°. Second, intermediate bend **42** extends in a direction opposite bend **41** and is in the range of about 75° to 100°. Third bend **43** near the distal end of outer catheter **11** extends in the same direction as bend **42** and is in the range of about 130° to 175°. These ranges refer to the angle formed by the straight segments adjacent each bend when the catheter is in an undistorted state. Operation of the deflection device to tighten the cable will reduce these angles, especially for second bend **42**. The material of which outer catheter **11** is made, e.g. silastic, has sufficient shape memory to return to its original shape when undistorted. The undistorted shape of outer catheter **11** can be varied and catheter **10** thereby made in several sizes to accommodate different heart sizes. For example, for a normal size atria with a prominent Eustachian valve, outer catheter **11** may be substantially J-shaped with no first bend (bend **41**=180°), whereas for large atria with a prominent Eustachian valve, it may be useful to make catheter **11** more in a question mark shape (shown inverted in FIGS. **1–2**).

Coronary sinus catheter **10** may be deployed in the following fashion. Distal balloon **21** is deflated, inner catheter **12** is withdrawn completely into outer catheter **11**, and catheter **10** is inserted through a venous sheath introduced in the left XX subclavian vein. It is guided into the right atrium over a guide wire, and the guide wire and sheath are then removed. Catheter **10** is rotated until tip **17** lies within the tricuspid valve, then advanced until tip **17** is seen to lie in the inferior-most portion of the tricuspid valve. If the reach of catheter **10** in this configuration is not sufficient to cannulate the tricuspid valve, then inner catheter **12** is advanced out of outer catheter **11** to make the entire system longer.

Subsequent manipulation is carried out in a left anterior fluoroscopic view. Counterclockwise torque is exerted on catheter **10**. At the same time, inner catheter **12** is gradually withdrawn. Eventually, catheter **10** slips over the inguinal annulus and, because of the counterclockwise torque, twists and pops into the proximal coronary sinus. In some instances, it may come to lie at the mouth of the proximal coronary sinus. In that case, inner catheter **12** is gradually advanced until the coronary sinus is cannulated. Once the coronary sinus is cannulated, inner catheter **12** is advanced as far as it will go into the coronary sinus and/or great cardiac vein. Distal balloon **21** on outer catheter **11** is inflated using syringe **22** to occlude the proximal coronary sinus. Contrast medium is injected via a port **25** through the lumen of inner catheter **12** to obtain a coronary sinus angiogram. Port **36** is then hooked up to a saline flush. A coronary sinus lead is introduced through a hemostasis valve **14** into inner catheter **12**. It is positioned using a guide wire in an appropriate branch of the coronary sinus.

A triple catheter **50** according to the invention is designed to overcome the obstacles described above that are encountered with congestive heart failure patients and further provide a more economical catheter system that does not rely on specialized miniature adjustment mechanisms. The

US 6,638,268 B2

5

system includes an outer guide catheter 51, an inner guide catheter 52 nested therein, an obturator 53 nested inside the inner guide 52. In one example, outer guiding catheter 51 is 2.9 mm in outer diameter, 2.6 mm inner diameter. It is relatively stiff and has a braided design, which lends support and one-for-one torque control. In this respect, it can resemble an angioplasty guiding catheter. The shape of outer guiding catheter 51 is similar, but not identical, to a left amplatz curve. The proximal end terminates in an screw-adjusted hemostatic valve 56, to allow introduction of leads or wires of different diameters without leakage of blood. There is also a side-port 58, preferably with a 3-way valve, to allow injection of contrast medium and saline.

Inner guiding catheter 52 made of a soft, pliable material such as silicone, and in this example is 2.6 mm in outer diameter and 2.3 mm in inner diameter. It has no longitudinal braiding, which makes it extremely flexible and able to conform to various shapes. Inner catheter 52 is designed to advance over a guide wire into a side branch of the coronary sinus, in conjunction with the obturator 53. Its flexibility allows it to negotiate tortuous vessels and side branches that originate from the coronary sinus at an acute angle, yet it still possesses the radial strength needed to prevent it from collapsing when obturator 53 is withdrawn. Inner guide 52 is longer than outer guide 51, e.g., 68 cm in length. The proximal end of guide 52 has a hemostasis valve 57 to prevent back bleeding and a side port 59 to permit contrast medium injection.

Obturator 53 is preferably made of very pliable silicone, and has a central lumen that will accommodate an 0.038 inch guide wire. Obturator 53 fits into inner guide 52, and in one embodiment is 70 mm long, 2.1 mm in outer diameter tapering to 1.25 mm diameter at its tip. In use, obturator 53 tracks over a 0.038" guide wire 81 into a targeted side branch 56, in concert with the inner guide catheter 52. A tapered tip 71 of obturator 53 may protrude from the front end opening of inner catheter 52. Without such a protruding tip 71, the edge of inner catheter 52 might catch on venous valves or sharp angles. The terminal 7 mm of obturator 53 may have a bend 72 therein of up to about 30 degrees, i.e., defining an angle from 150–180 degrees. This allows tip 71 to function as a guiding device for the 0.038" guide wire 81, which can then be directed into acutely angled side branches. The proximal end of obturator 53 terminates in a standard port 60 allowing attachment of a 10 cc syringe.

Referring to FIGS. 7 and 8, outer guiding catheter 51 is initially connected to a syringe and pressure monitoring system and then inserted into the right atrium 80. The physician attempts to use it to cannulate the coronary sinus without the use of the other components. If this succeeds, an 0.038" hydrophillic-coated guide wire 81 is advanced through it, and used to cannulate the target lateral coronary sinus side-branch 56. (If the side branch 56 cannot be easily cannulated, the angled obturator 53 can be extended and used to direct the guide wire 81 as illustrated in FIG. 7.) The inner guide 52, with obturator 53 inside, is then passed through outer guide 52 over the 0.038" wire into the target side branch 56. Obturator 53 is then withdrawn, and an electrical lead 83 is then advanced through the catheter over a 0.014" guide wire 82 to its final resting place in the target branch 56, and ultimately connected to a pacemaker after the catheter is withdrawn in order to apply electrical heart stimulation to that location. Guide wire 82 is only used if needed; it may be possible to place lead 83 without it.

An advantage of this three-part system is that it allows a standard lead (not an over-the-wire design) to be positioned in a transverse branch 56 which has a relatively sharp

6

angulation at its origin from the main coronary sinus. Although not deflectable using an screw adjustment mechanism as described above in connection with the first embodiment, this embodiment can nevertheless be used to cannulate the coronary sinus whether the latter is placed normally, higher than normal, or lower than normal. The angle of outer guide 51 can be changed by inserting or withdrawing the inner guide 52. Inserting inner guide 52 without obturator 53 before cannulation straightens outer guide 51, i.e., makes the angle of the outer guide 51 shallower, allowing engagement of a lower origin of the coronary sinus. Inserting both obturator 53 and inner guide 52 makes the outer guide angle even shallower. Thus, the outer guide alone, the outer guide plus inner guide, and outer guide plus inner guide plus obturator can be used as needed to cannulate coronary sinuses of varying heights of origin.

This three-part telescoping embodiment thus eliminates the need for a cable system to change the curvature of the catheter during manipulation As shown in FIG. 4, outer guide catheter 51 preferably has three bends in a manner similar to outer catheter 11, with the first or proximal bend 61 ranging from about 150–180 degrees, the second (middle) bend 62 ranging from about 120–180 degrees, and the third proximal bend from 90 to 160 degrees in a direction opposite to that of the other two bends, as shown. Inner guide catheter 51 preferably has three bends in a manner similar to the outer catheter 11, with the first or proximal bend 61 ranging from about 150–180 degrees, the second (middle) bend 62 ranging from about 120–180 degrees, and the third proximal bend 63 from 90 to 160 degrees in a direction opposite to that of the other two bends, as shown. In one preferred form, outer guide 51 is 9 French diameter, 60 cm length, inner guide 52 is made of a soft material 8 French diameter, 68 cm length, and obturator 53 is 5 French diameter, 75 cm length.

Referring to FIG. 5, obturator 53 stiffens and shapes inner guide 52 when inside of it. It may be pre-formed with a right angle bend 54 as shown to conform more easily to the shape of outer guide 51, but this is not essential. However, tip 71 of obturator is 53 bent to an angle in the range of about 150–180 degrees to better aid in introducing a lead into a transverse vein as described above. Obturator 53 preferably tapers to a blunt point having a small opening therein just large enough to admit the largest size guide wire to be used in the procedure, in this example, 0.038 inch.

In an alternative version of catheter 50, the radial strength of the inner guide or catheter 52 prevents its collapse when obturator 53 is withdrawn. For this purpose, as shown in FIG. 6, a bend 56 in inner guide 52 is reinforced with a helical wire coil 55 that is embedded therein, or a series of spaced wire rings or hoops. These hoop reinforcements prevent inner guide 52 from collapsing during withdrawal of obturator 53 but do not prevent inner guide 52 from bending in a flexible manner.

The claims which follow define certain aspects of the invention but do not limit the invention. It will be evident, for example, that a catheter according to the invention can be used to reach other hard to access parts of the human body, both in the heart and elsewhere, due to its unique structure.

What is claimed is:

1. A double catheter, comprising:

an outer, resilient catheter having shape memory and a hook shaped distal end configured for cannulation of the coronary sinus with at least one curved bend;

an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so

US 6,638,268 B2

7

8

that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, the inner catheter having an internal lumen configured for the introduction of contrast media and a pacing lead into the coronary sinus; and

a mechanism operable from the proximal end of the outer catheter for changing the curvature of the distal end of the outer catheter.

**2**. The double catheter of claim **1**, wherein the mechanism for changing the curvature of the hook shaped distal end further comprises an obturator slidably disposed inside of the inner catheter, wherein the obturator is configured to reduce the curvature of the hook shaped distal end when inserted in the inner catheter.

**3**. The double catheter of claim **1**, further comprising a balloon mounted on the outside of the distal end of the outer catheter positioned for occlusion of the proximal coronary sinus, and a conduit permitting inflation of the balloon at the proximal end of the outer catheter.

**4**. A double catheter, comprising:

an outer, resilient catheter having shape memory and a hook-shaped distal end with at least one curved bend;

an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, the inner catheter having an internal lumen suitable for the introduction of a fluid therethrough; and

a mechanism operable from the proximal end of the outer catheter for changing the curvature of the distal end of the outer catheter, wherein the mechanism for changing the curvature of the hook shaped distal end comprises a cable anchored to the outer catheter at a point proximate the distal end of the outer catheter and at a point proximate the proximal end of the outer catheter, whereby shortening of the cable from the point proximate the proximal end of the outer catheter results in increased curvature of the hook shaped distal end.

**5**. The double catheter of claim **4**, wherein the cable runs inside a wall of the outer catheter.

**6**. The double catheter of claim **1**, further comprising a mechanism operable from a proximal end of the outer catheter for securing the inner catheter against sliding movement relative to the outer catheter.

**7**. The double catheter of claim **6**, further comprising a port for introducing a fluid into a space between the inner and outer catheters.

**8**. The double catheter of claim **1**, wherein the hook-shaped distal end comprises substantially straight segments spanning three bends.

**9**. The double catheter of claim **8**, wherein a first bend adjoining a straight, proximal portion of the outer catheter is in the range of 130° to 175°, a second, intermediate bend is in the range of 75° to 100°, and a third bend nearest the distal end of the outer catheter is in the range of to 130° to 175°.

**10**. The double catheter of claim **1**, wherein the mechanism for changing the curvature of the hook shaped distal end comprises a portion of the inner catheter configured to reduce the curvature of the hook shaped distal end when inserted in the outer catheter.

**11**. A method for placing an electrical lead in a lateral branch of a coronary sinus vein using a double catheter including an outer catheter and an inner catheter slidably disposed inside the outer catheter, comprising:

inserting the catheter into the coronary sinus;

advancing a guide wire through the catheter into a coronary sinus lateral branch vein;

advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;

inserting the lead through the outer and inner catheters to a target location in the branch vein; and

withdrawing the catheter leaving the lead in the branch vein.

**12**. The method of claim **11**, further comprising:

adjusting the curvature of the double catheter in order to enter the coronary sinus.

**13**. An outer catheter configured for use with an inner, pliable catheter which can be slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter, the outer catheter comprising a resilient tube having shape memory and sufficient stiffness to permit advancement of the outer catheter into a distal coronary sinus, and having a hook-shaped distal end wherein a first bend adjoining a straight, proximal portion of the outer catheter is in the range of 130° to 180°, a second, intermediate bend is in the range of 75° to 100° in a direction opposite the first bend, and a third bend nearest the distal end of the outer catheter in the same direction as the second bend is in the range of to 130° to 175°.

**14**. The catheter of claim **13**, wherein the first bend equals 180°, rendering the outer catheter substantially J-shaped.

**15**. The catheter of claim **13**, wherein the first bend is in the range of 130–175°, rendering the outer catheter substantially question mark-shaped.

**16**. The catheter of claim **13**, wherein the outer catheter is made of a braided silastic.

**17**. The catheter of claim **13**, wherein the outer catheter further comprises:

an external inflatable cuff near the distal end of the outer catheter; and

means for inflation of the cuff sufficient to permit occlusion of the proximal coronary sinus.

**18**. A double catheter, comprising:

an outer catheter comprising a resilient tube having shape memory and sufficient stiffness to permit advancement of the outer catheter into a distal coronary sinus, and having a hook-shaped distal end wherein a first bend adjoining a straight, proximal portion of the outer catheter is in the range of 130° to 180°, a second, intermediate bend is in the range of 75° to 100° in a direction opposite the first bend, and a third bend nearest the distal end of the outer catheter in the same direction as the second bend is in the range of to 130° to 175°, and

an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, wherein the inner catheter has an internal lumen suitable for the introduction of a fluid therethrough and a hemostatic valve at a proximal end thereof that prevents leakage of blood when a pacing lead is introduced through the inner catheter into the coronary system.

**19**. The double catheter of claim **18**, wherein the first bend equals 180°, rendering the outer catheter substantially J-shaped.

US 6,638,268 B2

9                                                          10

**20**. The double catheter of claim **18**, wherein the first bend is in the range of 130–175°, rendering the outer catheter substantially question mark-shaped.

**21**. The double catheter of claim **18**, wherein the outer catheter is made of a braided silastic.

**22**. The double catheter of claim **18**, wherein the outer catheter further comprises:

an external inflatable cuff near the distal end of the outer catheter; and

means for inflation of the cuff sufficient to permit occlusion of the proximal coronary sinus.

**23**. The double catheter of claim **18**, further comprising a mechanism operable from a proximal end of the outer catheter for changing the curvature of the distal end of the outer catheter.

**24**. A method for placing a electrical lead in a lateral branch of a coronary sinus vein using a double catheter including an outer catheter comprising a resilient tube having shape memory and sufficient stiffness to permit advancement of the outer catheter into a distal coronary sinus, and having a hook-shaped distal end, and an inner, pliable catheter slidably disposed in the outer catheter and of greater length than the outer catheter so that a distal end portion of the inner catheter can be extended or retracted from a distal end opening of the outer catheter to vary the overall length of the double catheter, the method comprising:

inserting the catheter into the coronary sinus;

advancing a guide wire through the catheter into a coronary sinus lateral branch vein;

advancing the inner catheter out of a front end opening of the outer catheter along the guide wire into the branch vein;

inserting the lead through the outer and inner catheters to a target location in the branch vein; and

withdrawing the catheter leaving the lead in the branch vein.

**25**. The method of claim **24**, wherein a first bend adjoining a straight, proximal portion of the outer catheter is in the range of 130° to 180°, a second, intermediate bend is in the range of 75° to 100° in a direction opposite the first bend, and a third bend nearest the distal end of the outer catheter in the same direction as the second bend is in the range of to 130° to 175°.

**26**. The method of claim **25**, wherein the first bend equals 180°, rendering the outer catheter substantially J-shaped.

**27**. The method of claim **25**, wherein the first bend is in the range of 130–175°, rendering the outer catheter substantially question mark-shaped.

\* \* \* \* \*

**<u>Certificate of Compliance with Rule 32(a)</u>**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X]    this brief contains 12,891 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman size 14 font.

Date:  June 21, 2021           /s/ Michael T. Griggs
                             Michael T. Griggs
                             Adam L. Brookman
                             Timothy E. Newholm
                             Marriam Lin
                             Boyle Fredrickson, S.C.
                             840 N. Plankinton Avenue
                             Milwaukee, WI 53203
                             (414) 225-9755

                             Attorneys for Plaintiff-Appellant
                             Niazi Licensing Corporation